UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CUSTOM HARDWARE ENGINEERING            )
& CONSULTING, INC.,                    )
                                       )
                                       )
        Plaintiff/Counterclaim-Defendant,  )
                                       )
    vs.                                )          Case No. 4:10CV000653 ERW
                                       )
JONATHAN D. DOWELL, *et al*.,          )
                                       )
                                       )
        Defendants/Counterclaim-Plaintiffs.  )

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment on
All Counts of Plaintiff's Second Amended Complaint [ECF No. 288], Plaintiff Custom
Hardware Engineering & Consulting, Inc.'s ("CHE") Motion for Summary Judgment as to
Counts III through VI of CHE's Second Amended Complaint [ECF No. 302], and CHE's Motion
to Strike Declaration of John Dowell [ECF No. 330].

CHE filed its Second Amended Complaint ("SAC") for Injunctive Relief and Damages
against Defendants Jonathan D. Dowell, Marcus K. Smith, Laura Smith, William Pilling, and
TriPoint Development, Inc. ("TriPoint"), alleging the following causes of action: 1) Copyright
Infringement (against all Defendants); 2) Violation of Federal Fraud and Abuse Act (against all
Defendants); 3) Breach of Contract (against Dowell, Marcus Smith, and Laura Smith); 4) Breach
of Contract (against Pilling); 5) Breach of Fiduciary Duty and Duty of Loyalty (against Dowell,
Marcus Smith, Laura Smith and Pilling); 6) Tortious Interference with Contract (against
TriPoint); 7) Misappropriation of Trade Secrets (against all Defendants); 8) Unfair Competition
(against all Defendants); 9) Civil Conspiracy (against all Defendants); 10) Replevin (against all

Defendants); 11) Conversion (against all Defendants); and 12) Unjust Enrichment (against all Defendants).

Defendants filed several counterclaims in this matter, naming CHE and David York as Counterclaim-Defendants [ECF Nos. 58, 59, 60, 61, 167, 169].  Laura Smith and Third Party Plaintiff Linda Pilling filed Third Party Complaints against CHE and York [ECF No. 62, 63, 167, 169].

## I.      STATEMENT OF UNDISPUTED FACTS

The following fact statement is a recitation of undisputed facts taken from Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 147], Defendants' Joint Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 154], Defendants' Statement of Uncontroverted Material Facts [ECF No. 291], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Response to Defendants' Statement of Uncontroverted Material Facts [ECF No. 314-1], Defendants' Reply to Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts and Statement of Additional Facts [ECF No. 325-1], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF 304-1], Defendants' Response to Plaintiff's Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 319], Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V, and VI of Its Second Amended Complaint [ECF NO. 319-1], and Plaintiff's Response to Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's

Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 337-1].

CHE is a Delaware corporation with its principal place of business in Fenton, Missouri. CHE's President and Chief Executive Officer is David York.   In addition to its Fenton office employees, CHE has employees working from home across thirty-seven states.  In the course of its business, CHE provides, among other things, computer hardware maintenance services on IBM, STK, EMC, HP, Sun Microsystems, HDS, Spectrologix, Quantum, and several other computer systems.  As part of the hardware services that it provides, CHE has developed and fielded remote monitoring technology that allows CHE personnel to monitor and troubleshoot computer systems remotely.  CHE provides its services to commercial and government entities in all parts of the United States, including Missouri and Texas.  Some of CHE's customers are Mainline, IBM, Service Express, Sentinel, SSCS, MVSS, Telestra, Bank of America, Fannie Mae, and the State of California.

Defendants Dowell, Marcus Smith, and Laura Smith are residents of McKinney, Texas. Defendant Pilling is a resident of Tucson, Arizona.  Defendant TriPoint is a Texas corporation with its principle place of business in McKinney, Texas.  CHE employed Piling as a Software Engineer in April 2003, and Dowell as a Systems Analyst in June 2005.  In 2007, Dowell told Marcus Smith about an employment opportunity with CHE, and Marcus Smith applied for the position.  CHE hired Marcus Smith as a Director of Security and Information Systems in March 2007, and it employed his wife, Laura Smith, as a Software Quality Assurance Specialist in the spring of 2008.  Marcus Smith, Laura Smith,  Dowell, and Pilling signed Employment

Agreements with CHE.  The agreements[1] executed by Dowell, Marcus Smith, and Laura Smith

contain non-waiver clauses, stating that no modification, amendment or waiver of the

agreements' provisions would be effective unless made in writing, and further provide, in part:

> 3. Faithful Performance  Employee acknowledges that he [or she] is employed by
> CHE in a fiduciary relationship of trust and confidence and therefore agrees to
> devote his or her full time and attention to the business and affairs of CHE and, at
> all time, to use his [or her] best efforts to promote the interests of CHE and to
> faithfully and efficiently perform the responsibilities assigned to him [or her] to
> the fullest extent necessary to discharge such responsibilities.  Further, Employee
> agrees that during his [or her] employment, he [or she] will not accept
> employment of any nature, including self employment, for which remuneration is
> received unless said employment is recognized, agreed to and approved in writing
> by CHE in its sole discretion prior to such other employment or association.
> Employee also agrees he [or she] shall have no financial or other interest in any
> business entity which detracts from, or interferes with, Employee devoting his [or
> her] full time and attention to CHE's business without the prior, written
> permission of CHE in its sole discretion.[2]

Pilling's Employment Agreement with CHE also included a nonwaiver clause [ECF No.

304-5].  Section 2 of Pilling's agreement provided, in part:

> [E]mployee will devote Employee's full time and attention to the business of, and
> work exclusively for CHE unless otherwise agreed to by CHE's President, and
> shall not work for or assist any competitor of CHE or have any discussions with
> another person or business about engaging in any activity in competition with
> CHE.

CHE issued computers and other equipment to Dowell, Marcus Smith, and Laura Smith

as part of their employment.  These defendants were contractually obligated, by the terms of their

employment agreements, to return all CHE property upon termination:

---

[1]The language in the agreements signed by Marcus Smith and Laura Smith differ slightly
from the language contained in the agreement by Dowell, in that the Smith Employment
Agreements use the pronouns "he or she" to refer to the Employee, whereas the language in
Dowell's uses only the masculine pronoun for the reference [ECF Nos. 304-8, 304-11, 296-4].

[2]The Court notes that CHE has indicated that this language is contained in Section 1 of
the agreements; however, the quoted language is actually contained in Section 3.

4

4.6.  Return of Company Property.  Employee acknowledges that all written records, databases, source code, CDs, DVDs, and disks containing information relating to CHE's business, including, without limitation, memoranda, notes, correspondence, reports, manuals, books, papers, letters, Client profile data, orders, customer lists, contracts, software programs, drafts, and other documentation (whether in draft or final form), and other sales, financial or technical information relating to CHE's business, and any and all other documents containing Company Information furnished to Employee by any representative of CHE or otherwise acquired or developed by him [or her] in connection with his [or her] association with CHE (collectively, "Recipient Materials") shall at all times be CHE's exclusive property.  Within twenty-four (24) hours of termination of his [or her] employment, Employee promises to return any Recipient Materials that are in his [or her] possession, custody or control, regardless of whether such Materials are located in Employee's office or automobile, or on Employee's office, home or personal computer. . . .  Additionally, within twenty-four (24) hours of the termination of his [or her] employment, Employee . . . shall disclose any and all passwords or codes required to gain access to such devices.

Pilling's "Employee Confidentiality and Non-Competition Agreement" with CHE provided that, upon his termination , "and at any time or times before then when requested by CHE," Pilling would "return to CHE, and shall not retain, all CHE property and all documents, computer disks, and other electronic storage media containing or embodying any Confidential Information, and shall destroy or erase all such information from all non-CHE owned information systems and electronic media storage disks (but first shall make a copy of the same and deliver it to CHE)."  The agreement also stated that, because compliance with this provision might require data to be removed from Pilling's personal or home computer equipment, Pilling granted CHE or its contractors access to such equipment for that purpose.

