UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CUSTOM HARDWARE ENGINEERING        )
& CONSULTING, INC.,                )
                                   )
                                   )
        Plaintiff/Counterclaim-Defendant,  )
                                   )
    vs.                            )        Case No. 4:10CV000653 ERW
                                   )
JONATHAN D. DOWELL, *et al*.,      )
                                   )
                                   )
        Defendants/Counterclaim-Plaintiffs.  )

## MEMORANDUM AND ORDER

This matter comes before the Court on Counterclaim Defendants Custom Hardware Engineering, Inc. ("CHE") and David York's Motion for Summary Judgment as to Counts I, II, IV, V, and VI of Counterclaim Plaintiff William Pilling's Counterclaim Directed Against Counterclaim Defendants [ECF No. 297], and CHE's Motion to Strike Portions of Declaration of William Pilling [ECF No. 334].

CHE filed its Second Amended Complaint ("SAC") for Injunctive Relief and Damages against Defendants Jonathan D. Dowell, Marcus K. Smith, Laura Smith, William Pilling, and TriPoint Development, Inc. ("TriPoint"), alleging the following causes of action: 1) Copyright Infringement (against all Defendants); 2) Violation of Federal Fraud and Abuse Act (against all Defendants); 3) Breach of Contract (against Dowell, Marcus Smith, and Laura Smith); 4) Breach of Contract (against Pilling); 5) Breach of Fiduciary Duty and Duty of Loyalty (against Dowell, Marcus Smith, Laura Smith and Pilling); 6) Tortious Interference with Contract (against TriPoint); 7) Misappropriation of Trade Secrets (against all Defendants); 8) Unfair Competition (against all Defendants); 9) Civil Conspiracy (against all Defendants); 10) Replevin (against all

Defendants); 11) Conversion (against all Defendants); and 12) Unjust Enrichment (against all Defendants) [ECF No. 147].

Defendants filed several counterclaims in this matter, naming CHE and David York as Counterclaim-Defendants [ECF Nos. 58, 59, 60, 61, 167, 169].  Laura Smith and Third Party Plaintiff Linda Pilling filed Third Party Complaints against CHE and York, alleging that the Court had supplemental subject jurisdiction over certain state law claims under 28 U.S.C. §1367 [ECF No. 62, 63, 167, 169].  In his Counterclaim, Pilling asserted eight claims: 1) unpaid wages (against CHE); 2) breach of contract (royalties); 3) federal copyright infringement; 4) fraudulent misrepresentation; 5) slander and libel; 6) wrongful termination; 7) tortious interference with a business expectancy or relationship; and 8) abuse of process [ECF No. 60].  Subsequently, Pilling dismissed and withdrew without prejudice his claim for vacation pay contained in Count I of his Counterclaim, and withdrew Counts III (federal copyright infringement), VII (tortious interference), and VIII (abuse of process) [ECF No. 169].

I.     STATEMENT OF UNDISPUTED FACTS

The following fact statement is a recitation of undisputed facts taken from Counterclaim Plaintiff William Pilling's Counterclaims Directed Against Counterclaim-Defendants [ECF No. 60], Counterclaim-Defendant CHE's Answer to Counterclaim-Plaintiff William Pilling's Counterclaims [ECF No. 71], Counterclaim Defendants CHE and David York's Statement of Uncontroverted Material Facts in Support of Their Motion for Summary Judgment as to Counts I, II, IV, V, and VI of Counterclaim Plaintiff William Pilling's Counterclaim Directed Against Counterclaim Defendants [ECF No. 298-1], Counterclaim Plaintiff William Pilling's Response to Counterclaim Defendants' Statement of Uncontroverted Material Facts [ECF No. 317], Counterclaim Plaintiff William Pilling's Statement of Controverted and Additional Material

Facts in Response to Counterclaim Defendants' Motion for Summary Judgment [ECF No. 317-1], Counterclaim Defendants CHE and David York's Response to Counterclaim Plaintiff William Pilling's Statement of Controverted and Additional Material Facts in Response to Counterclaim Defendants' Motion for Summary Judgment [ECF No. 328-1],  Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 147], Defendants' Joint Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 154], Defendants' Statement of Uncontroverted Material Facts [ECF No. 291], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Response to Defendants' Statement of Uncontroverted Material Facts [ECF No. 314-1], Defendants' Reply to Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts and Statement of Additional Facts [ECF No. 325-1], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF 304-1], Defendants' Response to Plaintiff's Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 319], Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V, and VI of Its Second Amended Complaint [ECF NO. 319-1], and Plaintiff's Response to Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 337-1].

CHE is a Delaware corporation with its principal place of business in Fenton, Missouri. CHE's President and Chief Executive Officer is David York.  In addition to its Fenton office

3

employees, CHE, has employees working from home across thirty-seven states.  In the course of its business, CHE provides, among other things, computer hardware maintenance services on IBM, STK, EMC, HP, Sun Microsystems, HDS, Spectrologix, Quantum, and several other computer systems.  As part of the hardware services that it provides, CHE has developed and fielded remote monitoring technology that allows CHE personnel to monitor and troubleshoot computer systems remotely.  CHE provides its services to commercial and government entities in all parts of the United States, including Missouri and Texas.  Some of CHE's customers are Mainline, IBM, Service Express, Sentinel, SSCS, MVSS, Telestra, Bank of America, Fannie Mae, and the State of California.

Defendants Dowell, Marcus Smith, and Laura Smith are residents of McKinney, Texas.  Defendant Pilling is a resident of Tucson, Arizona.  Defendant TriPoint is a Texas corporation with its principle place of business in McKinney, Texas.

Pilling is a former fifty percent owner in a corporation called Microcoders, a company that designed software for other corporations.  Terry Neckar owned the other fifty percent of Microcoders.  In 2001, Microcoders contracted with DP Software, an affilliate or subsidiary of CHE, to develop a program called Lantool, which ultimately became Library Event Manager, or "LEM" software.  LEM works with StorageTek ("STK") silos.  Microcoders later developed Peripheral Exercising Tool, "PET," for DP software.  PET works with EMC disk drives.  E-PET does not work with STK tape.  Microcoders also developed software called Service Account Manager, or "SAM."  SAM was used to be able to view E-LEM and E-PET data.  Microcoders also developed a parts management system program called FED that acted as a tool used by support staff to view what needed to be addressed in the field.  FED later became known as Field Engineering Dispatch Auto Alert System, or "FED-AA."  Microcoder sold the rights to all of this

4

software to CHE on June 15, 2002.  CHE became the exclusive owner of E-PET, and other software developed by Microcoders.

