UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CUSTOM HARDWARE ENGINEERING       )
& CONSULTING, INC.,               )
                                  )
                                  )
        Plaintiff/Counterclaim-Defendant,    )
                                  )
    vs.                           )          Case No. 4:10CV000653 ERW
                                  )
JONATHAN D. DOWELL, *et al*.,     )
                                  )
                                  )
        Defendants/Counterclaim-Plaintiffs.   )

**MEMORANDUM AND ORDER**

This matter comes before the Court on Third Party Defendants Custom Hardware

Engineering & Consulting's (CHE's) and David York's Motion for Summary Judgment as to

Counts I, II, and III of Third Party Plaintiff Laura Smith's Complaint Directed Against

Counterclaim Defendants [ECF No. 294].

CHE filed its Second Amended Complaint ("SAC") for Injunctive Relief and Damages

against Defendants Jonathan D. Dowell, Marcus K. Smith, Laura Smith, William Pilling, and

TriPoint Development, Inc. ("TriPoint"), alleging the following causes of action: 1) Copyright

Infringement (against all Defendants); 2) Violation of Federal Fraud and Abuse Act (against all

Defendants); 3) Breach of Contract (against Dowell, Marcus Smith, and Laura Smith); 4) Breach

of Contract (against Pilling); 5) Breach of Fiduciary Duty and Duty of Loyalty (against Dowell,

Marcus Smith, Laura Smith and Pilling); 6) Tortious Interference with Contract (against

TriPoint); 7) Misappropriation of Trade Secrets (against all Defendants); 8) Unfair Competition

(against all Defendants); 9) Civil Conspiracy (against all Defendants); 10) Replevin (against all

Defendants); 11) Conversion (against all Defendants); and 12) Unjust Enrichment (against all

Defendants) [ECF No. 147].

Defendants filed several counterclaims in this matter, naming CHE and David York as Counterclaim-Defendants [ECF Nos. 58, 59, 60, 61, 167, 169].  Laura Smith and Third Party Plaintiff Linda Pilling filed Third Party Complaints against CHE and York, alleging that the Court had supplemental subject jurisdiction over certain state law claims under 28 U.S.C. §1367 (claims so related as to form part of same case or controversy) [ECF No. 62, 63, 167, 169].  In her Third Party Complaint, Laura Smith asserted four claims: 1) unpaid wages (against CHE only); 2) slander and libel; 3) wrongful termination; and 4) tortious interference with a business expectancy or relationship [ECF No, 63].  CHE and York filed an Answer to Laura Smith's Third Party Complaint, asserting several affirmative defenses [ECF No. 111].  Subsequently, Laura Smith voluntarily dismissed without prejudice a claim for vacation pay contained in Count I (unpaid wages), and Count IV (tortious interference) [ECF No. 169].

## I.    STATEMENT OF UNDISPUTED FACTS

The following fact statement is a recitation of undisputed facts taken from Third Party Plaintiff Laura Smith's Complaint [ECF No. 63], Third Party Defendants CHE and York's Answer to Third Party Plaintiff Laura Smith's Complaint [ECF No. 111], Counterclaim Defendants CHE and York's Statement of Uncontroverted Material Facts in Support of Their Motion for Summary Judgment as to Counts I, II, IV, V, and VI of Laura Smith's Third Party Complaint Directed Against Counterclaim Defendants [ECF No. 296-1], Third Party Laura Smith's Response to Counterclaim Defendants' Statement of Uncontroverted Material Facts [ECF No. 318], Third Party Plaintiff Laura Smith's Statement of Controverted and Additional Material Facts in Response to Counterclaim Defendants' Motion for Summary Judgment [ECF No. 318-1], Counterclaim Defendants CHE's and York's Response to Third Party Plaintiff Laura Smith's Statement of Controverted and Additional Material Facts in Response to Counterclaim

Defendants' Motion for Summary Judgment [ECF No. 327-1], Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 147], Defendants' Joint Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 154], Defendants' Statement of Uncontroverted Material Facts [ECF No. 291], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Response to Defendants' Statement of Uncontroverted Material Facts [ECF No. 314-1], Defendants' Reply to Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts and Statement of Additional Facts [ECF No. 325-1], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF 304-1],  Defendants' Response to Plaintiff's Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 319], Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V, and VI of Its Second Amended Complaint [ECF NO. 319-1], and Plaintiff's Response to Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 337-1].