During the course of their employment with CHE, Defendants were provided access to CHE's trade secrets and confidential proprietary information, including copyrighted computer programs identified as E-PET, E-LEM, and ERDS.  CHE's intellectual property also includes the source code for E-LEM, E-PET 1.9, E-PET 4.0, FED-AA, SAM, ARG, ERDS, SERPA, Blue Bayou, TDT, DDT, and CHE's MySQL database structure.  E-LEM, E-PET1.9, E-PET 4.0,

SERPA and Blue Bayou are remote monitoring tools. DDT is used in conjunction with E-PET 1.9, and TDT is used in conjunction with E-LEM. The SAM (Service Account Manager) program is utilized to monitor employee activity.

In Section 3 of his "Employee Confidentiality and Non-Competition Agreement," Pilling agreed to never "publicize, or disclose or reveal to any third party not employed or engaged by CHE any Confidential Information," and to "never use (or attempt to recreate by memory or otherwise) any Confidential Information except for CHE's benefit" during Pilling's period of employment with CHE. Dowell's, Mr. Smith's, and Mrs. Smith's Employment Agreements limited their use of CHE information as follows:

> 4.2.2. Employee agrees not to, directly or indirectly; participate in the unauthorized use, disclosure, or conversion of any Company Information. Employee agrees not to use Company Information for the benefit of a competitor or in any other way that harms CHE or diminishes the value of Company Information.

As Director of Security and Information Systems, Marcus Smith was responsible for the day-to-day operations of CHE's current and future network systems. His duties and responsibilities included developing a company network equipment design requirements document for business systems' enhancement; developing a collocation network strategy and implementation plan; and developing a company network security strategy that would insure high availability to CHE team members but, at the same time, lock out competitors and other unwanted network attacks. He was also in charge of implementing proper software testing procedures for programs developed by company software personnel; supervising, as a senior developer, the software coders, the design of the code; and supervising other company network personnel and resources. Within three months of his hire, Marcus Smith became the direct supervisor of Pilling, Dowell, and an employee named Terry Neckar.

In late May 2008, Pilling, Dowell, and Marcus Smith decided to form an entity they would call "TriPoint Development."  TriPoint, a "custom solutions and consulting" information technology firm, was formed in June 2008, by Dowell, Marcus Smith, Pilling, and Linda Pilling. Marcus Smith and William Pilling owned two-thirds of TriPoint's shares.  Defendants operated Tri-Point, serviced TriPoint customers, invoiced its customers, and collected revenue on its behalf during the time period between July 2008 and February 20, 2009.  Defendants were employed by CHE at all times between July 2008 and February 20, 2009.  After leaving CHE on February 20, 2009, Defendants continued to operate and perform work for TriPoint.  According to information displayed on its company website, TriPoint specializes in the design and implementation of Great Plains and other Microsoft development applications;  provides in-house solutions developed to meet the student tracking and administrative needs of the educational market; and develops, through its Remote Systems Group, custom solutions around mainframe tape and disk storage systems.  One of TriPoint's computer programs, "CIT" captures customer information and allows incoming phone calls to be tracked by the customer's caller ID and to be logged into a database.

TriPoint provided services as a subcontractor for Matrix while Defendants were still employed at CHE.  In its relationship with Matrix, TriPoint performed work for several companies with Texas locations, including Pioneer, Pinnacle Anesthesia, Rapp Collins Consulting, Trintech, Independent Banker's Bank, and Enfora.  TriPoint also performed some business as a subcontractor through a company called the Harbor Group.  Defendants did not have written permission to perform side work while employed by CHE, and Defendants did not inform CHE of TriPoint's existence, or that they were providing services to TriPoint.

On October 1, 2008, David York sent an e-mail to Marcus Smith, in which York described several issues that had not been accomplished by Marcus Smith and his team, and warned, "Either you and every member of your team get your selves organized, communicating effectively and producing functional deliverables or I will take actions to find replacement personnel who can do precisely that" [ECF No. 314-8 at 1-2].  In this e-mail, York detailed numerous issues existing within Marcus Smith's department and with his teams, including the team's failure to communicate, follow-up, and keep CHE's systems running.   York also stated, "I requested on or about August 19, 2008 a total systems design paper with logins and passwords. I get an e-mail that basically says nothing nor demonstrates anything in that regard" [ECF No. 314-8 at 1].

CHE uses a program called Star Team to store and maintain its source code [ECF No. 325-1 at 40].  While employed at CHE, Defendants began using a program called Groove to store CHE's source code [ECF No. 325-1 at 40].

On February 20, 2009, David York notified Defendants and others that a mandatory meeting had been scheduled for that afternoon [ECF No. 314-20 at 1-2].  The mandatory meeting resulted from ongoing issues, many of which were outlined in York's October 1, 2008 e-mail to Marcus Smith.  York's February 20th e-mail included an agenda for the conference call, and advised the recipients that they were going to address problems happening with various tools provided by CHE.

Prior to the mandatory meeting, Pilling had a conference call with Dowell and the Smiths. Approximately one hour after receiving the e-mail calling a mandatory meeting, Pilling sent an e-mail telling York he was resigning.  Subsequently, the other defendants, and Laura Smith, sent similar e-mail communications.  All of the individual defendants attempted to resign from CHE

on or about February 20, 2009.  However, York rejected their resignations, and terminated them on that date.  Following their terminations, Defendants continued to operate and perform work for TriPoint.

Defendants eventually returned CHE property, including the computers they used to perform their job duties with CHE.  Pilling returned his personal computer and CHE equipment after CHE compensated him for it.  Upon inspection, CHE was unable to find any of its source code on Dowell's, Pilling's, Marcus Smith's, or Laura Smith's computers.  CHE has remained unable to locate its source code [ECF No. 325-1 at 8-9, 40-41].

CHE initiated this litigation on April 20, 2010 [ECF No. 1].  During the course of discovery, Defendants were instructed, by Court Order, to protect electronically stored information [ECF Nos. 12-15].  Defendants were also directed to turn computers within their possession over to forensic-imaging experts for examination.  On April 30, 2010, mere hours before he turned over his computer for imaging, Pilling installed Eraser 6, a data-wiping software, on his computer [ECF No. 291-21].  Eraser 6 makes it impossible to determine what files have been on a computer and what the file's contents had been. [ECF No. 325-1 at 39].

## II.    SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56(c) provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment will not lie if a genuine dispute about a material fact is shown; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In ruling on a motion for summary judgment, the Court may not make credibility determinations, weigh the evidence, or draw inferences from the facts.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

 To satisfy his initial responsibility, the movant must inform the court of the basis for his motion and must identify those portions of the record that he believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 1042.  Once the moving party has discharged the requisite evidentiary burden, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial."  *Id.*  (citations omitted).  If the nonmovant fails to produce such evidence, summary judgment in favor of the moving party is proper.  *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## III.    DISCUSSION

### 1.    Count I: Copyright Infringement

In Count I of its SAC, CHE alleges that it owns valid and enforceable copyrights of the E-LEM (Enhance Library Event Manager), E-PET (Enhanced Peripheral Exercise Tool) and ERDS (Error Reporting Data System) software programs, and that these programs are creative works of original authorship by CHE [ECF No. 147 at 18-21].  CHE further alleges that Defendants violated its exclusive rights by retaining the source code to these software programs, misappropriating and utilizing the material for TriPoint's benefit; by copying, creating derivative works, and utilizing CHE's software and source codes to offer identical services to Defendants'

10

customers, in violation of 17 U.S.C. § 106; and by controlling, directing, inducing or materially contributing to the copying, distribution, public display or creation of derivative works from CHE's copyrighted materials.