As part of the asset purchase between CHE and Microcoders, Pilling became a CHE employee.   On June 14, 2002, CHE offered Pilling a position as a Software Support Specialist. CHE's offer included an agreement that Pilling would work exclusively for CHE during the entire term of his employment.  A Memorandum of Understanding, attached to the offer letter, stated: "[D]uring the term of his employment with [CHE], [Pilling] will receive 20% net profits received from PET licenses sold by CHE." Pilling executed an Employee Confidentiality and Non-Competition Agreement on June 15, 2002.

On February 7, 2003, Pilling resigned from CHE to help care for his father.  CHE reemployed Pilling as a Software Engineer in April 2003, and Pilling again executed an Employee Confidentiality and Non-Competition Agreement, which contained the same terms as his previously executed agreement with CHE, and included the prior royalty agreement.  In April 2008, Pilling traveled to CHE's headquarters in Fenton, Missouri, to work on a Virtual Storage Master ("VSM") unit.  During the course of his employment, Pilling received periodic raises, including a raise in June 2008, from an annual salary of $98,953, to $100,932.

CHE hired Dowell as a Systems Analyst in June 2005.  In 2007, Dowell told Marcus Smith about an employment opportunity with CHE, and Marcus Smith applied for the position. CHE hired Marcus Smith as a Director of Security and Information Systems in March 2007, and it employed his wife, Laura Smith, as a Software Quality Assurance Specialist in the spring of 2008.  Marcus Smith, Laura Smith, and Dowell signed Employment Agreements with CHE.  The

agreements[1] executed by Dowell, Marcus Smith, and Laura Smith contain non-waiver clauses, stating that no modification, amendment or waiver of the agreements' provisions would be effective unless made in writing, and further provide, in part:

> 3. <u>Faithful Performance</u>  Employee acknowledges that he [or she] is employed by CHE in a fiduciary relationship of trust and confidence and therefore agrees to devote his [or her] full time and attention to the business and affairs of CHE and, at all times, to use his [or her] best efforts to promote the interests of CHE and to faithfully and efficiently perform the responsibilities assigned to him [or her] to the fullest extent necessary to discharge such responsibilities.  Further, Employee agrees that during his [or her] employment, he [or she] will not accept employment of any nature, including self employment, for which remuneration is received unless said employment is recognized, agreed to and approved in writing by CHE in its sole discretion prior to such employment or association.  Employee also agrees he [or she] shall have no financial or other interest in any business entity which detracts from, or interferes with, Employee devoting his [or her] full time and attention to CHE's business without the prior, written permission of CHE in its sole discretion.[2]

Pilling's Employment Agreement with CHE also included a nonwaiver clause.  Section 2 of Pilling's agreement provided, in part:

> [E]mployee will devote Employee's full time and attention to the business of, and work exclusively for CHE unless otherwise agreed to by CHE's President, and shall not work for or assist any competitor of CHE or have any discussions with another person or business about engaging in any activity in competition with CHE.

CHE issued computers and other equipment to Dowell, Marcus Smith, and Laura Smith as part of their employment.  These defendants were contractually obligated, by the terms of their employment agreements, to return all CHE property upon termination:

---

[1]The language in the agreements signed by Marcus Smith and Laura Smith differ slightly from the language contained the in the agreement by Dowell, in that the Smith Employment Agreements use the pronouns "he or she" to refer to the Employee, whereas the language in Dowell's uses only the masculine pronoun for the reference.

[2]The Court notes that CHE has indicated that this language is contained in Section 1 of the agreements; however, the quoted language is actually contained in Section 3.

4.6.  Return of Company Property.  Employee acknowledges that all written records, databases, source code, CDs, DVDs, and disks containing information relating to CHE's business, including, without limitation, memoranda, notes, correspondence, reports, manuals, books, papers, letters, Client profile data, orders, customer lists, contracts, software programs, drafts, and other documentation (whether in draft or final form), and other sales, financial or technical information relating to CHE's business, and any and all other documents containing Company Information furnished to Employee by any representative of CHE or otherwise acquired or developed by him [or her] in connection with his [or her] association with CHE (collectively, "Recipient Materials") shall at all times be CHE's exclusive property.  Within twenty-four (24) hours of termination of his or her employment, Employee promises to return any Recipient Materials that are in his [or her] possession, custody or control, regardless of whether such Materials are located in Employee's office or automobile, or on Employee's office, home or personal computer. . . . Additionally, within twenty-four (24) hours of the termination of his [or her] employment, Employee . . . shall disclose any and all passwords or codes required to gain access to such devices.

Pilling's "Employee Confidentiality and Non-Competition Agreement" with CHE provided that, upon his termination , "and at any time or times before then when requested by CHE," Pilling would "return to CHE, and shall not retain, all CHE property and all documents, computer disks, and other electronic storage media containing or embodying any Confidential Information, and shall destroy or erase all such information from all non-CHE owned information systems and electronic media storage disks (but first shall make a copy of the same and deliver it to CHE)."   The agreement also stated that, because compliance with this provision might require data to be removed from Pilling's personal or home computer equipment, Pilling granted CHE or its contractors access to such equipment for that purpose.

During the course of their employment with CHE, Defendants were provided access to CHE's trade secrets and confidential proprietary information, including copyrighted computer programs identified as E-PET, E-LEM, and ERDS.  CHE's intellectual property also includes the source code for E-LEM, E-PET 1.9, E-PET 4.0, FED-AA, SAM, ARG, ERDS, SERPA, Blue Bayou, TDT, DDT, and CHE's MySQL database structure.  E-LEM, E-PET1.9, E-PET 4.0,

SERPA and Blue Bayou are remote monitoring tools.  DDT is used in conjunction with E-PET 1.9, and TDT is used in conjunction with E-LEM.  The SAM (Service Account Manager) program is utilized to monitor employee activity.

In Section 3 of his "Employee Confidentiality and Non-Competition Agreement," Pilling agreed to never "publicize, or disclose or reveal to any third party not employed or engaged by CHE any Confidential Information," and to "never use (or attempt to recreate by memory or otherwise) any Confidential Information except for CHE's benefit" during Pilling's period of employment with CHE.  Dowell's, Mr. Smith's, and Mrs. Smith's Employment Agreements limited their use of CHE information as follows:

> 4.2.2.  Employee agrees not to, directly or indirectly; participate in the unauthorized use, disclosure, or conversion of any Company Information. Employee agrees not to use Company Information for the benefit of a competitor or in any other way that harms CHE or diminishes the value of Company Information.