CHE is a Delaware corporation with its principal place of business in Fenton, Missouri. CHE's President and Chief Executive Officer is David York.  In addition to its Fenton office personnel, CHE has employees working from home across thirty-seven states.  In the course of its business, CHE provides, among other things, computer hardware maintenance services on IBM, STK, EMC, HP, Sun Microsystems, HDS, Spectrologix, Quantum, and several other

3

computer systems.  As part of the hardware services that it provides, CHE has developed and fielded remote monitoring technology that allows CHE personnel to monitor and troubleshoot computer systems remotely.  CHE provides its services to commercial and government entities in all parts of the United States, including Missouri and Texas.  Some of CHE's customers are Mainline, IBM, Service Express, Sentinel, SSCS, MVSS, Telestra, Bank of America, Fannie Mae, and the State of California.

Defendants Dowell, Marcus Smith, and Laura Smith are residents of McKinney, Texas. Defendant Pilling is a resident of Tucson, Arizona.  Defendant TriPoint is a Texas corporation with its principle place of business in McKinney, Texas.  CHE employed Pilling as a Software Engineer in April 2003, and Dowell as a Systems Analyst in June 2005.  In 2007, Dowell told Marcus Smith about an employment opportunity with CHE, and Marcus Smith applied for the position.  CHE hired Marcus Smith as a Director of Security and Information Systems in March 2007, and it employed his wife, Laura Smith, as a Software Quality Assurance Specialist in the spring of 2008.  Marcus Smith, Laura Smith,  Dowell, and Pilling signed Employment Agreements with CHE.  The agreements[1] executed by Dowell, Marcus Smith, and Laura Smith contain non-waiver clauses, and further provide, in part:

> 3. <u>Faithful Performance</u>  Employee acknowledges that he [or she] is employed by CHE in a fiduciary relationship of trust and confidence and therefore agrees to devote his [or her] full time and attention to the business and affairs of CHE and, at all time, to use his [or her] best efforts to promote the interests of CHE and to faithfully and efficiently perform the responsibilities assigned to him [or her] to the fullest extent necessary to discharge such responsibilities.  Further, Employee agrees that during his [or her] employment, he [or she] will not accept employment of any nature, including self employment, for which remuneration is

---

[1]The language in the agreements signed by Marcus Smith and Laura Smith differ slightly from the language contained the in the agreement by Dowell, in that the Smith Employment Agreements use the pronouns "he or she" to refer to the Employee, whereas the language in Dowell's uses only the masculine pronoun for the reference.

received unless said employment is recognized, agreed to and approved in writing by CHE in its sole discretion prior to such employment or association.  Employee also agrees he [or she] shall have no financial or other interest in any business entity which detracts from or interferes with, Employee devoting his [or her] full time and attention to CHE's business without the prior, written permission of CHE in its sole discretion.[2]

Pilling's Employment Agreement with CHE also included a nonwaiver clause.  Section 2 of Pilling's agreement provided, in part:

[E]mployee will devote Employee's full time and attention to the business of, and work exclusively for CHE unless otherwise agreed to by CHE's President, and shall not work for or assist any competitor of CHE or have any discussions with another person or business about engaging in any activity in competition with CHE.

CHE issued computers and other equipment to Dowell, Marcus Smith, and Laura Smith as part of their employment.  These defendants were contractually obligated, by the terms of their employment agreements, to return all CHE property upon termination:

4.6.  <u>Return of Company Property</u>.  Employee acknowledges that all written records, databases, source code, CDs, DVDs, and disks containing information relating to CHE's business, including, without limitation, memoranda, notes, correspondence, reports, manuals, books, papers, letters, Client profile data, orders, customer lists, contracts, software programs, drafts, and other documentation (whether in draft or final form), and other sales, financial or technical information relation to CHE's business, and any and all other documents containing Company Information furnished to Employee by any representative of CHE or otherwise acquired or developed by him or her in connection with his or her association with CHE (collectively, "Recipient Materials") shall at all times be CHE's exclusive property.  Within twenty-four (24) hours of termination of his or her employment, Employee promises to return any Recipient Materials that are in his or her possession, custody or control, regardless of whether such Materials are located in Employee's office or automobile, or on Employee's office, home or personal computer. . . . Additionally, within twenty-four (24) hours of the termination of his [or her] employment, Employee . . . shall disclose any and all passwords required to gain access to such devices.

---

[2]The Court notes that CHE has indicated that this language is contained in Section 1 of the agreements; however, the quoted language is actually contained in Section 3.

5

Pilling's "Employee Confidentiality and Non-Competition Agreement" with CHE provided that, upon his termination , "and at any time or times before then when requested by CHE," Pilling would "return to CHE, and shall not retain, all CHE property and all documents, computer disks, and other electronic storage media containing or embodying any Confidential Information, and shall destroy or erase all such information from all non-CHE owned information systems and electronic media storage disks (but first shall make a copy of the same and deliver it to CHE)."  The agreement also stated that, because compliance with this provision might require data to be removed from Pilling's personal or home computer equipment, Pilling granted CHE or its contractors access to such equipment for that purpose.