To prevail on a claim of copyright infringement, CHE must show: 1) show ownership of the allegedly infringed material; and 2) must demonstrate that the alleged infringers copied the original elements of its work.  *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 962-63 (8th Cir. 2005).  In the absence of direct evidence of copying, the copyright owner may establish this element by proving 1) the alleged infringer had access to the copyrighted material; and 2) the existence of substantial similarity between the alleged infringing material and the copyrighted material.  *Id.* at 964.  The Eighth Circuit applies a two-step analysis to determine substantial similarity.  *Id*. at 966.  First, the Court extrinsically analyzes similarity of ideas, focusing on objective similarities in the details of the works.  *Id.*  If substantial similarity in ides are found, the Court then intrinsically evaluates similarity of expression, a test depending on the response of the ordinary, reasonable person to the forms of expression.  *Id.*

Defendants do not challenge CHE's ownership of the intellectual property [ECF No. 291 at 3, ¶¶ 14-20].   In their motion, Defendants argue that they should be granted summary judgment on CHE's copyright infringement claim because "there is no evidence CHE's rights were violated because TriPoint did not copy or create derivative works of CHE's copyrighted programs."  Therefore, only the copying element of the claim is at issue.

The record, as is often the case when unauthorized duplication occurs, does not contain direct evidence of copying; however, CHE can prove copying by showing that Defendants had access to CHE's copyrighted programs and that Defendants' work is substantially similar to the protected work.  *See id.* at 964; *Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 276-

11

77.  It is undisputed that Defendants had access to CHE's copyrighted material, including the source and object codes for the copyrighted computer programs.  Defendants assert that, although CHE examined the computers used by Defendants during their employment with CHE, their personal computers used after their employment, and all of TriPoint's source code, CHE's examination did not yield any evidence of similarities between TriPoint's programs and CHE's copyrighted materials.

In its Response in Opposition to Defendants' Motion [ECF No. 314], CHE claims that it has been unable to discover relevant evidence as a result of Defendant Pilling's use of a data wiping software program, Eraser 6, on his computer.  CHE states that Pilling's usage of the program deleted files from his computer, replaced file names with random information, and left Plaintiff unable to determine the contents of Pilling's hard drive when the computer was turned over during discovery to forensic imaging experts for mirror-imaging.  CHE asserts that a grant of summary judgment would be premature because it would deny it the opportunity to present evidence related to Pilling's use of Eraser 6 to destroy evidence.  CHE further argues that, notwithstanding the destruction of relevant evidence, facts in evidence demonstrate that Defendants are in possession of CHE's copyrighted materials.  Among other things, they assert that Defendants' website demonstrates Defendants were in possession of and were prepared to use CHE's source code, as they initially solicited work identical to that performed by CHE, and Defendant would be unable to perform such services without CHE's source code.

A computer program, for purposes of the federal Copyright Act, is defined as a "set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. § 101.  A computer program's "source code" is the program as initially written in the programming language being used.  The source code must be changed into "object

code" before the computer can execute its instructions.  *See Microsoft Corp. v. AT&T Corp.*, 550

U.S. 437, 448 n. 8 (2007); *Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1013 (8th Cir. 2006).

 The Court agrees with CHE that Defendants' Motion for Summary Judgment as to

Count I is premature, and that a grant of judgment in Defendants' favor would be neither

warranted, nor equitable.  The record demonstrates that there is a genuine dispute as to several

material facts pertaining to the similarities between CHE's copyrighted material and TriPoint's

work.  As stated, inspection of the defendants' computers did not reveal any of CHE's source

codes on their hard drives.  However, the record shows the "certain result" that the instructions in

CHE's copyrighted materials bring about, when used in a computer, includes, among other

things, remote monitoring of mainframe tape and disk devices that allows CHE personnel to

monitor and troubleshoot computer systems remotely.  The record also establishes that TriPoint,

through its website, was offering this service to potential customers [ECF Nos. 304-1 at 8, 304-

14, 319 at 15-17].  As well, CHE presented unrefuted evidence that one of TriPoint's programs

captures customer information and generates time stamps, work orders, and timekeeping

information in a manner very similar to CHE's SAM (Site Account Manager) program [ECF No.

291-1 at 13-14].

 Moreover, a grant of summary judgment in favor of Defendants would have the

undesirable and inequitable effect of rewarding Defendants for the alleged destruction of

evidence caused by Pilling's installation and use of Eraser 6 on his computer prior to turning it

over for forensic imaging.  On December 15, 2011, the Court entered an Order in which it

considered, among other motions, CHE's Rule 37 Motion for Sanctions against Defendants

William Pilling and Tri-Point Development, Inc. [ECF No. 228].  In its Motion, CHE claimed

that the parties' jointly selected forensic imaging specialist had determined that Pilling had

13

installed and ran Eraser 6 on his computers.  CHE contended that Pilling intentionally destroyed

evidence by installing and running the data-wiping program on his computers, making it

impossible to complete discovery.  Although the Court denied CHE's Motion for Sanctions, it

stated that the jury would "be permitted to hear evidence of Pilling's use of the Eraser program,

his removal of the Eraser program from his computer(s), and his alleged use of the Eraser

program(s) to delete files on his computer."  The Court additionally stated that it would decide,

"at the time of submission of the evidence to the jury, whether an adverse jury instruction is

appropriate" [ECF No. 228 at 3].   When a nonmovant shows by affidavit or declaration that, for

specified reasons, it cannot present facts essential to justify its opposition, the Court may: 1)

defer considering the motion or deny it; 2) allow time to obtain affidavits or declarations or to

take discovery; or 3) issue any other appropriate order.  Fed. R. Civ. P. 56(d).  Accordingly,

Defendants' Motion, as to Count I, Copyright Infringement, will be denied.

### 2. **Count II: Violation of Federal Computer Fraud and Abuse Act (CFAA)**

In its SAC, CHE alleges that Defendants violated the Federal Computer Fraud and Abuse

Act ("CFAA") "by intentionally accessing a computer used for interstate commerce or

communication, without authorization or by exceeding authorized access to such a computer, and

by obtaining information from such a protected computer," and "by means of such conduct

furthered the intended fraud and obtained one or more things of value, including but not limited

to CHE's computer software, program source code, and other confidential information and trade

secrets" [ECF No. 147 at 21-22].  CHE further alleges that through these acts, Defendants

knowingly caused the transmission of a program, information, code or command, and as a result,

intentionally caused damage without authorization to a protected computer owned by CHE.

Specifically, CHE alleges that Defendants violated subsections (a)(2)(c); (a)(4); and (a)(5)(A),

(B), and (C) of 18 U.S.C. § 1030, which provide as follows:

> (a) Whoever –
>
>             \*        \*        \*
>
>   (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains –
>
>             \*        \*        \*
>
>   (C) information from any protected computer;
>
>             \*        \*        \*
>
>   (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;
>
>   (5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
>
>   (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
>
>   (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

Defendants contend that they should be granted summary judgment on CHE's federal

CFAA claim because they: 1) had permission to access CHE's computers; 2) never exceeded the

scope of that permission; 3) returned their computers and equipment upon request when their

employment ended; 4) did not use their access for any fraudulent purpose; 5) did not use their

access to delete any of CHE's information; 5) did not transmit a program without authorization

that caused damage to a protected computer; and 6) did not cause damage or loss to CHE by their access.

CHE first argues that summary judgment is not appropriate on Count II because whether Defendants exceeded the scope of their authorization is a fact question to be determined by a jury. CHE claims that Defendants' access authorization terminated because they violated their duty of loyalty to CHE by deleting or destroying information from CHE's computers.  It further contends that Defendants' authorization was limited by their Employment Agreements to purposes related to the performance of CHE's business, and that the Agreements precluded Defendants from retaining CHE's protected information.  CHE claims it sustained damage from Defendants' actions, as their unlawful retention of its source code nearly paralyzed CHE's operations and materially compromised its ability to compete in the marketplace.