As Director of Security and Information Systems, Marcus Smith was responsible for the day-to-day operations of CHE's current and future network systems.  His duties and responsibilities included developing a company network equipment design requirements document for business systems' enhancement; developing a collocation network strategy and implementation plan; and developing a company network security strategy that would insure high availability to CHE team members but, at the same time, lock out competitors and other unwanted network attacks.  He was also in charge of implementing proper software testing procedures for programs developed by company software personnel; supervising, as a senior developer, the software coders, the design of the code, and supervising other company network personnel and resources.  Within three months of his hire, Marcus Smith became the direct supervisor of Pilling, Dowell, and Terry Neckar.

In late May 2008, Pilling, Dowell, and Marcus Smith decided to form an entity they would call "TriPoint Development."  TriPoint, a "custom solutions and consulting" information technology firm, was formed in June 2008, by Dowell, Marcus Smith, Pilling, and Linda Pilling. Marcus Smith and William Pilling owned two-thirds of TriPoint's shares.  Defendants operated Tri-Point, serviced TriPoint customers, invoiced its customers, and collected revenue on its behalf during the time period between July 2008 and February 20, 2009.  Defendants were employed by CHE at all times between July 2008 and February 20, 2009.

After leaving CHE on February 20, 2009, Defendants continued to operate and perform work for TriPoint.  According to information displayed on its company website,  TriPoint specializes in the design and implementation of Great Plains and other Microsoft development applications;  provides in-house solutions developed to meet the student tracking and administrative needs of the educational market; and develops, through its Remote Systems Group, custom solutions around mainframe tape and disk storage systems.  One of TriPoint's computer programs, "CIT" captures customer information and allows incoming phone calls to be tracked by the customer's caller ID and to be logged into a database.

TriPoint provided services as a subcontractor for Matrix while Defendants were still employed at CHE.  In its relationship with Matrix, TriPoint performed work for several companies with Texas locations, including Pioneer, Pinnacle Anesthesia, Rapp Collins Consulting, Trintech, Independent Banker's Bank, and Enfora.  TriPoint also performed some business as a subcontractor through a company called the Harbor Group.  Defendants did not have written permission to perform side work while employed by CHE, and Defendants did not inform CHE of TriPoint's existence, or that they were providing services to TriPoint.

On October 1, 2008, David York sent an e-mail to Marcus Smith, in which York described several issues that had not been accomplished by Marcus Smith and his team, and warned, "Either you and every member of your team get your selves organized, communicating effectively and producing functional deliverables or I will take actions to find replacement personnel who can do precisely that" [ECF No. 314-8 at 1-2].  In this e-mail, York detailed numerous issues existing within Marcus Smith's department and with his teams, including the team's failure to communicate, follow-up, and keep CHE's systems running.   York also stated, "I requested on or about August 19, 2008 a total systems design paper with logins and passwords. I get an e-mail that basically says nothing nor demonstrates anything in that regard" [ECF No. 314-8 at 1].

CHE uses a program called Star Team to store and maintain its source code [ECF No. 325-1 at 40].  While employed at CHE, Defendants began using a program called Groove to store CHE's source code [ECF No. 325-1 at 40].

On February 20, 2009, David York notified Defendants and others by em-mail that a mandatory meeting had been scheduled for that afternoon [ECF No. 314-20 at 1-2]. The mandatory meeting resulted from ongoing issues, many of which were outlined in York's October 1, 2008 e-mail to Marcus Smith.  York's February 20th e-mail included an agenda for the conference call, and advised the recipients that they were going to address problems happening with various tools provided by CHE.

Prior to the mandatory meeting, Pilling had a conference call with Dowell and the Smiths. Approximately one hour after receiving the e-mail calling a mandatory meeting, Pilling sent York an e-mail telling York that he was resigning.  Subsequently, the other defendants, and Laura Smith, sent similar e-mail communications.  All of the individual defendants attempted to

10

resign from CHE on or about February 20, 2009.  However, York rejected their resignations, and

terminated them on that date.  York sent an e-mail to CHE employees on February 20, with the

subject "Company Departures," stating, among other things, that Defendants had "been

terminated by the company for gross misconduct, insubordination, dereliction of duty, and

violation of company's standard operating procedures" [ECF No. 340-2].  The e-mail was sent to

"checonsulting" and "service_users@cheservice.com" .  Following their terminations,

Defendants continued to operate and perform work for TriPoint.

On April 2, 2009, CHE sent a letter to Pilling, informing him that funds had "been

withdrawn" from Pilling's "vacation pay in accordance with CHE rights under the

Confidentiality and Non-Competition Agreement" signed by Pilling on May 3, 2003, and

enclosing a prepared invoice regarding legal fees incurred due to Pilling's termination, as well as

a check for "vacation hours paid minus legal fees" [ECF NO. 298-26].

Defendants eventually returned CHE property, including the computers they used to

perform their job duties with CHE.  Pilling returned his personal computer and CHE equipment

after CHE compensated him for it.  Upon inspection, CHE was unable to find any of its source

code on Dowell's, Pilling's, Marcus Smith's, or Laura Smith's computers.  CHE has remained

unable to locate its source code [ECF No. 325-1 at 8-9, 40-41].

CHE initiated this litigation on April 20, 2010 [ECF No. 1].  During the course of

discovery, Defendants were instructed, by Court Order, to protect electronically stored

information [ECF Nos. 12-15].  Defendants were also directed to turn computers within their

possession over to forensic-imaging experts for examination.  On April 30, 2010, mere hours

before he turned over his computer for imaging, Pilling installed Eraser 6, a data-wiping

software, on his computer [ECF No. 291-21].  Eraser 6 makes it impossible to determine what

files have been on a computer and what the file's contents had been. [ECF No. 325-1 at 39].