During the course of their employment with CHE, Defendants were provided access to CHE's trade secrets and confidential proprietary information, including copyrighted computer programs identified as E-PET, E-LEM, and ERDS.  CHE's intellectual property also includes the source code for E-LEM, E-PET 1.9, E-PET 4.0, FED-AA, SAM, ARG, ERDS, SERPA, Blue Bayou, TDT, DDT, and CHE's MySQL database structure.  E-LEM, E-PET1.9, E-PET 4.0, SERPA and Blue Bayou are remote monitoring tools.  DDT is used in conjunction with E-PET 1.9, and TDT is used in conjunction with E-LEM.  The SAM (Site Account Manager) program is utilized to monitor employee activity.

In Section 3 of his "Employee Confidentiality and Non-Competition Agreement," Pilling agreed to never "publicize, or disclose or reveal to any third party not employed or engaged by CHE any Confidential Information," and to "never use (or attempt to recreate by memory or otherwise) any Confidential Information except for CHE's benefit" during Pilling's period of employment with CHE.  Dowell's, Mr. Smith's, and Mrs. Smith's Employment Agreements limited their use of CHE information as follows:

4.2.2.  Employee agrees not to, directly or indirectly; participate in the unauthorized use, disclosure, or conversion of any Company Information. Employee agrees not to use Company Information for the benefit of a competitor or in any other way that harms CHE or diminishes the value of Company Information.

As Director of Security and Information Systems, Marcus Smith was responsible for the day-to-day operations of CHE's current and future network systems.  His duties and responsibilities included developing a company network equipment design requirements document for business systems' enhancement; developing a collocation network strategy and implementation plan; and developing a company network security strategy that would insure high availability to CHE team members but, at the same time, lock out competitors and other unwanted network attacks.  He was also in charge of implementing proper software testing procedures for programs developed by company software personnel; supervising, as a senior developer, the software coders, the design of the code, and supervising other company network personnel and resources.  Within three months of his hire, Marcus Smith became the direct supervisor of Pilling, Dowell, and an employee named Terry Neckar.

Marcus Smith informed his wife, Laura Smith, of a position in documentation and quality assurance at CHE in 2008.  After interviewing for the position with Marcus Smith and York, Laura Smith accepted an offer of employment with CHE.  She signed her Employment Agreement on May 1, 2008.  Mrs. Smith also received and read CHE's Employee Handbook, and agreed to abide by its terms.  Mrs. Smith's job responsibilities were to make sure that CHE software was functioning properly, and did not contain any "bugs."  She worked exclusively from home, and exclusively on CHE programs.  Mrs. Smith also worked for a Montessori school while she was employed at CHE.  Mrs. Smith did not seek York's approval to work twenty hours weekly at the Montessori school.

7

In late May 2008, Pilling, Dowell, and Marcus Smith decided to form an entity they would call "TriPoint Development."  TriPoint, a "custom solutions and consulting" information technology firm, was formed in June 2008, by Dowell, Marcus Smith, Pilling, and Linda Pilling. Marcus Smith and William Pilling owned two-thirds of TriPoint's shares.  Defendants operated Tri-Point, serviced TriPoint customers, invoiced its customers, and collected revenue on its behalf during the time period between July 2008 and February 20, 2009.  Defendants were employed by CHE at all times between July 2008 and February 20, 2009.

After leaving CHE on February 20, 2009, Defendants continued to operate and perform work for TriPoint.  According to information displayed on its company website, TriPoint specializes in the design and implementation of Great Plains and other Microsoft development applications;  provides in-house solutions developed to meet the student tracking and administrative needs of the educational market; and develops, through its Remote Systems Group, custom solutions around mainframe tape and disk storage systems.  One of TriPoint's computer programs, "CIT" captures customer information and allows incoming phone calls to be tracked by the customer's caller ID and to be logged into a database.

TriPoint provided services as a subcontractor for Matrix while Defendants were still employed at CHE.  Via its relationship with Matrix, TriPoint performed work for several companies with Texas locations, including Pioneer, Pinnacle Anesthesia, Rapp Collins Consulting, Trintech, Independent Banker's Bank, and Enfora.  TriPoint also performed some business as a subcontractor through a company called the Harbor Group.  Defendants did not have written permission to perform side work while employed by CHE, and Defendants did not inform CHE of TriPoint's existence, or that they were providing services to TriPoint.