The Court finds that genuine material issues of fact exist as to whether Defendants' exceeded the scope of their authorization to access CHE's protected computer.  The terms of Defendants' Employment Agreements clearly limit their use of CHE's protected materials to the period of their employment, and for the benefit of CHE; consequently, any access by Defendants after their termination would be unauthorized, as would any access not used for CHE's benefit.

The Court also finds that genuine issues of material fact exist as to whether Defendants used their access to delete any of CHE's protected information.  The record contains evidence establishing that CHE's policy was that source code was to be held in a software repository called Star Team, but that, at some point during his employment, Mr. Smith began using a password-protected repository called Groove to store the source code, and that CHE was unable to retrieve any source code from Groove after Defendants left its employment [ECF Nos. 314-10 at 12-13, 314-28 at 5-8].  The record also contains unrefuted evidence showing  that, when Defendants

16

ultimately returned their computers to CHE, the CHE source codes that were necessary for them to perform their programming duties were no longer accessible on their computers[3] [ECF No. 314-10 at 11-12, 325-12].  In fact, Defendants tendered a supplemental letter from Dowell, dated March 3, 2009, that supports the inference that the CHE source codes were not accessible to CHE, and that Defendants were aware that they were not accessible [ECF No. 325-12].  Moreover, although the letter indicates that code was stored on "Groove's Team workspace (Files tab)," it does not provide a password for access.   The absence of source codes that should have been on Defendants' computers supports the inference that Defendants used their access to delete, or render inaccessible, protected information.

Furthermore, the Court finds that genuine issues of material fact exist as to whether the defendants' conduct caused damage or loss.  Furthermore, the record contains unrefuted evidence that CHE's programs stopped working after Defendants were terminated, that efforts to find the CHE source code needed to reinstall the programs on CHE's servers were unsuccessful, and that CHE expended time and resources to restructure the tools for which the source code was missing [ECF Nos. 314-6 at 19-21, 314-10 at 11-13, 314-28 at  5-12, 325-1 at 40-41].

As previously discussed, the "certain result" the instructions in CHE's copyrighted materials bring about when used in a computer includes, among other things, remote monitoring of mainframe tape and disk devices, which allows CHE personnel to monitor and troubleshoot computer systems remotely.  The record establishes that, during the period when Defendants were

---

[3]The Court recognizes that Defendants submitted affidavits containing the following statement: "When I returned my computer to CHE, it contained all CHE source code that I worked with or had access to" [ECF Nos. 325-5 at 2, 325-6 at 2, 325-7 at 2].  However, Defendants' affidavits, while perhaps minimally sufficient to create a factual dispute as to whether their computers contained CHE source code, do not refute CHE's claim that the CHE source codes, purportedly stored on Groove, were not accessible to CHE.

employed by CHE, they formed TriPoint, and that TriPoint, through its website, represented its ability to provide this service to potential customers.  The record also contains evidence, unrefuted by Defendants, that CHE is the only company with remote monitoring software for mainframe tape and disk systems [ECF No. 314-6 at 18].  Furthermore, considering Pilling's undisputed use of the data-wiping program on his computer, CHE has produced sufficient evidence that Defendants accessed CHE's protected material, obtained one or more things of value, and used that material to further their business interests while employed by CHE to require submission of this claim to a jury.  Defendants' Motion, as to Count II, Violation of Federal CFAA, will be denied.

### 3.      Count III: Breach of Contract (against Dowell, Mr. Smith, & Mrs. Smith)

In Count III of its SAC, CHE alleges that Dowell, Mr. Smith, and Mrs. Smith breached Sections 1, 3  and 4 (including Sections 4.2.2, 4.6, 4.7.3, and 4.8) of their Employment Agreements with CHE by acting contrary to the best interests of CHE by "engaging in a calculated scheme to defraud and directly compete with CHE," and knowingly misappropriating and misusing CHE's confidential information and trade secrets for their personal benefit and for the benefit of TriPoint, which they created.  To prevail on a breach-of-contract claim, CHE must prove: 1) the existence of a valid contract; 2) the rights and obligations of each party pursuant to that contract; 3) its performance in accordance with the contract; 4) a breach of the contract by Defendants; and 5) damages suffered by CHE.  *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010).

The parties do not dispute the existence of valid employment agreements, or the terms of those agreements.  Defendants argue that they are entitled to summary judgment on Count III, breach of contract, of CHE's SAC because there is no evidence that Dowell, Mr. Smith, or Mrs.

18

Smith breached their employment agreements.  Defendants further contend that genuine and

material factual issues exist as to whether CHE waived its right to enforce the terms of their

Employment Agreements.

As a preliminary matter, the Court notes that the Declaration of John Dowell, which is the

subject of one of CHE's Motions to Strike, contains statements that are made solely in support of

CHE's argument that CHE waived its right to enforce these sections of their Employment

Agreements, because CHE failed to prevent other employees from pursuing or engaging in side

jobs [ECF No. 319-13].  In its Memorandum supporting its Motion to Strike Declaration of John

Dowell, CHE moves to strike the affidavit, in its entirety, on grounds that it violates Federal Rule

of Civil Procedure 37(c)(1), because Defendants failed to supplement incomplete Rule 26(a)

disclosures and interrogatory answers as required by Rule 26(e) [ECF No. 331].  CHE argues that

John Dowell's Declaration must be precluded because Defendants failed to disclose the substance

of his testimony in their answers to interrogatories, and CHE claims Defendants "ambushed" it

with the Declaration in an attempt to create a dispute of fact as to CHE's alleged waiver of

Section 3 of the Defendants' employment agreements.

"Rule 37 does not provide for mandatory sanctions," and a court may find that a party's

failure to comply properly with Rule 26 disclosures was substantially justified or harmless.  *Davis

v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004).  However, affidavits in support of summary

judgment must be made on personal knowledge, and set out facts that would be admissible in

evidence.  Fed. R. Civ. P. 56(c)(4).  Where an affidavit fails to meet this standard, it is subject to a

motion to strike.  *McSpadden v. Mullins*, 456 F.2d 428, 430 (8th Cir. 1972).

The Court finds meritless Defendants' claim that CHE waived its right to enforce these

sections of their Employment Agreements because CHE failed to prevent other employees from

19

pursuing or engaging in side jobs.  Missouri limits the application of waiver by virtue of long

continued course of conduct strictly to conduct between the parties themselves.  *Clayton*

*Brokerage Co. of St. Louis, Inc. v. Raleigh*, 679 S.W.2d 376, 379 (Mo. App. E.D. 1984).

Accordingly, the Declaration of John Dowell, tendered solely in support of this argument, sets out

irrelevant facts that would be not be admissible as evidence.  CHE's Motion to Strike Declaration

of John A. Dowell [ECF No. 330] will be granted.

Defendants assert that CHE waived its right to enforce the applicable section of the

Employment Agreements, because it knew that Defendants engaged in side work, and did not

discipline them for the purported breach.[4]  They claim CHE was aware that Defendants were

involved in side jobs when they were hired, and that CHE acted in a manner inconsistent with an

intention to assert its rights by not disciplining the individual defendants for doing so.  Given

CHE's undisputed lack of knowledge concerning Defendants' formation of TriPoint, and the

activities Defendants performed on TriPoint's behalf, the Court finds Defendants' waiver

argument unconvincing.[5]  "Waiver is the intentional relinquishment of a known right."  *Roeder v.*

---

[4]Defendants also assert that they did not breach Section 4.2.2 of the agreement because
they did not use CHE information.  In Section 4.2.2, Defendants agreed not to use CHE
information "for the benefit of a competitor or in any other way that harms CHE or diminishes
the value of Company Information."  As indicated by the Court's discussion of Counts I and II of
the SAC, CHE has produced sufficient evidence that Defendants used CHE's protected material
to further their business interests while employed by CHE, to require submission of this element
to a jury.