## II.      SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56(c) provides that a party asserting that a fact

cannot be or is genuinely disputed must support the assertion by citing to particular parts of

materials in the record, or showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  Summary judgment will not lie if a genuine dispute about a material fact is

shown; "that is, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id.*  In ruling on a motion for summary judgment, the Court may not make

credibility determinations, weigh the evidence, or draw inferences from the facts.  *Torgerson v.*

*City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

To satisfy his initial responsibility, the movant must inform the court of the basis for his

motion and must identify those portions of the record that he believes demonstrate the absence of

a genuine issue of material fact.  *Id.* at 1042.  Once the moving party has discharged the requisite

evidentiary burden, the nonmovant must respond by submitting evidentiary materials that set out

"specific facts showing that there is a genuine issue for trial."  *Id.*  (citations omitted).  If the

nonmovant fails to produce such evidence, summary judgment in favor of the moving party is proper. *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## III.    DISCUSSION

### 1.    <u>Motion to Strike Portions of William Pilling's Declaration</u>

In their Motion to Strike Portions of William Pilling's Declaration, CHE and York ask the Court to strike, in their entirety,  paragraphs 19, 20, 23. and 29 of William Pilling's Declaration.  In their Memorandum in Support of the Motion to Strike, CHE and York contend that these paragraphs should be stricken because they are speculative, are not based on personal knowledge, and are contradicted by Pilling's prior deposition testimony.  In these paragraphs, Pilling declares as follows.  " 19.  The Company Departures E-Mail, sent by David York upon my termination, reached at least one individual not employed by CHE."  "20.  My reputation was damaged as a result of the Company Departures E-Mail."  "23.  I believe that David York used intimidation tactics to prevent other CHE employees from talking to me after I was terminated." "29.  I took no affirmative steps to conceal TriPoint's formation from CHE."

In his Response opposing the Motion to Strike, Pilling claims the motion should be denied because the statements are admissible, and comply with Rule 56(e), in that they are based on his personal knowledge and he is competent to testify on the matters stated.  Pilling further claims that the statements do not contradict his prior deposition testimony.

Affidavits in support of summary judgment must be made on personal knowledge and contain admissible evidence.  Fed. R. Civ. P. 56(c)(4).  If an affidavit does not meet the standards set forth in Rule 56, it is subject to a motion to strike.  *McSpadden v. Mullins*, 456 F.2d 428, 430 (8th Cir. 1972).  Courts may consider only admissible evidence, and are prohibited from considering affidavits and depositions that were made without personal knowledge or consisted

of hearsay.  *Weitlauf v. Parkway Sch. Dist.*, 2008 WL 3925162 at \*3 (E.D. Mo. Aug. 20, 2008).

Under the rule, affidavits filed in connection with a summary judgment motion must be based

upon the personal knowledge of the affiant; information and belief is insufficient.  *Camfield*

*Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir. 1983).

      The statement made by Pilling in Paragraph 23 of his Declaration, "I believe that David

York used intimidation tactics to prevent other CHE employees from talking to me after I was

terminated[,]" is not a statement of fact within Pilling's knowledge.  Pilling's belief as to David

York's actions with other employees following Pilling's termination is a mere surmise on his

part.  As such, the statement does not meet Rule 56's standards, and cannot be considered for

purposes of summary judgment.

      Post-deposition contradictory affidavits are admissible only when the subsequent affidavit

helps explain confusion shown by prior deposition testimony.  *Popoalii v. Corr.  Med. Servs.*,

512 F.3d 488, 498 (8th Cir. 2008).  "A party should not be allowed to create issues of credibility

by contradicting his own earlier testimony."  *Id.*

      The record shows that Pilling was deposed on July 18, 2012 [ECF No. 335-1].  During

his deposition, Pilling testified that he did not tell York that he was working or consulting for

TriPoint, or that he was providing any level of services to TriPoint [ECF No. 335-6 at 2].  Pilling

further stated that, at no time during his employment, did he tell anyone at CHE, other than

Dowell or Marcus Smith, about TriPoint's existence, and Pilling said that the three of them kept

TriPoint's formation a secret among themselves. [ECF No. 335-6 at 2-3].  Pilling testified that he

did not see "any need to tell anybody" about TriPoint [ECF No. 335-6 at 3].  The Court finds that

the statement contained in Paragraph 29 of Pilling's Declaration, "I took no affirmative steps to

conceal TriPoint's formation from CHE[,]" is contradictory to his prior deposition testimony.

14

The Court further finds that the deposition does not reflect any confusion on Pilling's part that might require explanation, that Pilling's affidavit does not explain aspects of his deposition testimony, and that the affidavit does not put forth newly discovered evidence.  *See Camfield Tires, Inc.*, 719 F.2d at 1365.  By filing his inconsistent Declaration, Pilling creates issues concerning his concealment of TriPoint's existence from CHE and York, and concerning his own credibility.  *Id.*  In doing so, Pilling injects issues that are not genuine, because the circumstances do not suggest legitimate reasons for Pilling's filing of the inconsistent affidavit.  *Id.*

Pilling also testified that he did not have direct knowledge that anyone outside the two service users distribution lists, identified by the e-mail addresses to whom the e-mail was directed, received the Company Departures e-mail sent by York on February 20, 2009 [ECF No. 335-1 at 2].  During his deposition, Pilling further stated that he did not have any direct knowledge that any of the listed recipients read the e-mail [ECF No. 335-1 at 2].

Pilling's Declaration does not explain the basis of his knowledge for his post-deposition statements made in Paragraph 19, "The Company Departures E-Mail, sent by David York upon my termination, reached at least one individual not employed by CHE," and in Paragraph 20, "My reputation was damaged as a result of the Company Departures E-Mail."  Nor does the Declaration identify with any level of particularity the "one individual not employed by CHE," or supply a factual basis for his asserted reputational damage.  In his Response opposing CHE's Motion to Strike, Pilling contends that his preamble statement, "I have personal knowledge of the statements made in this Declaration, and if called as a witness, I could testify competently thereto[,]" demonstrates his personal knowledge of the contested statements and satisfies the requirements of Rule 56 [ECF No. 340].

As to Paragraph 19 of his Declaration, Pilling claims in his Response that he was responsible for maintaining the "service_users" distribution list, and that, at CHE's request, he added a person external to CHE to that distribution list.  Pilling further claims that when he testified that he did not have knowledge that any recipient "other than what's listed" received the e-mail, he was including the recipient that he added to the distribution list.  The Court notes that Pilling not only fails to identify the "personal external to CHE" he allegedly added to the list, he also fails to cite to any evidence or provide any reference to support his factual allegation.

Pilling contends that the statement contained in Paragraph 20 of his Declaration is not contradictory to his previous deposition testimony because, although he does not have direct knowledge of anyone reading the Company Departures E-mail, he "can certainly testify how his peers treated him before and after the sending of the e-mail" [ECF No. 340].  Pilling further argues, "If he was treated differently after the e-mail was sent, [he] can attribute that result to the e-mail without having observed people actually reading the e-mail.  This is not a contradictory statement; he can simply compare and contrast how he was treated before and after the e-mail was sent."   The Court finds that Paragraphs 19 and 20 of Pilling's Declaration are not based on personal knowledge, and are inconsistent with his prior deposition testimony.  The Court will grant CHE's Motion to Strike Portions of Declaration of William Pilling and will strike Paragraphs 19, 20, 23, and 29 of Pilling's Declaration.