8

On October 1, 2008, David York sent an e-mail to Marcus Smith, in which York described several issues that had not been accomplished by Marcus Smith and his team, and warned, "Either you and every member of your team get your selves organized, communicating effectively and producing functional deliverables or I will take actions to find replacement personnel who can do precisely that" [ECF No. 314-8 at 1-2].  In this e-mail, York detailed numerous issues existing within Marcus Smith's department and with his teams, including the team's failure to communicate, follow-up, and keep CHE's systems running.   York also stated, "I requested on or about August 19, 2008 a total systems design paper with logins and passwords. I get an e-mail that basically says nothing nor demonstrates anything in that regard" [ECF No. 314-8 at 1].

CHE uses a program called Star Team to store and maintain its source code [ECF No. 325-1 at 40].  While employed at CHE, Defendants began using a program called Groove to store CHE's source code [ECF No. 325-1 at 40].

On February 20, 2009, David York notified Defendants and others by e-mail that a mandatory meeting had been scheduled for that afternoon [ECF Nos. 296-11, 314-20 at 1-2]. The mandatory meeting resulted from ongoing issues, many of which were outlined in York's October 1, 2008 e-mail to Marcus Smith.  York's February 20th e-mail included an agenda for the conference call, and advised the recipients that they were going to address problems happening with various tools provided by CHE.

Prior to the mandatory meeting, Pilling had a conference call with Dowell and the Smiths. Subsequently, all of the individual defendants sent e-mails to York telling York that they were resigning.  All of the individual defendants attempted to resign from CHE on or about February 20, 2009.  However, York rejected their resignations, and terminated them on that date.  York

9

sent an e-mail to CHE employees on February 20, with the subject "Company Departures," stating, among other things, that Defendants had "been terminated by the company for gross misconduct, insubordination, dereliction of duty, and violation of company's standard operating procedures" [ECF No. 296-16].  The e-mail was sent to "checonsulting" and "service_users@cheservice.com" [ECF 327-1].  Following their terminations, Defendants continued to operate and perform work for TriPoint.

CHE sent a letter to Mrs. Smith on April 2, 2009, with a prepared invoice from a law firm.  The letter stated: "These funds have been withdrawn from your vacation pay in accordance with CHE rights under the Employee Agreement you signed on 05/01/2008.  The enclosed check reflects vacation hours paid minus legal fees." [ECF No. 296-17].

Defendants eventually returned CHE property, including the computers they used to perform their job duties with CHE.  Pilling returned his personal computer and CHE equipment after CHE compensated him for it.  Upon inspection, CHE was unable to find any of its source code on Dowell's, Pilling's, Marcus Smith's, or Laura Smith's computers.  CHE has remained unable to locate its source code [ECF No. 325-1 at 8-9, 40-41].

CHE initiated this litigation on April 20, 2010 [ECF No. 1].  During the course of discovery, Defendants were instructed, by Court Order, to protect electronically stored information [ECF Nos. 12-15].  Defendants were also directed to turn computers within their possession over to forensic-imaging experts for examination.  On April 30, 2010, mere hours before he turned over his computer for imaging, Pilling installed Eraser 6, a data-wiping software, on his computer [ECF No. 291-21].  Eraser 6 makes it impossible to determine what files have been on a computer and what the file's contents had been. [ECF No. 325-1 at 39].

## II.        SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56(c) provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment will not lie if a genuine dispute about a material fact is shown; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In ruling on a motion for summary judgment, the Court may not make credibility determinations, weigh the evidence, or draw inferences from the facts.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

 To satisfy his initial responsibility, the movant must inform the court of the basis for his motion and must identify those portions of the record that he believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 1042.  Once the moving party has discharged the requisite evidentiary burden, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial."  *Id.*  (citations omitted).  If the nonmovant fails to produce such evidence, summary judgment in favor of the moving party is proper.  *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

III.    **DISCUSSION**

1.    **Count I: Unpaid Wages (against CHE)**

In Count I of her Third Party Complaint, Mrs. Smith alleges that she met CHE

requirements for payment under CHE's Bonus Program, that CHE did not pay her for bonus

money owed under the program, that CHE did not pay her for her last two weeks of employment,

and that CHE failed to reimburse her in whole for outstanding expense reports as of her date of

termination.  Mrs. Smith further alleges that she received a check from CHE, but the check was

not in full because CHE had withheld funds to pay for a consultation with an attorney regarding

her termination.  Mrs. Smith claims that "CHE's action is in direct violation of RSMo §