[5]CHE has filed a Motion to Strike Portions of William Pilling's Declaration [ECF No.
335].  One of the sections that CHE requests the Court to strike is Paragraph 29 of the
Declaration, which states: "I took no affirmative steps to conceal the formation of Tri-Point from
CHE" [ECF No. 319-15].  In light of the Court's analysis of Defendants' waiver argument,
Pilling's statement is irrelevant.  The remaining sections (paragraphs 19, 20, and 23 of Pilling's
Declaration ) that CHE moves to strike from the Declaration concern statements made in support
of Defendants' counterclaims.  The Court will rule on CHE's Motion to Strike Portions of
William Pilling's Declaration in its consideration of CHE's Motion for Summary Judgment as to
Counts I, II, IV, V and VI of Counterclaim Plaintiff William Pilling's Counterclaim Directed

*Ferrell-Duncan Clinic, Inc.*, 155 S.W.3d 76, 89 (Mo. App. S.D. 2004).  The burden to prove

waiver is upon the party claiming it.  *Id.*   If waiver is not shown by express declarations, but

implied by conduct, "there must be a clear, unequivocal and decisive act" of the waiving party

showing such purpose, and that act must be so consistent with an intention to waive "that no other

reasonable explanation is possible."  *Riggins v. City of Kansas City*, 351 S.W.3d 742, 749 (Mo.

App. W.D. 2011).  The Court finds that Defendants have failed to satisfy their evidentiary burden.

Accordingly, the Court determines that CHE did not waive its right to enforce the terms of its

employment agreements with Defendants.

CHE contends that it is entitled to summary judgment on its breach-of-contract claim

against Dowell, Mr. Smith, and Mrs. Smith, because undisputed material facts establish that they

acted in direct contravention of the terms of their Employment Agreements by inducing,

soliciting, and assisting one another to form and operate a competing business while employed by

CHE, and that CHE was damaged by Defendants' breaches.  It is undisputed that Dowell, Mr.

Smith, and Mrs. Smith all entered into Employment Agreements with CHE.  Section 4.7.3 of

these agreements provided, among other things, that these defendants would not "[o]wn, work for,

become employed by or associated with, or assist a Competing Business in any capacity unless

given the prior written consent of CHE's President to do so[.]"  Among other restrictions, the

Employment Agreements executed by these defendants contained the following terms, limiting

outside employment, in Section 3:

> Employee agrees that during his [or her] employment, he [or she] will not accept
> employment of any nature, including self employment, for which remuneration is
> received unless said employment is recognized, agreed to and approved in writing
> by CHE in its sole discretion prior to such employment or association.  Employee
> also agrees he [or she] shall have no financial or other interest in any business

Against Counterclaim Defendants [ECF No. 297].

entity which detracts from or interferes with, Employee devoting his [or her] full time and attention to CHE's business without the prior, written permission of CHE in its sole discretion.

It is undisputed that Dowell, Marcus Smith, Pilling and Linda Pilling formed TriPoint, a "custom solutions and consulting" information technology firm in June 2008. It is also undisputed that Defendants operated TriPoint, serviced TriPoint customers, invoiced its customers, and collected revenue on behalf of TriPoint while they were employed by CHE between June 2008 and February 20, 2009. It is further undisputed that Defendants' association with, ownership of, and work for TriPoint was not agreed to and approved in writing by CHE. In fact, Defendants acknowledge that none of them informed CHE of their TriPoint activities, or even of their formation of the entity. The Court finds that the record evidence conclusively establishes the absence of a genuine dispute as to the existence of valid contracts, the parties' rights and obligations under the contracts, CHE's performance in accordance with the contracts, and Defendants' breaches of Sections 3, and 4.7.3 of the contracts.

CHE alleges that Defendants also breached Section 4.8 of their Employment Agreements. Section 4.8 of the agreements contained the provision that, for a period of twelve (12) months following the termination of their employment, Defendants would not "recruit, solicit, hire or attempt to recruit, solicit, or hire, directly or by assisting others, any persons employed by or associated with CHE, nor shall he or she contact or communicate with, or direct or assist others in contacting or communicating with, any such persons for the purpose of inducing such persons to terminate their employment or association with CHE."

Defendants argue that they did not breach the non-solicitation term of their contracts because there is no evidence that they formed TriPoint with the intent to induce one another to quit working for CHE. They contend that they formed TriPoint "merely as a way for Defendants

22

to organize their side jobs," and state: "In fact, after the formation of TriPoint, Defendants

continued to work at CHE for nine months until they were terminated" [ECF No. 319-2 at 6].  In

making this argument, Defendants apparently either overlook the phrase preceding Section 4.8's

limitation precluding Defendants from contacting or communicating with other CHE employees

for the purpose of inducing them to quit working for CHE, in which they covenant not to "recruit,

solicit, hire or attempt to recruit, solicit, or hire, directly or by assisting others, any persons

employed by or associated with CHE," or they are urging the Court to read the term "nor" in the

conjunctive rather than disjunctive.

Contracts must be construed according to the terms used by the parties, and are taken and

understood, in the absence of ambiguity, in their plain, ordinary, and popular sense.  *See Kern v.*

*Liberty Mut. Ins. Co.*, 398 F.2d 958, 960 (8th Cir. 1968); *Wendorff v. Mo. States Life Ins. Co*., 1

S.W.2d 99, 102 (1927).  Contracts should be construed as a whole, and must receive a reasonable

interpretation, consistent with the apparent general purpose of the contract and the plain intent of

the parties.  *Wendorff*, 1 S.W.2d at 102.  The general purpose of the Employment Agreements'

non-solicitation clauses is prevent Defendants from using the knowledge and contacts, acquired

through their association with CHE and its employees, to impair CHE's ability to perform its

services, by siphoning off or draining CHE's employee skill resources.  The Court finds the intent

and meaning of the non-solicitation clause to be plain and clear to a person of ordinary

intelligence; consequently, the plain and ordinary meaning of the chosen words drives its analysis.

*See Gasconade Cnty. Counseling Servs., Inc. v. Mo. Dep't of Health*, 314 S.W.3d 368, 376 (Mo.

App. E.D. 2010).

Defendants' argument presupposes that the restrictive clause, "for the purpose of inducing

such persons to terminate their employment or association with CHE," modifies both phrases of

the non-solicitation paragraph.  The term "nor" is "used as a function word to introduce the second or last member or the second and each following member of a series *each* of which is negated."  www.merriam-webster.com/dictionary/nor (italics added for emphasis).  "Nor" is also used "to introduce and negate a following clause or phrase."  *Id.*  Under its plain meaning, "nor" indicates a series of separate items.  Thus, here, Defendants are precluded, for a period of twelve months following their termination, from engaging in two separate activities: 1) Defendants could not recruit, solicit or hire CHE employees or consultants, or assist others in doing so; and 2) Defendants could not contact or communicate with other CHE employees or consultants for the purpose of inducing them to terminate their employment, or association with CHE, or assist others in doing so.

Defendants' motivation for forming TriPoint and providing employment opportunities for themselves through the entity is irrelevant for the first restriction imposed by Section 4.8.   It is Section 4.8's second listed restriction that requires intent: " . . . nor shall he or she contact or communicate with, or direct or assist others in contacting or communicating with, any such persons for the purpose of inducing such persons to terminate their employment or association with CHE."[6]  The reasonableness of this interpretation is logically apparent.  Without the limiting inducement requirement, almost any contact or communication, even the most innocuous and well-intentioned, between Defendants and CHE's employees would be precluded after they left CHE's employ.