### 2.  **Count I: Unpaid Wages (against CHE)**

In Count I of his Counterclaim, Pilling alleges that CHE did not pay him for his last two weeks of employment, that he did not receive a full or proper raise during his last year of employment, that he did not receive any royalties due and owed to him under a certain Memorandum of Understanding, that CHE's negligently failed to itemize the cost of e-PET

licenses in its contracts, and that he suffered economic damage in the amount of 20% of the net

profits for each contract as a whole. Pilling further alleges that he received a check from CHE,

but the check was not in full because CHE had withheld funds to pay for a consultation with an

attorney regarding his termination.  Pilling claims that "CHE's action is in direct violation of

RSMo § 290.110[.]"[3] Among other things, Pilling asks for an award "[p]ursuant to RSMo §

290.110, sixty (60) days wages as penalty for violation of § 290.110[.]"  Missouri Revised

Statute § 290.110 is a penal statute, and must be strictly construed.  *Slavens v. William C. Haas*

*Co., Inc.*, 563 S.W.2d 157, 160 (Mo. App. 1978).  In Missouri, all actions upon any statute for

any penalty shall be commenced within one year after the commission of the offense.  Mo. Rev.

Stat. § 516.380.

   Pilling was terminated on February 20, 2009, and received his last paycheck sometime

thereafter.  On April 2, 2009, CHE sent a letter to Pilling, which stated:

   Attached please find a prepared invoice from Lashly Baer, CHE's Labor Law
   Firm, regarding legal fees incurred due to the end of your employment with CHE.

---

   [3]Mo. Rev. Stat. § 290.110 (Payment due discharged employee – exceptions – penalty for
delay) provides:

Whenever any person, firm, or corporation doing business in this state shall discharge, with or
without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of
the servant or employee then earned at the contract rate, without abatement or deduction, shall be
and become due and payable on the day of the discharge or refusal to longer employ and the
servant or employee may request in writing of his foreman or the keeper of his time to have the
money due him, or a valid check therefor, sent to any station or office where a regular agent is
kept; and if the money or valid check therefor, does not reach the station or office within seven
days from the date it is so requested, then as a penalty for such nonpayment the wages of the
servant or employee shall continue from the date of the discharge or refusal to further employ, at
the same rate until paid; provided, such wages shall not continue more than sixty days.  This
section shall not apply in the case of any employee who remuneration for work is based primarily
on commissions and whose duties include collection of accounts, care of a stock or merchandise
and similar activities and where an audit is necessary or customary in order to determine the net
amount due.

These funds have been withdrawn from your vacation pay in accordance with CHE rights under the Confidentiality and Non-Competition Agreement you signed on 05/03/2003.

The enclosed check reflects vacation hours paid minus legal fees.

[ECF No. 298-26].  The attached invoice billed for $792.50 for 2.60 hours of legal services, including review of e-mails, phone conferences, fact investigation, review and analysis of contracts, and legal research,  performed between March 3 and 10, 2009 [ECF No. 298-26].

Pilling filed his counterclaim in this action on October 10, 2010.  In its Motion for Summary Judgment, CHE argues that the Court lacks subject matter jurisdiction over the claim for unpaid wages contained in Count I of Pilling's Counterclaim because the claim was brought after the one year limitations period codified at Missouri Revised Statute § 516.380.  In his Response, Pilling contends that the Court has subject matter jurisdiction over Count I of his Complaint because the appropriate statute of limitations for his unpaid wages claim is five years, in accordance with Missouri Revised Statute §516.120(1),(2).  The Court finds that Pilling's claim for unpaid wages, brought pursuant to § 290.110 is untimely, and must be dismissed.

Alternatively, CHE contends that it is entitled to summary judgment as to the unpaid wages claim for failure to state a claim, because Pilling is unable to set forth a prima facie case of unpaid wages or unpaid royalties.  CHE asserts that CHE paid Pilling all wages earned and due and no such royalties are owed because CHE never sold a license for its E-PET software to a third party maintenance provider.

As an initial matter, the Court finds that Pilling's claim for recovery of royalties is not cognizable under Section 290.110.  *See* Mo. Rev. Stat. §290.110 (section shall not apply in the case of any employee who remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar activities and

where an audit is necessary or customary in order to determine the net amount due); *Slavens*,

563 S.W.2d at 161 (when method of employee's payment is not within the statutory definition of

"wages," employee cannot recover under Section 290.110).  The Court has determined that

Pilling's unpaid wages claim is untimely to be resolved under Section 290.110, and CHE

contends that Pilling's Complaint  fails to state an unpaid wages claim on any basis, because it

paid Pilling all wages due.

Although he voluntarily dismissed and withdrew his claim for vacation pay, Pilling

argues that he is entitled to recoup the amount withheld from his unused vacation pay because it

was CHE's policy to compensate its employees for unused vacation time.  He claims that a

genuine issue of material fact exists as to whether the withholding was permissible under his

Employment Agreement with CHE, because the money was withheld before CHE sought its

injunction to enforce the agreement, and before any breach had been judicially determined by the

Court.  Pilling asserts the withholding was premature and in violation of Missouri Revised

Statute 290.110.  Additionally, Pilling contends a genuine issue of material fact exists as to

whether CHE's invoice regarding the withholding was proper, as he claims the amount withheld

was excessive.  The Court finds Pilling's arguments unpersuasive.

 The record conclusively shows that the attorney's fees were withheld from Pilling's

check for unused vacation pay, and not from his check for wages.  Pillings dismissed his claim

for vacation pay, leaving no basis for his arguments of improper withholding.   The Court will

grant summary judgment to CHE on Pilling's claim for unpaid wages, and will dismiss, with

prejudice, Count I of Counterclaim Plaintiff William Pilling's Counterclaim Directed Against

Counterclaim Defendants.

19

**3.** **Count II: Breach of Contract (Royalties)**

In Count II of his Counterclaim, Pilling alleges that when CHE offered him employment in April of 2003, the offer letter he received from CHE included an attachment, which was a "Memorandum of Understanding" outlining incentives of the offer of employment.  Pilling further alleges that he completed his obligations under the Memorandum by developing E-PET, and that CHE had a contractual obligation to pay him 20% of the net profits received from all E-PET licenses sold through external marketing contracts.  He claims that he did not receive royalties owed him under the Memorandum for at least one such external marketing contracts and that he did not receive royalties owed him for any such external marketing contracts.  Pilling alleges that none of the external marketing contracts included an itemized cost for an E-PET license, and that CHE's negligent failure to itemize the cost of E-PET licenses in its contracts caused him significant economic damages for 20% of the net profits received from E-PET licenses sold by CHE.