290.110[.]"[3] Among other things, Mrs. Smith asks for an award "[p]ursuant to RSMo § 290.110,

sixty (60) days wages as penalty for violation of § 290.110[.]"  Although Count I also alleges that

Mrs. Smith was not payed for bonus money owed under CHE's Bonus Program, and money

owed for unspent vacation, sick and similar paid time off days, Mrs. Smith adduced no evidence

regarding her claims for bonus money, sick or similar paid time off days, and voluntarily

---

[3]Mo. Rev. Stat. § 290.110 (Payment due discharged employee – exceptions – penalty for delay) provides:

Whenever any person, firm, or corporation doing business in this state shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of the servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of the discharge or refusal to longer employ and the servant or employee may request in writing of his foreman or the keeper of his time to have the money due him, or a valid check therefor, sent to any station or office where a regular agent is kept; and if the money or valid check therefor, does not reach the station or office within seven days from the date it is so requested, then as a penalty for such nonpayment the wages of the servant or employee shall continue from the date of the discharge or refusal to further employ, at the same rate until paid; provided, such wages shall not continue more than sixty days.  This section shall not apply in the case of any employee whose remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar activities and where an audit is necessary or customary in order to determine the net amount due.

dismissed Count I's claim for vacation pay; moreover, during her deposition, she stated that she was seeking only the money withheld for attorney's fees as monetary damages [ECF Nos. 169, 296-2 at 37].

Missouri Revised Statute § 290.110 is a penal statute, and must be strictly construed. *Slavens v. William C. Haas Co., Inc.*, 563 S.W.2d 157, 160 (Mo. App. 1978).  In Missouri, all actions upon any statute for any penalty shall be commenced within one year after the commission of the offense.  Mo. Rev. Stat. § 516.380.

Mrs. Smith was terminated on February 20, 2009, and received her last paycheck sometime thereafter.  She filed her counterclaim in this action on October 10, 2010.  In its Motion for Summary Judgment, CHE argues that the Court lacks subject matter jurisdiction over the claim for unpaid wages contained in Count I of Mrs. Smith's Third Party Complaint because the claim was brought after the one year limitations period codified at Missouri Revised Statute § 516.380.  In her Response, Mrs. Smith contends that the Court has subject matter jurisdiction over Count I of her Complaint because the appropriate statute of limitations for her unpaid wages claim is five years, in accordance with Missouri Revised Statute §516.120(1),(2).  The Court finds that Mrs. Smith's claim for unpaid wages, brought pursuant to § 290.110 is untimely, and must be dismissed.

Alternatively, CHE contends that it is entitled to summary judgment as to the unpaid wages claim for failure to state a claim, because Mrs. Smith has not adduced any evidence that she was owed a bonus payment, CHE paid Mrs. Smith all wages earned and due, and the only money withheld by CHE for legal fees was taken from her vacation pay.

As an initial matter, the Court finds that Mrs. Smith's claims for vacation pay, sick leave pay, and bonus pay are not cognizable under Section 290.110.  *See* Mo. Rev. Stat. §290.110

13

(section shall not apply in the case of an employee whose remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar activities and where an audit is necessary or customary in order to determine the net amount due);  *Slavens*, 563 S.W.2d at 161 (when method of employee's payment is not within the statutory definition of "wages," employee cannot recover under Section 290.110; claims for vacation pay and sick leave pay are not within purview of the statute).  The Court has determined that Mrs. Smith's unpaid wages claim is untimely under Section 290.110, and CHE contends that Mrs. Smith's Complaint  fails to state an unpaid wages claim on any basis, because it paid her all wages due.

Although she voluntarily dismissed and withdrew her claim for vacation pay, Mrs. Smith argues that she is entitled to recoup the amount withheld from her unused vacation pay because it was CHE's policy to compensate its employees for unused vacation time.  She claims that a genuine issue of material fact exists as to whether the withholding was permissible under her Employment Agreement with CHE, because the money was withheld before CHE sought its injunction to enforce the agreement, and before any breach had been judicially determined by the Court.  Mrs. Smith asserts the withholding was premature and in violation of Missouri Revised Statute 290.110.  Additionally, Mrs. Smith contends a genuine issue of material fact exists as to whether CHE's invoice regarding the withholding was proper, as she claims the amount withheld was excessive.  The Court finds Mrs. Smith's argument unpersuasive.

The record conclusively show that the attorney's fees were withheld from Mrs. Smith's check for unused vacation pay, and not from her check for wages.  Mrs. Smith dismissed her claim for vacation, leaving no basis for her arguments of improper withholding.  The Court will grant summary judgment to CHE on Mrs. Smith's claim for unpaid wages, and will dismiss, with

14

prejudice, Count I of Third Party Plaintiff Laura Smith's Complaint Directed Against Counterclaim Defendants.