_____

[6]The Court notes that the record contains copies of the e-mails sent to CHE by Defendants to announce their intentions to resign [ECF Nos. 319-22, 319-23, 319-24].  The Court reached its conclusion, for purposes of summary judgment, as to Defendants' breach based on the first non-solicitation restriction of Section 4.8.  Nevertheless, the Court finds significance in the timing and language of Defendants' e-mail communications, as they arguably indicate communication among CHE's entire IT department concerning a decision to resign en masse.

24

As previously discussed, Defendants do not dispute that they collaborated with each other to form TriPoint.  They do not dispute that they performed work on the entity's behalf.  As well, they freely admit that they did these activities while they were CHE employees.  Defendants state that TriPoint does not exist without them, and that they are TriPoint [ECF 325-1 at35].  Acting as TriPoint, Defendants hired each other while they were still CHE employees, and they assisted each other and TriPoint in the process.  The Court finds that the record evidence conclusively establishes Defendants breached Section 4.8 of their Employment Agreements with CHE.

CHE also alleges that these defendants failed to return confidential information and property of CHE, including but not limited to, update source code for specific programs they had been developing and maintaining, upon the termination of their employment.  Under Section 4.6 of the agreements, Defendants were obligated to return all CHE property within twenty-four (24) hours of the termination of their employment, to "authorize and permit CHE to inspect all computer drives used or maintained by [Defendants]" during their employment, and to "disclose any and all passwords or codes required to gain access to [any equipment or other tangible property Defendants received from CHE during their employment]."  The record evidence shows that, although Defendants eventually returned the computers provided to them by CHE, and permitted CHE to inspect other computer drives used or maintained by them during their employment when ordered to do so by the Court, they did not do so within twenty-four hours of their termination, and they all refused to sign Return of Company Property Acknowledgements presented to them by CHE employees sent to retrieve the CHE computers.  The record evidence contains testimony by David York stating that Defendants took all source code out of Star Team and stored it in the Groove system, and that Defendants did not disclose all passwords or codes required to gain access to the source code after they left CHE's employment.  Defendants claim

that they told a CHE employee where to look for the source codes, but they also admit that CHE has never retrieved them.  Missouri law implies a duty of good faith and fair dealing in the performance and enforcement of every contract.  *Stone Motor Co. v. General Motors Corp.*, 293 F.3d 456, 466 (8th Cir. 2002).  Defendants have shown a genuine dispute of material fact as to whether they returned CHE property.  As well, CHE has produced sufficient evidence to establish a genuine issue of fact as to whether Defendants' conduct evaded the spirit of the Employment Agreements and denied CHE the expected benefit of the clauses requiring Defendants to return company property.

As to the damages element of CHE's claim, the record contains evidence that Defendants' performance of their job duties, particularly in terms of communication, follow-up, and follow-through with other team members, were deficient in 2008, that Defendants were not producing functional deliverables or responding to reports of problems in a timely fashion, and that CHE's ability to provide services to its customers and support its customer service engineers in the field was being adversely affected [ECF Nos. 319-14 at 4-5, 319-20].  The record contains evidence that Defendants actions have created confusion within the industry as to who has proper remote monitoring tools for mainframe tape and disk equipment [ECF No. 314-6 at 18].  Among other rights and remedies for violations, Defendants' Employment Agreements provides that CHE shall recover expenses, including attorneys' fees, incurred to enforce the agreements or to seek redress. Although the record evidence, at the minimum, establishes that Defendants' breaches caused damages, in that CHE has incurred expenses to enforce terms of Defendants' employment agreements, a genuine dispute of material fact remains as to the amount of damages caused by Defendants' breaches.

26

Defendants have not shown a genuine dispute of material fact as to whether their conduct breached Sections 3, 4.7.3, and 4.8 of their Employment Agreements.  Accordingly, the Court will grant summary judgment in favor of CHE and against Defendants, only as to liability on Count III. The damages issues will proceed to trial.

### 4.      Count IV: Breach of Contract (against Pilling)

In Count IV of its SAC, CHE alleges that Defendant Pilling, at various times before his termination, acted contrary to the best interests of CHE "by engaging in a calculated scheme to defraud and directly compete with CHE and thereby engage in conduct that directly conflicted with the best financial interest of CHE, and usurped business opportunities of CHE in direct breach of his contractual obligations set forth in Sections 1 and 2 of [his Employment Confidentiality and Non-Competition Agreement with CHE]" [ECF 147].  CHE also alleges that Pilling breached Sections 3 and 4 of his employment agreement by knowingly misappropriating and misusing CHE's confidential information and trade secrets for his and TriPoint's benefit, by forming TriPoint "with the intent to defraud, gain an economic advantage over, and compete directly with CHE. and by soliciting and inducing Dowell, Mr. Smith, and Mrs. Smith to terminate their employment with CHE and form TriPoint.[7]

---

[7]Section 4(b)(iv) of Pilling's "Employee Confidentiality and Non-Competition Agreement provides that, during the term of his employment, and for a period of two years following termination, Pilling shall not, directly or indirectly:

Solicit the employment of, recruit, employ, hire, cause to be employed or hired, entice away, or establish a business with, any then current officer, manager, or other employee or agent of CHE or a CHE entity, or any person who was employed by CHE within twelve (12) months immediately prior to such employment or establishment, or suggest to or discuss with any such employee the discontinuation of that person's status or employment with CHE, or such person's employment or participation in any activity in competition with CHE[.]

The facts pertinent to the breach-of-contract claim against Pilling differ from the factual situation of Dowell and the Smiths only in the language of his employment agreement, and his use of Eraser 6 on his personal computer prior to his surrendering it for forensic imaging.  The parties' arguments in support of, and opposing, summary judgment as to Count IV are the same as addressed in the Court's discussion of Count III's breach-of-contract claim.  For the reasons discussed above, the Court determines that CHE did not waive its right to enforce the terms of its employment agreement with Pilling.  The Court further finds that the record conclusively establishes the absence of a genuine dispute as to the existence of a valid contract between Pilling and CHE, the rights of CHE and Pilling under the contract, CHE's performance in accordance with the contract, and Pilling's breach of Sections 2, 3, and 4 of his "Employee Confidentiality and Non-Competition Agreement.  The Court additionally finds that CHE has produced sufficient evidence to establish that Pilling's conduct, in his admitted use of Eraser 6,  evaded the spirit of the Employment Agreements, denied CHE the expected benefit of the clauses requiring him to return company property, and resulted in no functional return of what was expected to be protected.

Among other rights and remedies for violations, including injunctive relief, Pilling's employment agreement provides that Pilling shall pay all costs, court cost, fees and expenses, including actual attorneys fees incurred by CHE to enforce the terms of the agreement.  A genuine dispute of material fact remains as to the amount of damages caused by Defendants' breaches.

Pilling has not shown a genuine dispute of material fact as to whether his conduct breached Sections 2, 3, and 4 of his" Employee Confidentiality and Non-Competition Agreement."  Accordingly, the Court will grant summary judgment in favor of CHE and against Pilling, only as to liability on Count IV.  The damages issues will proceed to trial.

**5.**   **Count V: Breach of Fiduciary Duty and Duty of Loyalty**

In Count V of its SAC, CHE alleges that Dowell, Mr. Smith, Mrs. Smith, and Pilling owed CHE a fiduciary duty not to act contrary to the interests of CHE during the course of their employment, a duty of loyalty to CHE not to actively exploit their positions within the corporation for their own personal benefits, or to hinder the ability of CHE to continue its business, and a duty not to compete with CHE, concerning the subject matter of their employment.  CHE further alleges that Defendants, at various times during their employ, knowingly misappropriated and misused CHE's confidential information and trade secrets for their benefit and TriPoint's benefit, with the intent to defraud, compete directly with, and gain an economic advantage over CHE.  In Missouri, a claim for breach of fiduciary duty requires a party to prove: 1) the existence of a fiduciary relationship between the parties; 2) a breach of that fiduciary duty; 3) causation; and 4) harm.  *Lafarge N. Am., Inc. v. Discovery Group L.L.C.*, 574 F.3d 973, 983 (8th Cir. 2009).