To make a submissible case on his breach-of-contract claim, Pilling must show: 1) the existence of a valid contract; 2) each party's rights and obligations under its terms; 3) a breach; and 4) damages.  *Kieffer v. Icaza*, 376 S.W.3d 653, 657 (Mo. banc 2012).

The "Memorandum of Understanding Attachment to Offer Letter," that was included with CHE's June 14, 2002 offer of employment, states that CHE was extending the following incentive as part of its offer: "During the term of his employment with CHE Consulting, Inc. (CHE), Vern Pilling will receive 20% of the net profit received from PET licenses sold by CHE" [ECF Nos. 298-1, 298-6, 317].  CHE claims that it is entitled to summary judgment on Count II, Pilling's breach of contract claim, because the uncontroverted facts demonstrate that no breach occurred because no E-PET licenses were ever sold.  The Court agrees.  During his deposition,

20

Pilling stated that he did not know of a single company that CHE has sold or allowed to use externally without CHE's involvement for E-PET [ECF No. 298-2 at 46].  York testified during his deposition that no royalties were ever paid to Pilling in relation to E-PET because E-PET had never been licensed by a third party [ECF No. 298-3 at 37-38].  York stated that, in June of 2002, he intended to market E-PET to third party maintenance providers, but that he decided not to market the product externally sometime in 2003, after Terry Neckar and Pilling encouraged him not to license E-PET or any other piece of CHE intellectual property to third parties because it would hurt the company [ECF No. 298-3 at 38].  In deposition testimony, Terry Neckar, who also had an agreement to receive royalties in relation to E-PET, stated that no licenses were sold [ECF No. 298-22 at 25, 298-23].  Neckar further testified that he, Pilling, and York decided that licensing the product to a third-party servicing organization was a bad idea because selling CHE programs to third-party maintainers would "be giving the competition a leg up" [ECF No. 298-22 at 26].  In an affidavit executed on March 21, 2011, Neckar attested: "I would have direct knowledge if CHE sold a PET, E-PET, or LEM/E-LEM license to a third party maintainer because I am still active with CHE.  To date, CHE and its personnel are the exclusive users of the PET/E-PET or LEM/E-LEM software programs [ECF No. 298-23].

Despite months of extensive discovery that has included *in camera* review of confidential documents, Pilling has failed to adduce evidence of sales of E-PET licenses.  The Court finds that Pilling has failed to establish a breach of the Memorandum of Understanding because the triggering event for payment of royalties did not occur.  The Court will grant summary judgment to CHE on Pilling's claim for breach of contract (royalties), and will dismiss, with prejudice, Count II of Counterclaim Plaintiff William Pilling's Counterclaim Directed Against Counterclaim Defendants.

4.     **Count IV: Fraudulent Misrepresentation**

In Count IV of his Counterclaim, Pilling alleges that, on June 1, 2002, York verbally represented that Pilling would receive 20% of the net profits for PET licenses sold, and that York made the same representation in the Memorandum of Understanding Pilling received on June 14, 2002.  Pilling claims that York later stated that he had no intention of paying any royalties to Pilling.  Pilling says that he accepted CHE's employment offer, and allowed CHE to acquire Microcoders based upon York's representations regarding employment and royalties.  He claims that he suffered economic damage from being fraudulently induced, in that he was not compensated for the full value of his work, and that, without the promise of royalty payments, he would have secured employment elsewhere to receive the full value of his work.

Under Missouri law, the elements of a claim of fraud include a misrepresentation, its falsity, the maker's knowledge of its falsity, the maker's intent that it should be acted upon by the other person and in the manner reasonably contemplated, and the other person's ignorance of its falsity, detrimental reliance on its truth and right to rely thereon.  *Morrill v. Becton, Dickinson & Co.*, 747 F.2d 1217, 1222 (8th. Cir. 1984)(citing *Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 634 (Mo. App. E.D. 1980).  Proof of each element is essential, and failure to prove any element is fatal to recovery.  *Cantrell*, 603 S.W.2d at 634.  Although fraud may be established by a showing of facts and circumstances from which it reasonably and fairly may be inferred, a finding of fraud must be supported by something more substantial than suspicion, surmise and speculation.  *Id.* at 634-35.

In their Motion, CHE and York contend that they are entitled to a grant of summary judgment on Pilling's claim of fraudulent misrepresentation in Cnt IV of his Counterclaim because he has failed to state a claim upon which relief may be granted.  They assert that Pilling

has adduced no evidence that CHE made a false representation that he detrimentally relied upon, claiming that CHE fully honored the terms of Pilling's employment agreement, and that Pilling is not entitled to payment for royalties because CHE never sold a license for its E-PET software to a third-party maintenance provider.  Pilling argues that genuine issues of disputed fact exists as to whether an event occurred that would trigger the royalty clause and as to whether Defendants ever intended to honor the agreement.  Pilling claims that if he knew the Defendants were not going to honor the royalty agreement, he would not have agreed to its terms, and that, he relied upon Defendants' representation to his detriment, because it prevented him from selling the E-PET technology to another party and deriving profits from that transaction.  The Court finds that Pilling has failed to adduce evidence showing that the incentive offer was false, that York or CHE had knowledge of its falsity or ignorance of its truth, or that Pilling suffered a consequent and proximately caused injury.

As discussed in connection with Pilling's breach-of-contract claim, the unrefuted evidence shows that no E-PET license was ever sold.  Pilling has not adduced evidence showing that York or CHE did not intend to honor the terms of the royalty clause when it was extended to Pilling in 2002.   The record shows that a decision was made sometime in 2003 that the product would not be marketed externally, and that Pilling was involved in the making of that decision. The Court will grant summary judgment to CHE on Pilling's claim for fraudulent misrepresentation, and will dismiss, with prejudice, Count IV of Counterclaim Plaintiff William Pilling's Counterclaim Directed Against Counterclaim Defendants.

### 5.    **Count V: Slander and Libel**

In Count V of his Counterclaim, Pilling alleges that the February 20 "Company Departures" e-mail sent to CHE employees by York wrongly accused him of gross misconduct,

insubordination, dereliction of duty, and violation of the company's standard operating procedures.  He claims the statement was prejudicial to his reputation because it accused him of acts unbecoming of an employee or co-worker.  Pilling asserts that he has suffered damage to his business reputation because of the statement, that the computer industry is such that potential future clients, co-workers, and employers have heard or will hear the allegedly defamatory comments, and that the statement has harmed and will continue to harm him as he attempts to make a living.