### 2.  **Count II: Defamation Claim**

In Count III of her Third Party Complaint, Mrs. Smith alleges that the February 20 "Company Departures" e-mail sent to CHE employees by York wrongly accused her of gross misconduct, insubordination, dereliciton of duty, and violation of the company's standard operating procedures.  She claims the statement was prejudicial to her reputation because it accused her of acts unbecoming of an employee or co-worker.  Mrs. Smith asserts that she has suffered damage to her business reputation because of the statement, that the computer industry is such that potential future clients, co-workers, and employers have heard or will hear the allegedly defamatory comments, and that the statement has harmed and will continue to harm her as she attempts to make a living.

To prevail on her defamation claim, Mrs. Smith must establish: 1) publication; 2) of a defamatory statement; 3) that identifies her; 4) that is false; 5) that is published with the requisite degree of fault; and 6) damages her reputation.  *State ex rel. BP Prod. N. Am., Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. banc 2005).  "A plaintiff must prove actual damages in all defamation cases."  *Id.*

CHE claims it is entitled to summary judgment on Mrs. Smith's defamation claim (Count II) because the undisputed record establishes that the intra-corporate e-mail advising of Mrs. Smith's termination and the reasons for it, was true, and was subject to a qualified privilege. CHE also argues that Mrs. Smith has not presented any evidence establishing that she sustained a quantifiable professional or personal injury on account of the e-mail.  Mrs. Smith claims that genuine issue of material facts exist as to whether: 1) the statement made in the Company

Departures e-mail was true; 2) the e-mail reached only CHE employees and was subject to intra-company privilege; and 3) she suffered reputational damage as a result of the e-mail.

The Court finds that the record contains insufficient factual grounds to support a defamation claim.  Mrs. Smith has failed to establish the fourth, fifth, and sixth elements of a claim for defamation.

The Court finds that Plaintiff has failed to show that the e-mail was false, that the statements within the e-mail were made with knowledge that they were false or with a reckless disregard for the truth.  The record shows that York informed Mrs. Smith's supervisor, Marcus Smith, of York's dissatisfaction with the performance of the Information Technology ("IT") personnel in his department, including Mrs. Smith, and that he called a mandatory meeting with Mr. Smith's IT team, requiring their attendance on February 20, 2009 [ECF No. 318 at 10-11].  The record further shows that, although notified of the mandatory meeting via e-mail, Mrs. Smith did not attend, but, instead, sent York an e-mail stating that, effective immediately, she was resigning [ECF No. 318 at 11].  York rejected Mrs. Smith's resignation, and instead, terminated her and the other members of the IT team who refused to attend the mandatory meeting [ECF No. 318 at 11].  York sent an e-mail titled "Company Departures" explaining to others at CHE that Mrs. Smith and Defendants Marcus Smith, William Pilling and Jonathan Dowell were no longer employed at CHE, and stating that York terminated them for "gross misconduct, insubordination, dereliction of duty, and violation of company operating procedures" [ECF Nos. 296-16, 318 at 12].

Under Missouri law, insubordination is defined as "a willful disregard of express or implied direction or a defiant attitude."  *Dixon v. Stoam Indus., Inc.*, 216 S.W.3d 688, 693 (Mo. App. S.D. 2007).  Willful misconduct is established when action or inaction by an employee

"amounts to conscious disregard of the interests of the employer or constitutes behavior contrary to that which an employer has a right to expect from an employee." *Id.* With these principles as a guide, the Court finds that Mrs. Smith's refusal to comply with the lawful and reasonable directive from his employer to attend a meeting to discuss problems impacting the company's ability to service its customers constitutes misconduct and insubordination. As well, because it is a related rule of law in Missouri that, in every contract of employment, it is implied that an employee will obey the lawful and reasonable orders and instructions of his employer, the Court finds that Mrs. Smith's conduct violated CHE operating procedures. *Id.* Accordingly, the Court finds that the record shows that the statement made in the Company Departures e-mail was true.