Defendants argue that they are entitled to summary judgment on Count V of the SAC because CHE's breach-of-fiduciary-duty and breach-of-the-duty-of-loyalty claims are preempted by the Missouri Uniform Trade Secrets Act ("MUTSA"), Missouri Revised Statute § 417.463(1).  Section 417.463 provides as follows:

1.  Except as provided in subsection 2 of this section, sections 417.450 to 417.467 displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.

2.  Sections 417.450 to 417.467 shall not affect:

(1) Contractual remedies, whether or not based upon misappropriation of a trade secret; or

(2) Other civil remedies that are not based upon misappropriation of a trade secret; or

(3) Criminal remedies, whether or not based upon misappropriation of a trade secret; or

29

(4) The discovery of facts, opinions, information, documents, things, and any other matters discoverable in litigation, except in litigation which alleges misappropriation of trade secrets as a cause of action.

By virtue of this Missouri statute, civil claims that are derivative of a claim of misappropriation of trade secrets are preempted. *Lasco Foods, Inc. v. Hall & Shaw Sales, Mktg. & Consulting, LLC*, 2009 WL 3523986 at *5 (E.D. Mo. October 26, 2009). Claims based on facts related to the misappropriation claim are derivative, and therefore preempted. *Id.* CHE argues that its duty-of-loyalty claim is not a derivative claim under MUTSA, because Defendants' breach included their willful breach of their employment agreements' contractual obligations. The basis for CHE's claim appears to be Defendants' use and misappropriation of CHE protected information in breach of their duties and obligations to CHE. Accordingly, this cause of action is preempted by MUTSA. *Id.*; *Secure Energy, Inc. v. Coal Synthetics, LLC*, 2010 WL 1691454 at *3 (E.D. Mo. April 27, 2010). The Court will deny CHE's Motion for Summary Judgment as to Count V. The Court will grant summary judgment in favor of Defendants and against CHE as to Count V of the SAC, and will dismiss CHE's breach-of-fiduciary-duty and breach-of-the-duty-of-loyalty claims.

### 6.      **Count VI: Tortious Interference with Contract (against TriPoint only)**

Under Missouri law, the elements of a claim of tortious interference with contract include: 1) the presence of a contract; 2) the defendant's knowledge of the contract; 3) intentional interference by defendant by the defendant inducing or causing a breach of the contract; 4) absence of justification; and 5) damages resulting from defendant's conduct. *Howard v. Youngman*, 81 S.W.3d 101, 112 (Mo. App. E.D. 2002). In Count VI of its SAC, CHE alleges that TriPoint, through it employees, had knowledge of the existing Employment Agreements between CHE and Defendants, and intentionally interfered in the contracts by virtue of its

relationship with Defendants, causing Defendants to breach the agreements by engaging in competitive activities during Defendants' period of employment, and by requiring and demanding that Defendants provide confidential information and trade secrets to TriPoint.

CHE claims that it is entitled to summary judgment on this claim because it is undisputed that the individual Defendants entered into valid and binding employment agreements with CHE, that TriPoint knew of the contracts, and that TriPoint, through its employees, induced and hired the individual Defendants to compete directly with CHE. Defendants argue that they are entitled to summary judgment on Count VI because TriPoint did not cause a contract to be breached, TriPoint's actions were justified, and there is no evidence of damages. Defendants again argue that a genuine issue of material fact exists as to whether CHE waived its right to enforce the terms of their employment agreements requiring written approval of the performance of non-CHE work. Defendants further argue that, even assuming that TriPoint did intentionally interfere and cause or induce a breach of Defendants' employment agreements with CHE, any such breach was justified. Defendants claim that they "had a legitimate interest in forming TriPoint, to wit, as an entity to funnel all of their side projects[,]" and that no improper means were involved in their creation of a business to centralize their projects.

However, in its discussion of Counts III and IV of the SAC, the Court found that the record evidence conclusively establishes that Defendants failed to satisfy their burden of proving waiver, and that Defendants breached certain sections of their employment agreements with CHE, including clauses prohibiting, absent written permission by CHE, self employment for which remuneration was received. Consequently, Defendants' justification argument fails. Furthermore, Defendants state that TriPoint does not exist without them, and that they are TriPoint; Defendants even stress that "[i]t is important to remember that the individual defendants make up TriPoint"

[ECF No. 298 at 19].  Defendants had knowledge of their agreements.  Thus, TriPoint had

knowledge of the agreements.  *See Howard*, 81 S.W.3d at 116-17 (a corporate officer or agent

acting for a corporation is the corporation for purposes of a tortious interference claim).

Defendants argue that it is impossible to conclude that TriPoint induced the individuals to do

anything, stating, "This is as absurd as saying that Dowell could induce himself to do something."

The record evidence, however, establishes that TriPoint (through the actions of Defendants as its

agents), in direct breach of Defendants' employment agreements with CHE, induced Defendants

to perform work on its behalf with the expectation of remuneration.  Although the record contains

evidence of damage caused by Defendants' breaches, the Court found that a genuine dispute of

material fact remains as to the amount of damages caused by Defendants' breaches.  Accordingly,

the Court will grant summary judgment in favor of CHE and against TriPoint, only as to liability

on Count VI.  The damages issue will proceed to trial.

       **7.**        **<u>Misappropriation of Trade Secrets</u>**

     In Count VII of its SAC, CHE brings a claim for Misappropriation of Trade Secrets under

MUTSA, Mo. Rev. Stat. 417.450 et seq.  In this count, CHE alleges that Defendants, by improper

means and without the consent of CHE, knowingly misappropriated, used and disclosed

confidential information and trade secrets, of which they had a duty to maintain secrecy, to their

benefit, and to CHE's detriment, in forming TriPoint to directly compete with CHE.  CHE further

alleges that TriPoint misappropriated and used this information to attempt to gain an unfair

competitive advantage over CHE and to attempt to solicit and take CHE's customers and other

business opportunities in direct competition with CHE.  CHE asserts that Defendants have

misappropriated CHE source code, the know-how behind CHE's intellectual property ("IP"),

knowledge of how CHE performs the development of its IP, and CHE's customer list [ECF No. 314-6 at 18-19].

To establish a violation of MUTSA, CHE must show: 1) the existence of a protectable trade secret; 2) misappropriation of the trade secret by Defendants; and 3) damages.  Mo. Rev. Stat. 417.453.  "It is well established that a source code is a trade secret."  *Two Palms Software, Inc. v. Worldwide Freight Mgmt. LLC*, 2012 WL 2418913 at *4 (E.D. Mo. June 26, 2012) (citing *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1129 (9th Cir. 2010)).  Here, the record establishes the existence of a protectable trade secret.  Further, the record conclusively shows that CHE considered the information it shared with Defendants to be secret, and that it took steps to protect its secret information by requiring Defendants to execute confidentiality agreements.

Misappropriation of trade secrets occurs in two ways: 1) acquiring a trade secret through improper means, such as theft, bribery, or inducing one to breach a duty of secrecy; and 2) disclosing a trade secret without consent, among other things, knowing or having reason to know that the secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit usage.  *H & R Block E. Tax Servs. Inc. v. Enchura*, 122 F.Supp.2d 1067, 1074 (W.D. Mo. 2000).  Evidence exists in the record that demonstrates, at the very least, a likelihood that Defendants used confidential CHE information in providing services on TriPoint's behalf. Through its website, TriPoint represented that the entity's services included developing custom solutions around mainframe tape and disc storage systems [ECF No. 319-4].  CHE provided evidence that CHE offers these services, and that CHE is the only company with remote monitoring software for mainframe tape and disk systems [ECF Nos. 314-6 at 63-640].  *See Cerner Corp. v. Visicu, Inc.*, 667 F.Supp.2d 1062, 1078 (W.D. Mo. 2009) (citing to *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1072 (N.D. Cal. 2005)(court found use

33

of a trade secret where the trade secret was considered in conducting research and development, experimentation, manufacturing, production, marketing, or solicitation of customers).