To prevail on his slander and libel claim, Pilling must establish: 1) publication; 2) of a defamatory statement; 3) that identifies him; 4) that is false; 5) that is published with the requisite degree of fault; and 6) damages his reputation.  *State ex rel. BP Prod. N. Am., Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. banc 2005).  "A plaintiff must prove actual damages in all defamation cases."  *Id.*

CHE claims it is entitled to summary judgment on Pilling's slander and libel claim (Count V) because the undisputed record establishes that the intra-corporate e-mail advising of Pilling's termination, and the reasons for it, was true, and was subject to a qualified privilege. CHE also argues that Pilling has not presented any evidence establishing that he sustained a quantifiable professional or personal injury on account of the e-mail.  Pilling claims that genuine issues of material fact exist as to whether: 1) the statement made in the Company Departures e-mail was true; 2) the e-mail reached only CHE employees and was subject to intra-company privilege; and 3) he suffered reputational damage as a result of the e-mail.

The Court finds that the record contains insufficient factual grounds to support Pilling's slander and libel claim.  In particular, the Court finds that Plaintiff has failed to show that the e-mail was false, or that the statements within the e-mail were made with knowledge that they were

false, or with a reckless disregard for the truth.  The record shows that York informed Pilling's

supervisor, Marcus Smith, of York's dissatisfaction with the performance of the (Information

Technology ("IT") personnel in his department, including Pilling, and that York called a

mandatory meeting with Mr. Smith's IT team, requiring their attendance on February 20, 2009

[ECF Nos. 298-19, 317 at 22].  The record further shows that, although notified of the mandatory

meeting via e-mail, Pilling did not attend, but, instead, sent York an e-mail stating that, effective

immediately, he was resigning [ECF Nos. 298-20, 317 at22].  York rejected Pilling's resignation,

and instead, terminated him and the other members of the IT team who refused to attend the

mandatory meeting [ECF Nos. 298-21, 317 at 22-23].  In his e-mail rejecting Pilling's

resignation, York informed Pilling: "The company has elected to terminate you effective

immediately for gross misconduct, insubordination, dereliction of duty and violation of the

company's standard operating procedure" [ECF No. 298-21].  York sent an e-mail titled

"Company Departures" explaining to others at CHE that Pilling and Defendants Marcus Smith,

Laura Smith, and Jonathan Dowell were no longer employed at CHE, and stating that York

terminated them for "gross misconduct, insubordination, dereliction of duty, and violation of

company operating procedures" [ECF No.  317 at 24].

Under Missouri law, insubordination is defined as "a willful disregard of express or

implied direction or a defiant attitude."  *Dixon v. Stoam Indus., Inc.*, 216 S.W.3d 688, 693 (Mo.

App. S.D. 2007).  Willful misconduct is established when action or inaction by an employee

"amounts to conscious disregard of the interests of the employer or constitutes behavior contrary

to that which an employer has a right to expect from an employee."  *Id.*  With these principles as

a guide, the Court finds that Pilling's refusal to comply with the lawful and reasonable directive

from his employer to attend a meeting to discuss problems impacting the company's ability to

service its customers constitutes misconduct and insubordination.  As well, because it is a related

rule of law in Missouri that, in every contract of employment, it is implied that an employee will

obey the lawful and reasonable orders and instructions of his employer, the Court finds that

Pilling's conduct violated CHE operating procedures.  *Id.*  Accordingly, the Court finds that the

record shows that the statement made in the Company Departures e-mail was true.

Furthermore, the record is devoid of evidence that the statement damaged Pilling's

reputation.  It is undisputed that Pilling has no direct knowledge of whether anyone read the

Company Departures e-mail [ECF No. 317 at 24].  During his deposition, Pilling testified that the

friends he had in CHE did not want to talk to him after he left CHE [ECF No. 298-2 at 53].

When asked if he knew this lack of contact was due to the e-mail, Pilling replied, "I have no idea.

It's speculation, yes" [ECF No. 298-2 at 53].  The Court will grant CHE's Motion for Summary

Judgment on Pilling's libel and slander claim, and will dismiss, with prejudice, Count V of

Counterclaim-Plaintiff Pilling's Counterclaim.

### 6. <u>Count VI: Wrongful Termination</u>

"Under Missouri's employment at will doctrine an employer can discharge – for cause or

without cause – an at will employee who does not otherwise fall within the protective reach of a

contrary provision and still not be subject to liability for wrongful discharge." *Johnson v.*

*McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. banc 1988).  However, the Missouri

Supreme Court has expressly adopted a public-policy exception to its at-will employment

doctrine that provides an employee a cause of action in tort for wrongful discharge if he is

terminated: 1) for refusing to violate the law or any well-established and clear mandate of public

policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or

rules created by a governmental body; or 2) for reporting wrongdoing or violations of law to

superiors or public authorities.  *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo.

banc 2010).

 Missouri has extended this limited right to bring a wrongful discharge in violation of

public policy to contract employees.  *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 102-03

(Mo. banc 2010).  One of the compelling reasons identified by Missouri's Supreme Court for

allowing contract employees to pursue an action for wrongful discharge in violation of public

policy was that limiting the cause of action to at-will employees failed to recognize the distinct

underlying purpose of the wrongful discharge cause of action.  *Id.* at 102.  While a breach-of-

contract action enforces privately negotiated employment terms and conditions, a wrongful

discharge claim is premised on a conflict between the employment conditions and the applicable

constitutional, statutory, or regulatory provisions.  *Id.*  "A discharge is not 'wrongful' because it

violates the contractual terms of employment."  *Id.*

 To prevail on a claim for wrongful termination, Pilling must prove that he refused to

perform an illegal act or act in a manner contrary to public policy, that he was discharged, and

that there was a causal connection between his discharge and his refusal to engage in the actions

at issue.  *Id.* at 103.

 In Count VI of his Counterclaim, Pilling alleges that, although CHE's stated reasons for

terminating him on February 20, 2009, were gross misconduct, insubordination, dereliction of

duty, and violation of the company's standard operating procedures, ''[a] contributing factor in

CHE constructively discharging and terminating Pilling was because he refused to perform

illegal acts requested of him by David York."  He alleges that he never acted in a way to warrant

termination with cause, and that "[a] contributing reason for Pilling not receiving a full raise his

last year of employment was his reporting and refusal to engage[] in illegal acts as requested by

Defendants." Pilling alleges that CHE and York received passwords of CHE competitor STK, and that CHE and York wanted Marcus Smith and his department, including Pilling, to use those passwords to read hard drives, extract data, and determine how STK's systems worked. Pilling claims that CHE and York wanted to create a hacked system that would allow CHE to maintain STK hardware at customer sites, but control the unit at a low level, which would interfere with other companies performing maintenance on the device. According to Pilling, when CHE and York asked Marcus Smith's team to "hack" into a STK VSM unit, Smith's team determined the request was illegal and refused to comply. Pilling alleges that when others determined how to hack the password protection scheme, Smith informed York of the illegal activity, and York praised those responsible for complying with the request. Pilling asserts that he reported his concerns with such activity, and that, prior to his termination, he was never written up and had never been disciplined.