Furthermore, the record is devoid of evidence that the statement damaged Mrs. Smith's reputation. Mrs. Smith has never spoken with anyone at CHE or anyone within the computer industry at large about the Company Departures e-mail [ECF No. 318 at 11]. Mrs. Smith does not know specifically who was on the distribution that received the e-mail [ECF Nos. 318 at 12, 318-4 at 5]. No one from Mrs. Smith's current employer has ever contacted her about the e-mail [ECF No. 318 at 13]. Mrs. Smith does not have direct knowledge that anyone read the e-mail, but Defendant Jonathan Dowell told her that his father, John Dowell, had seen it [ECF Nos. 318 at 12, 296-2 at 34]. Mrs. Smith did not actually speak to John Dowell [ECF No. 296-2 at 39]. John Dowell never told Mrs. Smith that she lost favor in his eyes due to the e-mail [ECF No. 296-2 at 39]. No one at CHE or in the computer industry has ever talked to her about the e-mail [ECF No. 296-2 at 40]. Only Mrs. Smith's partners at TriPoint have knowledge of the e-mail, and they still respect Mrs. Smith [ECF No. 296-2 at 40]. The Court finds that Mrs. Smith has failed to identify specific individuals to whom the communication was made, to show actual knowledge of falsity of the statements by York, to show reputational harm, and to show a

17

connection between any reputational harm and the e-mail's statements.  The Court will grant

CHE's Motion for Summary Judgment on Mrs. Smith's defamation claim, and will dismiss, with

prejudice, Count II of Third Party Plaintiff Laura Smith's Complaint Directed Against

Counterclaim Defendants.

### 3.    <u>Count III: Wrongful Termination</u>

"Under Missouri's employment at will doctrine an employer can discharge – for cause or

without cause – an at will employee who does not otherwise fall within the protective reach of a

contrary provision and still not be subject to liability for wrongful discharge." *Johnson v.

McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. banc 1988).  However, the Missouri

Supreme Court has expressly adopted a public-policy exception to its at-will employment

doctrine that provides an employee a cause of action in tort for wrongful discharge if he is

terminated: 1) for refusing to violate the law or any well-established and clear mandate of public

policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or

rules created by a governmental body; or 2) for reporting wrongdoing or violations of law to

superiors or public authorities.  *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo.

banc 2010).

Missouri has extended this limited right to bring a wrongful discharge claim in violation

of public policy to contract employees.  *Keveney v. Missouri Military Acad,*, 304 S.W.3d 98,

102-03 (Mo. banc 2010).  One of the compelling reasons identified by Missouri's Supreme Court

for allowing contract employees to pursue an action for wrongful discharge in violation of public

policy was that limiting the cause of action to at-will employees failed to recognize the distinct

underlying purpose of the wrongful discharge cause of action.  *Id.* at 102.  While a breach-of-

contract action enforces privately negotiated employment terms and conditions, a wrongful

discharge claim is premised on a conflict between the employment conditions and the applicable constitutional, statutory, or regulatory provisions.  *Id.*  "A discharge is not 'wrongful' because it violates the contractual terms of employment."  *Id.*

To prevail on a claim for wrongful termination, Mrs. Smith must prove that she refused to perform an illegal act or act in a manner contrary to public policy, that she was discharged, and that there was a causal connection between her discharge and her refusal to engage in the actions at issue.  *Id.* at 103.

In Count III of her Third Party Complaint, Mrs. Smith alleges that, although CHE's stated reasons for terminating her on February 20, 2009 were gross misconduct, insubordination, dereliction of duty, and violation of the company's standard operating procedures, "CHE actually terminated Smith because she refused to perform illegal acts requested of her by David York." She alleges that she never acted in a way to warrant termination with cause, and that "[a] contributing reason for her termination was her refusal to perform illegal acts."

CHE contends that it is entitled to summary judgment on Count III, Mrs. Smith's claim for wrongful termination, because the undisputed record establishes that she did not engage in protected conduct.  Mrs. Smith argues that the Motion for Summary Judgment should be denied as to Count III's wrongful termination claim, because genuine issues of material fact remain as to whether she engaged in protected conducted, "blew the whistle" on protected conduct, and was terminated as a result.  The Court finds that the record contains insufficient evidence to establish two essential elements of Mrs. Smith's wrongful termination claim, as she has not produced any evidence to show that she refused to perform an illegal act, or to act in a manner contrary to public policy; or any evidence to show a causal connection between her discharge and her refusal to engage in the actions at issue.  In fact, the record undisputedly establishes that CHE and York

19

never instructed Mrs. Smith to perform an illegal act or to act in a manner contrary to public

policy; Mrs. Smith could hardly refuse to engage in conduct she had not been instructed to

perform.

In deposition testimony, Mrs. Smith states that she received an STK manual,[4] marked

confidential, in an e-mail from an individual named Jim Gregory, but that she does not even

remember when she received the e-mail [ECF NO. 296-2 at 29, 31].  Mrs. Smith was not

required to use an STK manual in the performance of her quality assurance duties at CHE. [ECF

No. 296-2 at 30].  Mrs. Smith was not asked to do anything with the manual [ECF No. 296-2 at

30].