Again, although the record evidence, at the minimum, establishes that Defendants' activities caused damages, the Court finds that a genuine dispute of material fact remains as to the amount of damages caused by Defendants' actions.  Defendants have not met their burden under Rule 56(c).  Accordingly, the Court will deny TriPoint's Motion for Summary Judgment as to Count VII.

### 8.    <u>Unfair Competition</u>

In Count VIII of its SAC, CHE alleges that the individual defendants, acting as agents of TriPoint, conspired with each other to compete directly with CHE and to misappropriate CHE's confidential and proprietary information for use in competing unfairly against CHE, and for the benefit of TriPoint, during their period of employment with CHE.  CHE alleges that Defendants actions were outrageous, willful, malicious, and intentional and that it was damaged as a result of the Defendants' conspiracy and unfair competition.  CHE's factual allegations again describe how Defendants used protected information misappropriated from CHE.  As previously discussed in the Court's disposition of CHE's breach-of-fiduciary-duty and breach-of-the-duty-of-loyalty claims, civil claims based on facts related to a misappropriation-of-trade-secrets cause of action are derivative, and therefore preempted by MUTSA.  *Lasco Foods, Inc.*, 2009 WL 3523986 at *5. Accordingly, the Court will grant summary judgment in favor of Defendants and against CHE as to Count VIII of the SAC, and will dismiss CHE's unfair competition claim.

### 9.    <u>Civil Conspiracy</u>

In Count IX of its SAC, CHE alleges that the concerted actions engaged in by Defendants prior to their termination infer an agreement between the Defendants for the purpose of

accomplishing unlawful acts or to accomplish lawful acts in an unlawful manner, and that CHE

was damaged by the loss and misappropriation of its confidential information and trade secrets.

In addition to damages, CHE requests injunctive relief enjoining Defendants from conducting

business with or for any person or entity as to whom they solicited or did business before their

termination.   Under Missouri law, the elements of civil conspiracy are: 1) two or more persons;

2) with an unlawful objective; 3) after a meeting of the minds; 4) committed at least one act in

furtherance of the conspiracy; and 5) caused damage to the plaintiff. *American Builders &*

*Contractors Supply Co., Inc. v. Roofers Mart Inc.*, 2012 WL 3027904 at *4 (E.D. Mo. July 24,

2012); *Rice v. Hodapp*. 919 S.W.2d 240, 245 (Mo. 1996).

        Defendants argue that CHE's civil conspiracy claim fails as a matter of law because it

contains only conclusory allegations and speculation and lacks factual grounds sufficient to

support a claim of conspiracy.  CHE argues that its SAC refers to specific actions taken by

Defendants, including blatant violations of their employment agreements, the formation of

TriPoint, and the construction of a website soliciting business in direct competition with CHE.

CHE's civil conspiracy claim is based in part on its breach-of-contract and tortious interference

claims.  The Court finds that the record contains sufficient factual grounds to support a civil

conspiracy claim.  Defendants further assert that the claim fails because they did not breach their

employment agreements or fiduciary duties, and thus they did not engage in any unlawful activity,

or lawful activity in an unlawful manner. As previously discussed, the evidence establishes that

Defendants breached their agreements with CHE.  Defendants also contend CHE suffered no

damage as a result of their activities.  Genuine issues of disputed material facts exist that preclude

summary judgment with respect to this claim.  The Court will deny Defendants' Motion for

Summary Judgment as to Count IX.

**10.** __Replevin__

In Count X of its SAC, CHE alleges that by virtue of their breaches of their employment agreements and fiduciary duties, Defendants have improperly retained CHE property, and that CHE is in danger of losing the property unless the Court issues an order for replevin.  For the reasons discussed above, the Court finds the existence of genuine issues of disputed material facts as to whether Defendants returned CHE property that preclude summary judgment with respect to a claim of replevin.  The Court will deny Defendants' Motion for Summary Judgment as to Count X.

**11.** __Conversion__

In Count XI of its SAC, CHE alleges that it is entitled to the immediate possession of all property and information wrongfully taken and appropriated by Defendants, including but not limited to, updated source code for specific programs that Defendants had been developing and maintaining, computer software and data programs, and any other confidential CHE information and trade secrets.  CHE alleges that Defendants have acted unlawfully come into possession of the property, and have unlawfully converted and disposed of it to CHE's damage.  Based on the allegations of the SAC, the Court finds that this claim is derivative of CHE's MUTSA claim, and is therefore preempted. *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 2002 WL 32727076 at ** 4, 5 (E.D. Mo. Feb. 25, 2002).  Defendants are entitled to summary judgment as to CHE's conversion claim.  The Court will grant summary judgment in favor of Defendants and against CHE as to Count XI of the SAC, and will dismiss CHE's conversion claim.

**12.** __Unjust Enrichment__

In Count XII of its SAC, CHE alleges that, "as a proximate cause of the failure of Defendants Dowell, Marcus Smith, Laura Smith and Pilling to return CHE property, CHE lacked

valuable intellectual property that caused it to be at a serious competitive disadvantage and caused Defendants to gain an economic advantage over CHE and receive other financial benefits.  CHE claims that Defendants have acted unjustly and retained the benefit of CHE's intellectual property, computer software, and programming, and that CHE's damages include loss of sales, additional profits, and business goodwill development.  CHE asserts that it would be inequitable and unjust for Defendants to retain the benefits of possessing and utilizing CHE's confidential information and intellectual property.

Under Missouri law, CHE must show: 1) that Defendants were enriched by the receipt of a benefit; 2) that the enrichment was at CHE's expense; and 3) that it would be unjust to allow Defendants to retain the benefit.  *S & J, Inc. v. McLoud & Co., L.L.C.*, 108 S.W.3d 765, 768 (Mo. App. S.D. 2003).  Defendants argue that they should be granted summary judgment on Count XII of the SAC because CHE did not confer any benefit upon the individual Defendants and Defendants did not retain any purported benefit.  CHE contends that Defendant Pilling's use of Eraser 6 has made it impossible to discover relevant evidence in this matter, and for CHE to fully quantify the extent to which Defendants have been unjustly enriched by their retention of the benefits of CHE's intellectual property and computer software and programming.  The Court finds that the record contains insufficient evidence of enrichment to withstand Defendants' Motion. The Court will grant summary judgment to Defendants on CHE's unjust enrichment claim, and will dismiss Count XII of the SAC.

**IV.   CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that CHE's Motion to Strike Declaration of John Dowell [ECF No. 330] is **GRANTED**.

37

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on All Counts of Plaintiffs' Second Amended Complaint [ECF No. 288] is **GRANTED in part and DENIED in part.**  Defendants' Motion is granted as to Counts V, VIII, XI, and XII.  Counts V, VIII, XI, and XII are **DISMISSED with prejudice**.  Defendants' Motion is denied as to all remaining counts of Plaintiff's Second Amended Complaint.

**IT IS FURTHER ORDERED** that Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Motion for Summary Judgment as to Counts III through VI of CHE's Second Amended Complaint [ECF No. 302] is **GRANTED in part and DENIED in part.**  CHE's Motion is **DENIED** as to Count V of its Second Amended Complaint.  CHE's Motion is **GRANTED**, as to Counts III, IV, and VI, on the issue of liability only.  The issue of damages, as to Counts III, IV, and VI, will proceed to trial.

Dated this   23rd   day of January, 2013.

E. Richard Webber

_____

E. RICHARD WEBBER
 SENIOR UNITED STATES DISTRICT JUDGE