CHE contends that it is entitled to summary judgment on Count VI, Pilling's claim for wrongful termination, because Pilling has failed to state a claim upon which relief may be granted. CHE argues that the undisputed record establishes that Pilling did not engage in protected conduct, and that there is no causality between Pilling's "phantom complaint" and his employment termination. Pilling argues that the Motion for Summary Judgment should be denied as to Count III's wrongful termination claim, because genuine issues of material fact remain as to whether he engaged in protected conduct, "blew the whistle" on protected conduct, and was terminated as a result.

The Court finds that the record contains insufficient evidence to establish essential elements of Pilling's wrongful termination claim, as he has not produced any evidence to show that he refused to perform an illegal act or act in a manner contrary to public policy, to show that

he reported wrongdoing or violations of law to superiors or public authorities, and, most

significantly, to show a causal connection between his discharge and his alleged refusal to engage

in any illegal act or to act in a manner contrary to public policy.  Pilling alleges that, when he

traveled to CHE's headquarters in St. Louis to work on a VSM unit, CHE asked him "to directly

contravene the terms of [a] settlement agreement and violate Federal law" by circumventing "a

password protection on the [STK VSM] system because of the STK litigation" [ECF No. 317 at

12].  During his deposition, Pilling stated, "I knew that circumventing a password was a violation

of DMCA [Digital Millennium Copyright Act] and so I refused to proceed" [ECF No. 317-6 at

5].  When questioned about this statement, Pilling said that he formed his "own subjective

opinion" that circumvention a password would violate DMCA after reading the Act, and that he

told York that it was not legal [ECF No. 317-6 at 5-6].  Pilling testified that York "said, just go

home[,]" and that he, Dowell, and Marcus Smith left and went home [ECF No. 317-6 at 6].

Pilling further testified that he never told York that he refused to do what he was allegedly asked

to perform, and that, other than discussions with Marcus Smith and Dowell, he did not recall any

other conversations with anyone at CHE regarding his belief that he was asked to violate the law

by circumvention, or by  anything he believed to be an unlawful act [ECF No. 317-6 at 6].

    Pilling's allegations of wrongdoing describe conduct that has, in previous litigation

between STK and CHE, been determined not to violate the DMCA.  *See Storage Tech. Corp. v.

Custom Hardware Eng'g & Consulting, Inc.* ("STK I"), 421 F.3d 1307 (Fed. Cir. 2005); *Storage

Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.* ("STK II"), 2006 WL 1766434 (D.

Mass. June 28, 2006).  In *STK I*, STK alleged that CHE violated the anticircumvention provision

of the DMCA when CHE circumvented a protect system to force a customer's Control Unit to

transmit error codes.  *STK I*, 421 F.3d. at 1310.  Following remand from the Federal Circuit, the

29

District Court concluded that CHE's circumvention of the protect system did not violate the DMCA because it did not infringe a right protected by the Copyright Act. *STK II*, 2006 WL 1766434 at *7. The evidence shows that Pilling was fully aware of the prior STK litigation, and the courts' conclusions concerning the circumvention activities, at the time of the alleged incident in April of 2008 [ECF No. 317-6 at 5-6].

The Court finds that Pilling has not adduced evidence that he refused to perform illegal activity, and that the record conclusively shows that he was not terminated for such a refusal or for reporting illegal activity. Rather, the Court finds that York terminated him on February 20, because Pilling, in collaboration with his team members, intentionally failed to attend a mandatory meeting called by York on that date to discuss software problems. In fact, the record shows several incidents of favorable treatment Pilling received from CHE during the intervening ten-month period between the alleged incident of wrongdoing and Pilling's termination. It is undisputed that, in June 2008, two months after Pilling's alleged refusal and complaint, Pilling received a raise, from $98,953 per year, to $100,932 [ECF No. 317 at 15]. Prior to his termination, Pilling was never written up and had never been disciplined [ECF Nos. 60 at 6, ¶ 33; 71 at 6, ¶ 33]. Pilling testified that York's June 2008 performance appraisal for Pilling was reasonably fair [ECF No. 317-6 at 7]. It is undisputed that York informed Pilling of the mandatory meeting on February 20, 2009, and that Pilling, following discussion with the other members of his team, decided not to attend the meeting and, instead, sent York an email stating he was resigning, effective immediately. It is further undisputed that, after Pilling failed to attend the mandatory meeting, York rejected Pilling's resignation, and terminated him.

Even if Pilling had adduced sufficient evidence that he refused to perform, or had reported, a wrongdoing or violation of law, Pilling has not shown a causal connection between

the alleged April 2008 incident and his February 20, 2009 termination.  The Court will grant

CHE's Motion for Summary Judgment as to Pilling's wrongful termination claim and will

dismiss, with prejudice, Count VI of Pilling's Counterclaim.

## IV.    CONCLUSION

Counterclaim-Plaintiff Pilling previously dismissed Counts III, VII and VIII of his

Counterclaim; consequently, the Court's grant of summary judgment to CHE on Counts I, II, IV,

V, and VI will dispose of all remaining counts of Pilling's Counterclaim against CHE and York .

Accordingly,

**IT IS HEREBY ORDERED** that Custom Hardware Engineering & Consulting, Inc,'s

Motion to Strike Portions of Declaration of William Pilling [ECF No. 334] is **GRANTED.**

Paragraphs 19, 20, 23, and 29 of Declaration of William Pilling are **STRICKEN**.

**IT IS FURTHER ORDERED** that  Counterclaim Defendants Custom Hardware

Engineering, Inc. and David York's Motion for Summary Judgment as to Counts I, II, IV, V, and

VI of Counterclaim Plaintiff William Pilling's Counterclaim Directed Against Counterclaim

Defendants [ECF No. 297] is **GRANTED**.  Counterclaim Plaintiff William Pilling's

Counterclaim Directed Against Counterclaim Defendants [ECF No. 60] is **DISMISSED**.


Dated this   23rd    day of January, 2013.

_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE

31