Marcus Smith was Laura Smith's direct supervisor, and he never told her to do something

she found to be illegal [ECF No. 296-2 at 31-32].  Marcus Smith was responsible for preparing

Laura Smith's performance reviews, but she does not recall ever seeing a performance review

that she had to sign [ECF No. 296-2 at 33].  Marcus Smith did not ask Mrs. Smith to read third-

party documentation, and when he and Mrs. Smith discussed the STK document, Marcus Smith

instructed Mrs. Smith not to read the STK document [ECF No. 296-2 at 30-31].  York never

asked Mrs. Smith to read third-party documentation [ECF No. 296-2 at 30].  No one at CHE ever

told Mrs. Smith that she needed to read the STK document to complete her job duties [ECF No.

296-2 at 30].

---

[4]The Court notes that Mrs. Smith's allegations of wrongdoing concerning possession of
an STK manual are contrary to findings and holdings reached in previous litigation between STK
and CHE, and to a settlement agreement executed by those parties that granted CHE certain
access to STK manuals as needed to provide services to customers.  *See Storage Tech. Corp. v.
Custom Hardware Eng'g & Consulting, Inc.* ("STK I"), 421 F.3d 1307 (Fed. Cir. 2005); *Storage
Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.* ("STK II"), 2006 WL 1766434 (D.
Mass. June 28, 2006).

When asked if receipt of the STK document was the only incident of being asked to engage in illegal conduct she was alleging, Laura Smith said, "I believe there was some code, but I don't remember much about that." [ECF No. 296-2 at 32].  She also said that she did not recall being instructed to do anything with code that was sent, and that she "didn't look at that much either." [ECF No. 296-2 at 32].

As well, the record is void of evidence showing any causal connection between Mrs. Smith's discharge and her refusal to engage in any illegal act or to act in a manner contrary to public policy.  As discussed, the record is devoid of evidence showing Mrs. Smith was instructed to engage in any illegal act or to act in a manner contrary to public policy.  Moreover, even if Mrs. Smith's alleged receipt of the STK manual could be viewed as a request to do some illegal act or to act contrary to public policy, the record lacks any evidence showing that she mentioned the manual to anyone other than her husband, Marcus Smith, who obviously had no input into Mrs. Smith's termination decision, as he was terminated on the same day of her discharge.  Mrs. Smith continued to work for CHE after receipt of the STK document, and continued to take assignments from various individuals [ECF No. 296-2 at 32].   The record shows that York terminated Mrs. Smith after she attempted to resign on February 20, 2009, the day that she failed to attend a mandatory  meeting called by York [ECF Nos. 296-2 at 29, 296-11, 314-20 at 1-2]. The record also shows that York cited "gross misconduct, insubordination, dereliction of duty, and violation of the company's standard operating procedures" as reasons for Mrs. Smith's discharge.

It is clear that Laura Smith never contacted York or anyone in CHE's human resources department to report receipt of the STK document [ECF No. 296-2 at 32].   Laura Smith had only two personal discussions with York; one conversation was about her being hired by CHE, and

the other was about how documents should be written in the performance of her duties. Although Laura Smith was present during several conference calls between York and Marcus Smith, she never told York about her receipt of the STK manual or code [ECF No. 296-2 at 50]. There could hardly be a causal connection between York's termination of Mrs. Smith, and a report of alleged wrongdoing or violation of law that Mrs. Smith never made.  The Court will grant CHE's Motion for Summary Judgment as to Mrs. Smith's wrongful termination claim and will dismiss, with prejudice, Count III of Third Party Plaintiff Laura Smith's Complaint Directed Against Counterclaim Defendants.

## IV.     CONCLUSION

Third Party Plaintiff Laura Smith previously dismissed Count IV of her Third Party Complaint; consequently, the Court's grant of summary judgment to CHE on Counts I, II, and III in this Order will dispose of all remaining counts of the Complaint against Counterclaim Defendants CHE and David York.

Accordingly,

**IT IS HEREBY ORDERED** that Third Party Defendants Custom Hardware Engineering & Consulting's and David York's Motion for Summary Judgment as to Counts I, II, and III of Third Party Plaintiff Laura Smith's Complaint Directed Against Counterclaim Defendants [ECF No. 294] is **GRANTED.**   Third Party Plaintiff Laura Smith's Complaint Directed Against Counterclaim Defendants [ECF No. 63] is **DISMISSED with prejudice.**

Dated this  24th  day of January, 2013.

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE

22