UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CUSTOM HARDWARE ENGINEERING        )
& CONSULTING, INC.,                )
                                   )
                                   )
        Plaintiff/Counterclaim-Defendant,    )
                                   )
    vs.                            )         Case No. 4:10CV000653 ERW
                                   )
JONATHAN D. DOWELL, *et al*.,      )
                                   )
                                   )
        Defendants/Counterclaim-Plaintiffs.    )

**MEMORANDUM AND ORDER**

This matter comes before the Court on Counterclaim Defendants Custom Hardware

Engineering, Inc. ("CHE") and David York's Motion for Summary Judgment as to Counts I, II,

III, and IV of Counterclaim Plaintiff Jonathan Dowell's Counterclaim Directed Against

Counterclaim Defendants [ECF No. 299], and CHE's Motion to Strike Portions of Declaration of

Jonathan Dowell [ECF No. 332].

CHE filed its Second Amended Complaint ("SAC") for Injunctive Relief and Damages

against Defendants Jonathan D. Dowell, Marcus K. Smith, Laura Smith, William Pilling, and

TriPoint Development, Inc. ("TriPoint"), alleging the following causes of action: 1) Copyright

Infringement (against all Defendants); 2) Violation of Federal Fraud and Abuse Act (against all

Defendants); 3) Breach of Contract (against Dowell, Marcus Smith, and Laura Smith); 4) Breach

of Contract (against Pilling); 5) Breach of Fiduciary Duty and Duty of Loyalty (against Dowell,

Marcus Smith, Laura Smith and Pilling); 6) Tortious Interference with Contract (against

TriPoint); 7) Misappropriation of Trade Secrets (against all Defendants); 8) Unfair Competition

(against all Defendants); 9) Civil Conspiracy (against all Defendants); 10) Replevin (against all

Defendants); 11) Conversion (against all Defendants); and 12) Unjust Enrichment (against all Defendants) [ECF No. 147].

Defendants filed several counterclaims in this matter, naming CHE and David York as Counterclaim-Defendants [ECF Nos. 58, 59, 60, 61, 167, 169].  Laura Smith and Third Party Plaintiff Linda Pilling filed Third Party Complaints against CHE and York, alleging that the Court had supplemental subject jurisdiction over certain state law claims under 28 U.S.C. §1367 [ECF No. 62, 63, 167, 169].  In his Counterclaim, Dowell asserted six claims: 1) unpaid wages (against CHE); 2) breach of contract; 3) slander and libel; 4) wrongful termination; 5) tortious interference with a business expectancy or relationship; and 6) abuse of process [ECF No. 58]. Subsequently, Dowell dismissed and withdrew without prejudice his claim for vacation pay contained in Count I of his Counterclaim, and withdrew Counts V (tortious interference), and VI (abuse of process) [ECF No. 169].

## I.      STATEMENT OF UNDISPUTED FACTS

The following fact statement is a recitation of undisputed facts taken from Counterclaim Plaintiff Jonathan Dowell's Counterclaims Directed Against Counterclaim-Defendants [ECF No. 58], Counterclaim-Defendant CHE's Answer to Counterclaim-Plaintiff Jonathan Dowell's Counterclaims [ECF No. 75], Counterclaim Defendants CHE and David York's Statement of Uncontroverted Material Facts in Support of Their Motion for Summary Judgment as to Counts I, II, II, and IV of Counterclaim Plaintiff Jonathan Dowell's Counterclaim Directed Against Counterclaim Defendants [ECF No. 301-1], Counterclaim Plaintiff Jonathan Dowell's Response to Counterclaim Defendants' Statement of Uncontroverted Material Facts [ECF No. 315], Counterclaim Plaintiff Jonathan Dowell's Statement of Controverted and Additional Material Facts in Response to Counterclaim Defendants' Motion for Summary Judgment [ECF No. 315-

2

1], Counterclaim Defendants CHE and David York's Response to Counterclaim Plaintiff Jonathan Dowell's Statement of Controverted and Additional Material Facts in Response to Counterclaim Defendants' Motion for Summary Judgment [ECF No. 329-1],  Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 147], Defendants' Joint Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 154], Defendants' Statement of Uncontroverted Material Facts [ECF No. 291], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Response to Defendants' Statement of Uncontroverted Material Facts [ECF No. 314-1], Defendants' Reply to Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts and Statement of Additional Facts [ECF No. 325-1], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF 304-1], Defendants' Response to Plaintiff's Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 319], Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V, and VI of Its Second Amended Complaint [ECF NO. 319-1], and Plaintiff's Response to Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 337-1].

CHE is a Delaware corporation with its principal place of business in Fenton, Missouri. CHE's President and Chief Executive Officer is David York.  In addition to its Fenton office personnel, CHE has employees working from home across thirty-seven states.  In the course of

its business, CHE provides, among other things, computer hardware maintenance services on

IBM, STK, EMC, HP, Sun Microsystems, HDS, Spectrologix, Quantum, and several other

computer systems.  As part of the hardware services that it provides, CHE has developed and

fielded remote monitoring technology that allows CHE personnel to monitor and troubleshoot

computer systems remotely.  CHE provides its services to commercial and government entities in

all parts of the United States, including Missouri and Texas.  Some of CHE's customers are

Mainline, IBM, Service Express, Sentinel, SSCS, MVSS, Telestra, Bank of America, Fannie

Mae, and the State of California.

Defendants Dowell, Marcus Smith, and Laura Smith are residents of McKinney, Texas.

Defendant Pilling is a resident of Tucson, Arizona.  Defendant TriPoint is a Texas corporation

with its principle place of business in McKinney, Texas.

CHE hired Dowell as a Systems Analyst in June 2005.  In 2007, Dowell told Marcus

Smith about an employment opportunity with CHE, and Marcus Smith applied for the position.

CHE hired Marcus Smith as a Director of Security and Information Systems in March 2007, and

it employed his wife, Laura Smith, as a Software Quality Assurance Specialist in the spring of

2008.  Marcus Smith, Laura Smith,  Dowell, and Pilling signed Employment Agreements with

CHE.  The agreements[1] executed by Dowell, Marcus Smith, and Laura Smith contain non-waiver

clauses, stating that no modification, amendment or waiver of the agreements' provisions would

be effective unless made in writing, and further provide, in part:

> 3. <u>Faithful Performance</u>  Employee acknowledges that he [or she] is employed by
> CHE in a fiduciary relationship of trust and confidence and therefore agrees to

---

[1]The language in the agreements signed by Marcus Smith and Laura Smith differ slightly from the language contained the in the agreement by Dowell, in that the Smith Employment Agreements use the pronouns "he or she" to refer to the Employee, whereas the language in Dowell's uses only the masculine pronoun for the reference.

devote his [or her] full time and attention to the business and affairs of CHE and, at all time, to use his [or her] best efforts to promote the interests of CHE and to faithfully and efficiently perform the responsibilities assigned to him [or her] to the fullest extent necessary to discharge such responsibilities.  Further, Employee agrees that during his [or her] employment, he [or she] will not accept employment of any nature, including self employment, for which remuneration is received unless said employment is recognized, agreed to and approved in writing by CHE in its sole discretion prior to such employment or association.  Employee also agrees he [or she] shall have no financial or other interest in any business entity which detracts from, or interferes with, Employee devoting his [or her] full time and attention to CHE's business without the prior, written permission of CHE in its sole discretion.[2]

Pilling's Employment Agreement with CHE also included a nonwaiver clause.  Section 2 of Pilling's agreement provided, in part:

[E]mployee will devote Employee's full time and attention to the business of, and work exclusively for CHE unless otherwise agreed to by CHE's President, and shall not work for or assist any competitor of CHE or have any discussions with another person or business about engaging in any activity in competition with CHE.

CHE issued computers and other equipment to Dowell, Marcus Smith, and Laura Smith as part of their employment.  These defendants were contractually obligated, by the terms of their employment agreements, to return all CHE property upon termination:

4.6.  Return of Company Property.  Employee acknowledges that all written records, databases, source code, CDs, DVDs, and disks containing information relating to CHE's business, including, without limitation, memoranda, notes, correspondence, reports, manuals, books, papers, letters, Client profile data, orders, customer lists, contracts, software programs, drafts, and other documentation (whether in draft or final form), and other sales, financial or technical information relating to CHE's business, and any and all other documents containing Company Information furnished to Employee by any representative of CHE or otherwise acquired or developed by him or her in connection with his or her association with CHE (collectively, "Recipient Materials") shall at all times be CHE's exclusive property.  Within twenty-four (24) hours of termination of his or her employment, Employee promises to return any Recipient Materials that are in his or her possession, custody or control, regardless of whether such Materials are

---

[2]The Court notes that CHE has indicated that this language is contained in Section 1 of the agreements; however, the quoted language is actually contained in Section 3.

5

located in Employee's office or automobile, or on Employee's office, home or personal computer. . . . Additionally, within twenty-four (24) hours of the termination of his [or her] employment, Employee . . . shall disclose any and all passwords or codes required to gain access to such devices.

Pilling's "Employee Confidentiality and Non-Competition Agreement" with CHE provided that, upon his termination , "and at any time or times before then when requested by CHE," Pilling would "return to CHE, and shall not retain, all CHE property and all documents, computer disks, and other electronic storage media containing or embodying any Confidential Information, and shall destroy or erase all such information from all non-CHE owned information systems and electronic media storage disks (but first shall make a copy of the same and deliver it to CHE)."  The agreement also stated that, because compliance with this provision might require data to be removed from Pilling's personal or home computer equipment, Pilling granted CHE or its contractors access to such equipment for that purpose.

During the course of their employment with CHE, Defendants were provided access to CHE's trade secrets and confidential proprietary information, including copyrighted computer programs identified as E-PET, E-LEM, and ERDS.  CHE's intellectual property also includes the source code for E-LEM, E-PET 1.9, E-PET 4.0, FED-AA, SAM, ARG, ERDS, SERPA, Blue Bayou, TDT, DDT, and CHE's MySQL database structure.  E-LEM, E-PET1.9, E-PET 4.0, SERPA and Blue Bayou are remote monitoring tools.  DDT is used in conjunction with E-PET 1.9, and TDT is used in conjunction with E-LEM.  The SAM (Site Account Manager) program is utilized to monitor employee activity.

In Section 3 of his "Employee Confidentiality and Non-Competition Agreement," Pilling agreed to never "publicize, or disclose or reveal to any third party not employed or engaged by CHE any Confidential Information," and to "never use (or attempt to recreate by memory or otherwise) any Confidential Information except for CHE's benefit" during Pilling's period of

employment with CHE.  Dowell's, Mr. Smith's, and Mrs. Smith's Employment Agreements

limited their use of CHE information as follows:

> 4.2.2.  Employee agrees not to, directly or indirectly; participate in the
> unauthorized use, disclosure, or conversion of any Company Information.
> Employee agrees not to use Company Information for the benefit of a competitor
> or in any other way that harms CHE or diminishes the value of Company
> Information.

As Director of Security and Information Systems, Marcus Smith was responsible for the

day-to-day operations of CHE's current and future network systems.  His duties and

responsibilities included developing a company network equipment design requirements

document for business systems' enhancement; developing a collocation network strategy and

implementation plan; and developing a company network security strategy that would insure high

availability to CHE team members but, at the same time, lock out competitors and other

unwanted network attacks.  He was also in charge of implementing proper software testing

procedures for programs developed by company software personnel; supervising, as a senior

developer, the software coders, the design of the code, and supervising other company network

personnel and resources.  Within three months of his hire, Marcus Smith became the direct

supervisor of Pilling, Dowell, and an employee named Terry Neckar.

In late May 2008, Pilling, Dowell, and Marcus Smith decided to form an entity they

would call "TriPoint Development."  TriPoint, a "custom solutions and consulting" information

technology firm, was formed in June 2008, by Dowell, Marcus Smith, Pilling, and Linda Pilling.

Marcus Smith and William Pilling owned two-thirds of TriPoint's shares.  Defendants operated

Tri-Point, serviced TriPoint customers, invoiced its customers, and collected revenue on its

behalf during the time period between July 2008 and February 20, 2009.  Defendants were

employed by CHE at all times between July 2008 and February 20, 2009.

7

After leaving CHE on February 20, 2009, Defendants continued to operate and perform work for TriPoint.  According to information displayed on its company website,  TriPoint specializes in the design and implementation of Great Plains and other Microsoft development applications;  provides in-house solutions developed to meet the student tracking and administrative needs of the educational market; and develops, through its Remote Systems Group, custom solutions around mainframe tape and disk storage systems.  One of TriPoint's computer programs, "CIT" captures customer information and allows incoming phone calls to be tracked by the customer's caller ID and to be logged into a database.

TriPoint provided services as a subcontractor for Matrix while Defendants were still employed at CHE.  In its relationship with Matrix, TriPoint performed work for several companies with Texas locations, including Pioneer, Pinnacle Anesthesia, Rapp Collins Consulting, Trintech, Independent Banker's Bank, and Enfora.  TriPoint also performed some business as a subcontractor through a company called the Harbor Group.  Defendants did not have written permission to perform side work while employed by CHE, and Defendants did not inform CHE of TriPoint's existence, or that they were providing services to TriPoint.

On October 1, 2008, David York sent an e-mail to Marcus Smith, in which York described several issues that had not been accomplished by Marcus Smith and his team, and warned, "Either you and every member of your team get your selves organized, communicating effectively and producing functional deliverables or I will take actions to find replacement personnel who can do precisely that" [ECF No. 314-8 at 1-2].  In this e-mail, York detailed numerous issues existing within Marcus Smith's department and with his teams, including the team's failure to communicate, follow-up, and keep CHE's systems running.  York also stated, "I requested on or about August 19, 2008 a total systems design paper with logins and passwords.  I

get an e-mail that basically says nothing nor demonstrates anything in that regard" [ECF No. 314-8 at 1].

CHE uses a program called Star Team to store and maintain its source code [ECF No. 325-1 at 40].  While employed at CHE, Defendants began using a program called Groove to store CHE's source code [ECF No. 325-1 at 40].

On February 20, 2009, David York notified Defendants and others by e-mail that a mandatory meeting had been scheduled for that afternoon [ECF No. 314-20 at 1-2]. The mandatory meeting resulted from ongoing issues, many of which were outlined in York's October 1, 2008 e-mail to Marcus Smith.  York's February 20th e-mail included an agenda for the conference call, and advised the recipients that they were going to address problems happening with various tools provided by CHE.

Prior to the mandatory meeting, Pilling had a conference call with Dowell and the Smiths. Approximately one hour after receiving the e-mail calling a mandatory meeting, Pilling sent York an e-mail telling York that he was resigning.  Subsequently, Dowell and the Smiths sent similar e-mail communcations.  All of the individual defendants attempted to resign from CHE on or about February 20, 2009.  However, York rejected their resignations, and terminated them on that date.  York sent an e-mail to CHE employees on February 20, with the subject "Company Departures," stating, among other things, that Defendants had "been terminated by the company for gross misconduct, insubordination, dereliction of duty, and violation of company's standard operating procedures" [ECF No. 340-2].  The e-mail was sent to "checonsulting" and "service_users@cheservice.com."

On April 2, 2009, CHE sent a letter to Dowell, informing him that funds had "been withdrawn" from Dowell's "vacation pay" in accordance with CHE rights under its employment

agreement with Dowell, and enclosing a prepared invoice regarding legal fees incurred due to Dowell's termination, as well as a check for "vacation hours paid minus legal fees" [ECF NO. 301-23].

Defendants eventually returned CHE property, including the computers they used to perform their job duties with CHE. Pilling returned his personal computer and CHE equipment after CHE compensated him for it. Upon inspection, CHE was unable to find any of its source code on Dowell's, Pilling's, Marcus Smith's, or Laura Smith's computers. CHE has remained unable to locate its source code [ECF No. 325-1 at 8-9, 40-41]. Following their terminations, Defendants continued to operate and perform work for TriPoint.

CHE initiated this litigation on April 20, 2010 [ECF No. 1]. During the course of discovery, Defendants were instructed, by Court Order, to protect electronically stored information [ECF Nos. 12-15]. Defendants were also directed to turn computers within their possession over to forensic-imaging experts for examination. On April 30, 2010, mere hours before he turned over his computer for imaging, Pilling installed Eraser 6, a data-wiping software, on his computer [ECF No. 291-21]. Eraser 6 makes it impossible to determine what files have been on a computer and what the file's contents had been. [ECF No. 325-1 at 39].

## II.    SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(c) provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  Summary judgment will not lie if a genuine dispute about a material fact is

shown; "that is, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id.*  In ruling on a motion for summary judgment, the Court may not make

credibility determinations, weigh the evidence, or draw inferences from the facts.  *Torgerson*,

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

   To satisfy his initial responsibility, the movant must inform the court of the basis for his

motion and must identify those portions of the record that he believes demonstrate the absence of

a genuine issue of material fact.  *Id.* at 1042.  Once the moving party has discharged the requisite

evidentiary burden, the nonmovant must respond by submitting evidentiary materials that set out

"specific facts showing that there is a genuine issue for trial."  *Id.*  (citations omitted).  If the

nonmovant fails to produce such evidence, summary judgment in favor of the moving party is

proper.  *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## III.   DISCUSSION

### 1.   <u>Motion to Strike Portions of Jonathan Dowell's Declaration</u>

   In their Motion to Strike Portions of Jonathan Dowell's Declaration, CHE and York ask

the Court to strike, in their entirety,  paragraphs 17, 19, and 20 of Jonathan Dowell's Declaration

[ECF No. 319-16].  CHE and York also request that the phrase, "even though I met the

milestones," contained in Paragraph 21 of the Declaration be stricken.  In their Memorandum in

Support of its Motion to Strike, CHE and York contend that these paragraphs should be stricken

because they are speculative, are not based on personal knowledge, and are contradicted by

Dowell's prior deposition testimony.  In these paragraphs, Dowell declares as follows. " 17. I spoke with other people about the Company Departure E-Mail." "19.  My reputation was damaged as a result of the Company Departures E-Mail." "20.  I achieved the CHEOPS milestones as set forth in my Bonus Agreement." "21.  I was not compensated according to my Bonus Agreement, even though I met the milestones."

In his Response opposing the Motion to Strike, Dowell claims the motion should be denied because the statements are admissible and comply with Rule 56(e), in that they are based on his personal knowledge and he is competent to testify on the matters stated [ECF No. 339]. Dowell further claims that the statements do not contradict his prior deposition testimony. Dowell contends that his preamble statement, "I have personal knowledge of the statements made in this Declaration, and if called as a witness, I could testify competently thereto[,]" demonstrates his personal knowledge of the contested statements and satisfies the requirements of Rule 56 [ECF No. 339].

Affidavits in support of summary judgment must be made on personal knowledge and contain admissible evidence.  Fed. R. Civ. P. 56(c)(4).  If an affidavit does not meet the standards set forth in Rule 56, it is subject to a motion to strike.  *McSpadden v. Mullins*, 456 F.2d 428, 430 (8th Cir. 1972).  Courts may consider only admissible evidence, and are prohibited from considering affidavits and depositions that were made without personal knowledge or consisted of hearsay.  *Weitlauf v. Parkway Sch. Dist.*, 2008 WL 3925162 at *3 (E.D. Mo. Aug. 20, 2008). Under the rule, affidavits filed in connection with a summary judgment motion must be based upon the personal knowledge of the affiant; information and belief is insufficient.  *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir. 1983).

Dowell's Declaration does not explain the basis of his knowledge for his post-deposition statements made in Paragraph 19, "My reputation was damaged as a result of the Company Departures E-Mail." Nor does the Declaration supply a factual basis for his asserted reputational damage. Moreover, the statement made by Dowell in Paragraph 19 of his Declaration is not a statement of fact within Dowell's knowledge; rather, Dowell's declaration is purporting to state a legal conclusion as fact. As such, the statement contained in Paragraph 19 does not meet Rule 56's standards, and cannot be considered for purposes of summary judgment. *See Weitlauf,* 2008 WL 3925162 at \*3.

Post-deposition contradictory affidavits are admissible only when the subsequent affidavit helps explain confusion shown by prior deposition testimony. *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498 (8th Cir. 2008). "A party should not be allowed to create issues of credibility by contradicting his own earlier testimony." *Id.*

The record shows that Dowell was deposed on June 26, 2012 [ECF Nos. 333-1, 333-4, 333-5]. During his deposition, Dowell testified that his father, who was employed at CHE at the time of Dowell's termination, forwarded a copy of the Company Departures E-Mail to him [ECF No. 333-1 at 2]. Dowell stated that he had not had any conversations with any other CHE employee about the Company Departures E-Mail [ECF No. 333-1 at 3]. He testified that because of his lack of communication, he did not have any direct way to know that anyone not named in the e-mail read the e-mail [ECF No. 333-1 at 3]. Dowell further stated that he did not "personally have direct knowledge that any other particular person did or did not read this e-mail" [ECF No. 333-1 at 3]. When asked if he had made any attempts to contact anyone at CHE regarding its content, Dowell stated, "And I did not attempt to contact anyone at CHE related to this e-mail at that time" [ECF No. 333-1 at 3].

13

Dowell claims that his Declaration statement does not contradict his prior deposition testimony because it merely indicates that he spoke to others about the e-mail, and his testimony also plainly indicates that he talked to others about it, specifically his father.  Dowell asserts that he also discussed the e-mail with his fellow defendants in this matter, and that they "also fall under the category 'others' as indicated in his declaration" [ECF No. 339 at 6].  He contends that his deposition testimony concerning his lack of direct knowledge of anyone reading the Company Departures E-Mail would not preclude him from testifying that his reputation was damaged, because, '[i]f he was treated differently after the e-mail was sent, Dowell can attribute that result to the e-mail without having observed people actually reading the e-mail" [ECF No. 339 at 6].

The Court finds that the statement contained in Paragraph 17, "I spoke with other people about the Company Departures E-Mail[,]" is inconsistent with Dowell's prior deposition testimony.  Furthermore, the Court finds that the deposition does not reflect any confusion on Dowell's part that requires explanation, that Dowell's Declaration does not explain aspects of his deposition testimony, and that the affidavit does not put forth newly discovered evidence.  *See Camfield Tires, Inc.*, 719 F.2d at 1365.  By filing his inconsistent Declaration, Dowell creates issues concerning witnesses with knowledge of the e-mail, or with whom he discussed the e-mail.  *Id.*  In doing so, Dowell injects issues that are not genuine, because the circumstances do not suggest legitimate reasons for Dowell's filing of the inconsistent affidavit.  *Id.*

The statement contained in Paragraph 20, and the phrase, "even though I met the milestones[,]" contained in Paragraph 21, are also inconsistent with Dowell's prior deposition testimony; as well, they are inconsistent with record evidence.  The Court notes that both of these statements address what the record shows to be a financial incentive offered to Dowell through

14

Marcus Smith, for an assignment referred to as "CHEOPS," which was to be performed between July 23 and August 31, 2007.

In Paragraph 10 of his Counterclaim, Dowell alleges the following about this assignment and incentive offer:

> In July 2007, Dowell was tasked to complete milestones of CHEOPS and reports to Fanie May 9(sic) [and] was offered a $1,000 bonus for successful completion of said tasks.  This bonus agreement was laid-out through documented email.  These bonus-related duties were completed by August 2007.  Defendants, however, never paid Dowell the agreed upon bonus.  As a result of their failure to pay, Dowell sustained economic damages.

[ECF No. 58].  Dowell alleges in Paragraph 42 of his Counterclaim: "Dowell earned a $1,000.00 bonus from CHE but never received a check from CHE or David York with this bonus money.

The record contains an e-mail sent to Dowell by Marcus Smith on July 23, 2007, which stated:

> Jonathan per our discussion earlier, I am authorized to reward you from CHE for your weekend and overtime coding efforts to meet all CHEOPS milestones and develop the reports for Fannie Mae across the period beginning today through August 31st with a $1,000 bonus along the development lines previously discussed in numerous emails and codified in the CHEOPS master project documentation as well as those reports which you must craft from Vern Pilling's responsibility set from the Fannie Mae reports lists.  Please do not discuss this incentive with any other member of the department except myself, and outside the department with only David or Phyllis York as this is a private covenant between yourself and CHE.
>
> Your efforts to bring better product and service capability to our company reflect a strong personal work ethic which CHE both acknowledges and appreciates, and it is our pleasure to provide you this incentive offer as a reward for the service which we are confident you will put forth.

[ECF No. 301-7].

The record also contains an e-mail that Marcus Smith sent to David and Phyllis York on July 27, 2007, forwarding review documents for Dowell, and proposing a raise for Dowell: "I recommend that a standard raise of 3-4K at present should be followed by a salary adjustment to

15

81,000 after the delivery of CHEOPS to place him at the 25% level after he finishes proving

himself with his 1st generation delivery." [ECF No. 315-12 at 2].

Phyllis York's August 13, 2007, response to Marcus Smith's message indicated that she

and David had reviewed and revised Marcus Smith's appraisal of Dowell's performance, based

on their experience with Dowell's performance for the period, and that the salary increase they

had given Dowell was in line with the company's standard based on his revised score.  In this e-

mail, Phyllis York stated: "As the three of us discussed , he will not receive a significant increase

in salary until such time as we get an accomplished, acceptable deliverable.  When that occurs we

can make an appropriate title change as well.  If you have any questions or wish to discuss, please

don't hesitate to contact us" [ECF No. 315-12 at 1].

During his deposition, Dowell testified that he did not complete his work on the

CHEOPS program [ECF No. 335-1 at 2].  Dowell further stated that the CHEOPS product "could

not be finished until a huge host of things . . . were successfully . . . implemented to make it

possible to complete the programming and then convert over . . . in an effective manner" [ECF

No. 333-5 at 2-3].  He said that CHEOPS was the name he gave to an application system he was

putting together to generate a substantially improved interface over CHE's existing business

systems as a replacement for its SAM, PAM, and FED-AA user tools, and he stated that it could

not be worked on effectively until the IT team had achieved the necessary prerequisite of a

collocation facility.  Dowell further testified that, although he commenced work on CHEOPS, he

never came up with a final source code, and that he could not give a solid number of how much

of SAM or the other programs had been replaced [ECF No. 301-3 at 41-47].  Dowell stated that

towards the end of his employment, "most of the necessary prerequisites" for creating source

code for the programs had been "nailed down," but that he could not "make a meaningful

guesstimate of it as a percentage."  He said that "considerable work" and "considerable testing" remained to be performed, and that the CHEOPS program was "a work-in-progress" when he left [ECF No. 301-3 at 48].

Dowell contends his deposition testimony reflects only that he never completed the CHEOPS programming, not that he did not achieve the milestones that would trigger a bonus payment under his Bonus Arrangement [ECF No. 339 at 8].  The e-mail offer specified that Dowell was to "meet all CHEOPS milestones "all CHEOPS milestones and develop the reports for Fannie Mae across the period beginning today through August 31st with a $1,000 bonus along the development lines previously discussed in numerous emails and codified in the CHEOPS master project documentation as well as those reports which you must craft from Vern Pilling's responsibility set from the Fannie Mae reports list."  Dowell has adduced no evidence showing that he developed the required Fannie Mae reports.  Although Dowell asserts that he achieved the milestones set forth in his agreement, Dowell has adduced no evidence showing what those milestones were, and during his deposition, he was unable to specify with any particularity completion of any discrete task, phase, or goal, on the program prior to his departure.  The undisputed evidence establishes that the CHEOPS product was never finished or delivered.  Clearly, he did not do all that was required of him to earn the $1,000 bonus.

The Court finds that the statement contained in Paragraph 20, "I achieved the CHEOPS milestones set forth in my Bonus Agreement[,]" and the phrase "even though I met the milestones[,]" contained in Paragraph 21 of 's Dowell's Declaration, are contradictory to his prior deposition testimony stating that the product could not be worked on effectively until a collocation facility was achieved, that a "huge host of things" had to be implemented before the programming could possibly be completed, and that the product was never finished.  The Court

again finds that the deposition does not reflect any confusion on Dowell's part that might require

explanation, that Dowell's affidavit does not explain aspects of his deposition testimony, and that

the affidavit does not put forth newly discovered evidence. *See Camfield Tires, Inc.*, 719 F.2d at

1365. Dowell's deposition testimony, and the record do not support the Counterclaim's

allegations regarding his achievement of the incentive offer's requirement to "meet all CHEOPS

milestones." By filing his inconsistent Declaration, Dowell creates issues concerning his work

on the CHEOPS program, his achievement of milestones under a bonus agreement, and

concerning his own credibility. *Id.* Again Dowell's affidavit injects issues that are not genuine.

*Id.* Furthermore, the Court finds Dowell's statement in Paragraph 20, and the phrase "even

though I met the milestones" contained in Paragraph 21, are not statements of fact within

Dowell's knowledge; rather, Dowell's declaration again is purporting to state legal conclusions

as facts. As such, the statements does not meet Rule 56's standards, and cannot be considered for

purposes of summary judgment. *See Weitlauf,* 2008 WL 3925162 at *3. The Court will grant

CHE's Motion to Strike Portions of Declaration of Jonathan Dowell and will strike Paragraphs

17, 19, 20, and the phrase, "even though I met the milestones" contained in Paragraph 21 of

Dowell's Declaration.

## 2.    Count I: Unpaid Wages (against CHE)

In Count I of his Counterclaim, Dowell alleges that CHE delayed payment of wages,

expenses and vacation time and did not pay him for accrued sick leave. Dowell also alleges that

CHE, in direct violation of Missouri Revised Statute 290.110,[3] "removed money from [his]

---

[3]Mo. Rev. Stat. § 290.110 (Payment due discharged employee – exceptions – penalty for delay) provides:

Whenever any person, firm, or corporation doing business in this state shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of the servant or employee then earned at the contract rate, without abatement or deduction, shall be

check necessary to consult with an attorney regarding [his] termination." Dowell claims that he earned a $1,000 bonus from CHE, but never received a check from CHE or York with the bonus money, and that CHE failed to pay him his earned raise as part of his last yearly review with CHE. Among other things, Dowell asks for an award for the difference between actual pay due and pay given after the witholding for attorney's fees; money for unspent vacation, sick and similar paid time off days; money owed for unpaid wages and bonuses, and "[p]ursuant to RSMo § 290.110, sixty (60) days wages as penalty for violation of § 290.110[.]"

Missouri Revised Statute § 290.110 is a penal statute, and must be strictly construed. *Slavens v. William C. Haas Co., Inc.*, 563 S.W.2d 157, 160 (Mo. App. 1978). In Missouri, all actions upon any statute for any penalty shall be commenced within one year after the commission of the offense. Mo. Rev. Stat. § 516.380.

The record shows that Dowell was terminated on February 20, 2009, and received his last paycheck sometime thereafter. On April 2, 2009, CHE sent a letter to Dowell, which stated:

> Attached please find a prepared invoice from Lashly Baer, CHE's Labor Law Firm, regarding legal fees incurred due to the end of your employment with CHE.
>
> These funds have been withdrawn from your vacation pay in accordance with CHE rights under the Employment Agreement you signed on 06/02/2005.
>
> The enclosed check reflects vacation hours paid minus legal fees.

---

and become due and payable on the day of the discharge or refusal to longer employ and the servant or employee may request in writing of his foreman or the keeper of his time to have the money due him, or a valid check therefor, sent to any station or office where a regular agent is kept; and if the money or valid check therefor, does not reach the station or office within seven days from the date it is so requested, then as a penalty for such nonpayment the wages of the servant or employee shall continue from the date of the discharge or refusal to further employ, at the same rate until paid; provided, such wages shall not continue more than sixty days. This section shall not apply in the case of an employee whose remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar activities and where an audit is necessary or customary in order to determine the net amount due.

[ECF No. 301-23].  The attached invoice billed for $480.50 for 1.60 hours of legal services, including review of e-mails, phone conferences, review and analysis of contracts, and legal research,  performed between March 3 and 10, 2009 [ECF No. 301-23].

Dowell filed his counterclaim in this action on October 10, 2010.  In its Motion for Summary Judgment, CHE argues that the Court lacks subject matter jurisdiction over the claim for unpaid wages contained in Count I of Dowell's Counterclaim because the claim was brought after the one year limitations period codified at Missouri Revised Statute § 516.380.  In his Response, Dowell contends that the Court has subject matter jurisdiction over Count I of his Complaint because the appropriate statute of limitations for his unpaid wages claim is five years, in accordance with Missouri Revised Statute §516.120(1),(2).  The Court finds that Dowell's claim for unpaid wages, brought pursuant to Mo. Rev. Stat. § 290.110 is untimely under Mo. Rev. Stat. § 516.380, and must be dismissed.

Alternatively, CHE contends that it is entitled to summary judgment as to the unpaid wages claim for failure to state a claim, because Dowell is unable to set forth a prima facie case of unpaid wages.  CHE argues that Dowell's claims for wrongfully withheld attorney's fees, accrued sick leave, and bonus pay are not cognizable under § 290.110.

As an initial matter, the Court finds that Dowell's claims for vacation pay, sick leave pay, and bonus pay, are not cognizable under Section 290.110.  *See* Mo. Rev. Stat. §290.110 (section shall not apply in the case of an employee whose remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar activities and where an audit is necessary or customary in order to determine the net amount due); *Slavens*, 563 S.W.2d at 161 (when method of employee's payment is not within the statutory definition of "wages," employee cannot recover under Section 290.110; claims for

20

vacation pay and sick leave pay are not within purview of the statute).  The Court has determined that Dowell's unpaid wages claim is untimely under Section 290.110, and CHE contends that Dowells's Complaint  fails to state an unpaid wages claim on any basis, because it paid Dowell all wages due.

Although he voluntarily dismissed and withdrew his claim for vacation pay, Dowell argues that he is entitled to recoup the amount withheld from his unused vacation pay because it was CHE's policy to compensate its employees for unused vacation time.  He claims that a genuine issue of material fact exists as to whether the withholding was permissible under his Employment Agreement with CHE, because the money was withheld before CHE sought its injunction to enforce the agreement, and before any breach had been judicially determined by the Court.  Dowell asserts the withholding was premature and in violation of Missouri Revised Statute 290.110.  Additionally, Dowell contends a genuine issue of material fact exists as to whether CHE's invoice regarding the withholding was proper, as he claims the amount withheld was excessive.  The Court finds Dowell's arguments unpersuasive.

The record conclusively shows that the attorney's fees were withheld from Dowell's check for unused vacation pay, and not from his check for wages.  Dowell dismissed his claim for vacation pay, leaving no basis for his arguments of improper withholding.   The Court will grant summary judgment to CHE on Dowell's claim for unpaid wages, and will dismiss, with prejudice, Count I of Counterclaim Plaintiff Jonathan Dowell's Counterclaim Directed Against Counterclaim Defendants.

### 3.     Count II: Breach of Contract

In Count II of his Counterclaim, Dowell alleges that he "wrongfully failed to receive a raise during his last year of employment despite excellent scores on his yearly review, and that he

21

"earned a $1,000.00 bonus from CHE but never received a check from CHE or David York with

this bonus money."  He claims that CHE's failure to pay him in full breached CHE's agreement,

contained in Section 2.1 of his Employment Agreement, to pay his salary "in such time and

manner as is standard company policy[,]" and caused him to sustain economic damages.

To make a submissible case on his breach-of-contract claim, Dowell must show: 1) the

existence of a valid contract; 2) each party's rights and obligations under its terms; 3) a breach;

and 4) damages.  *Kieffer v. Icaza*, 376 S.W.3d 653, 657 (Mo. banc 2012).

CHE claims that it is entitled to summary judgment on Count II, Dowell's breach of

contract claim, because the uncontroverted facts demonstrate that there was no breach of contract

to pay Dowell a raise during his last year of employment, or pay him a $1,000.00 bonus.  CHE

contends that the clear and unambiguous terms of Dowell's Employment Agreement do not

provide for a guaranteed bonus.  CHE also argues that, even if Dowell could demonstrate that

CHE breached a contract, he is not entitled to recover under a breach-of-contract theory because

the undisputed facts demonstrate that Dowell materially breached his Employment Agreement

with CHE.

It is undisputed that Dowell's Employment Agreement does not provide for a bonus [ECF

No. 315 at 5, 7].  Section 2.1 of the agreement governs compensation, and states:

The compensation of Employee payable by CHE for the period commencing from the Effective
Date hereof until the Agreement is terminated or the salary is modified in accordance with the
terms of the Agreement, shall be at the rate of Seventy Thousand Dollars ($70,000) per year.
This is an annual salary to be pro-rated if the Employee serves less than one year.  This salary is
to be paid in such time and manner as is standard company policy.  The rate of compensation
shall be subject to periodic review and change.

In apparent recognition that the Employment Agreement's terms do not provide a basis

for his claim for an unpaid bonus, Dowell states that the "essence" of his breach-of-contract

claim against Defendants is that his Employment Agreement "was modified when CHE

22

introduced an incentive bonus program whereby CHE agreed to give Dowell a $1,000 bonus if he met certain project milestones" [ECF No. 315-2 at 10].  He claims summary judgment is improper because there is a genuine issue of material fact as to whether he met the proposed milestones, because according to Dowell and Marcus Smith, Dowell achieved the milestones and was entitled to the bonus.  In support of his argument, Dowell has submitted the Declaration of Marcus Smith [ECF No. 315-11], which contains the statement "Jonathan Dowell satisfied the requirements of his incentive bonus program" in Paragraph 30.  Mr. Smith's Declaration does not explain the basis of his knowledge for this statement.   Nor does the Declaration supply a factual context for Mr. Smith's assertion that the requirements were satisfied; it does not even identify the requirements that were to be satisfied.   Moreover, the statement made by Mr. Smith in Paragraph 30 of his Declaration is not a statement of fact within his knowledge; rather, Mr. Smith's declaration is purporting to state a legal conclusion as fact.  As such, the statement contained in Paragraph 30 does not meet Rule 56's standards, and cannot be considered for purposes of summary judgment.  *See Weitlauf,* 2008 WL 3925162 at *3.

As discussed in this Court's consideration of CHE's Motion to Strike, Marcus Smith's July 23, 2007, e-mail incentive offer, upon which Dowell bases his claim for breach of contract, states that Smith was authorized to reward Dowell for his efforts "to meet all CHEOPS milestones and develop the reports for Fannie Mae across the period beginning [July 23, 2007] through August [31, 2007] with a $1,000 bonus along the development lines previously discussed in numerous emails and codified in the CHEOPS master project documentation as well as those reports" Dowell "craft from Vern Pilling's responsibility set from Fannie Mae reports lists."  Despite months of extensive discovery that has included *in camera* review of confidential documents, Dowell has failed to adduce evidence, other than the unsupported statements stricken

from his Declaration and Mr. Smith's inadmissible statement, that show what milestones he is alleging to have met, much less evidence that he met any CHEOPS milestones.  The record lacks evidence of any reports Dowell developed during the applicable time period.   The plain language of the e-mail states that Dowell was to meet "all CHEOPS milestones and develop the reports for Fannie Mae across the period beginning today through August 31st with a $1,000 bonus along the development lines previously discussed in numerous emails and codified in the CHEOPS master project documentation as well as those reports which you must craft from Vern Pilling's responsibility set from the Fannie Mae reports list."   The record conclusively shows that Dowell never completed the CHEOPS assignment, and that he did not produce an accomplished deliverable product.  The Court finds that Dowell has failed to establish a breach of his Employment Agreement or that he met the milestones necessary to earn the offered incentive. The Court will grant summary judgment to CHE on Dowell's claim for breach of contract, and will dismiss, with prejudice, Count II of Counterclaim Plaintiff Jonathan Dowell's Counterclaim Directed Against Counterclaim Defendants.

**4.**      **Count III: Slander and Libel**

In Count V of his Counterclaim, Dowell alleges that the February 20 "Company Departures" e-mail sent to CHE employees by York wrongly accused him of gross misconduct, insubordination, dereliciton of duty, and violation of the company's standard operating procedures.  He claims the statement was prejudicial to his reputation because it accused him of acts unbecoming of an employee or co-worker.  Dowell asserts that he has suffered damage to his business reputation because of the statement, that the computer industry is such that potential future clients, co-workers, and employers have heard or will hear the allegedly defamatory

comments, and that the statement has harmed and will continue to harm him as he attempts to make a living.

To prevail on his slander and libel claim, Dowell must establish: 1) publication; 2) of a defamatory statement; 3) that identifies him; 4) that is false; 5) that is published with the requisite degree of fault; and 6) damages his reputation. *State ex rel. BP Prod. N. Am., Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. banc 2005). "A plaintiff must prove actual damages in all defamation cases." *Id.*

CHE claims it is entitled to summary judgment on Dowell's slander and libel claim (Count V) because the undisputed record establishes that the intra-corporate e-mail advising of Dowell's termination, and the reasons for it, were true, and were subject to a qualified privilege. CHE also argues that Dowell has not presented any evidence establishing that he sustained a quantifiable professional or personal injury on account of the e-mail. Dowell claims that genuine issues of material facts exist as to whether: 1) the statement made in the Company Departures e-mail was true; 2) the e-mail reached only CHE employees and was subject to intra-company privilege; and 3) he suffered reputational damage as a result of the e-mail.

The Court finds that the record contains insufficient factual grounds to support Dowell's slander and libel claim. In particular, the Court finds that Dowell has failed to show that the e-mail was false, or that the statements within the e-mail were made with knowledge that they were false, or with a reckless disregard for the truth. The record shows that York informed Dowell's supervisor, Marcus Smith, of York's dissatisfaction with the performance of the IT personnel in his department, including Dowell, and that he called a mandatory meeting with Mr. Smith's IT team, requiring their attendance on February 20, 2009 [ECF No. 315 at 21-22]. The record further shows that, although notified of the mandatory meeting via e-mail, Dowell did not attend,

but, instead, following a conference call with Marcus Smith, Laura Smith, and Pilling, sent York an e-mail stating that, effective immediately, he was resigning [ECF Nos. 315 at 22-23, 333-1 at 2].  York rejected Dowell's resignation, and instead, terminated him and the other members of the IT team who refused to attend the mandatory meeting [ECF Nos. 315 at 22-23, ].  In his e-mail rejecting Pilling's resignation, York informed Dowell: "The company has elected to terminate you effective immediately for gross misconduct, insubordination, dereliction of duty and violation of the company's standard operating procedure" [ECF No. 333-1 at 2].  York sent an e-mail titled "Company Departures" explaining to others at CHE that Dowell and Defendants Marcus Smith, Laura Smith, and Pilling were no longer employed at CHE, and stating that York terminated them for "gross misconduct, insubordination, dereliction of duty, and violation of company operating procedures" [ECF Nos. 315 at 24, 333-1 at 2-3].

Under Missouri law, insubordination is defined as "a willful disregard of express or implied direction or a defiant attitude."  *Dixon v. Stoam Indus., Inc.*, 216 S.W.3d 688, 693 (Mo. App. S.D. 2007).  Willful misconduct is established when action or inaction by an employee "amounts to conscious disregard of the interests of the employer or constitutes behavior contrary to that which an employer has a right to expect from an employee."  *Id.*  With these principles as a guide, the Court finds that Dowell's refusal to comply with the lawful and reasonable directive from his employer to attend a meeting to discuss problems impacting the company's ability to service its customers constitutes misconduct and insubordination.  As well, because it is a related rule of law in Missouri that, in every contract of employment, it is implied that an employee will obey the lawful and reasonable orders and instructions of his employer, the Court finds that Dowell's conduct violated CHE operating procedures.  *Id.*  Accordingly, the Court finds that the record shows that the statement made in the Company Departures e-mail was true.

26

Furthermore, the record is devoid of evidence that the statement damaged Dowell's reputation.  It is undisputed that Dowell has no "direct knowledge that any particular person did or did not read [the] e-mail [ECF Nos. 315 at 24, 333-1 at 3].  Dowell testified during his June 26, 2012 deposition that he did not have any conversations with any CHE employee other than his father about the e-mail [ECF No. 333-1 at 2-3].  It is undisputed that Dowell is currently employed in the computer services industry [ECF No. 315 at 25].  Dowell has failed to adduce evidence of an existing relationship that has been seriously disrupted and has identified no third parties that have held him in lower regard due to any knowledge of the e-mail's statements.   The Court will grant CHE's Motion for Summary Judgment on Dowell's libel and slander claim, and will dismiss, with prejudice, Count V of Counterclaim-Plaintiff Jonathan Dowell's Counterclaim.

## 5.    Count IV: Wrongful Termination

"Under Missouri's employment at will doctrine an employer can discharge – for cause or without cause – an at will employee who does not otherwise fall within the protective reach of a contrary provision and still not be subject to liability for wrongful discharge." *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. banc 1988).  However, the Missouri Supreme Court has expressly adopted a public-policy exception to its at-will employment doctrine that provides an employee a cause of action in tort for wrongful discharge if he is terminated: 1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body; or 2) for reporting wrongdoing or violations of law to superiors or public authorities.  *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. banc 2010).

Missouri has extended this limited right to bring a wrongful discharge in violation of public policy to contract employees. *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 102-03 (Mo. banc 2010).  One of the compelling reasons identified by Missouri's Supreme Court for allowing contract employees to pursue an action for wrongful discharge in violation of public policy was that limiting the cause of action to at-will employees failed to recognize the distinct underlying purpose of the wrongful discharge cause of action. *Id.* at 102.  While a breach-of-contract action enforces privately negotiated employment terms and conditions, a wrongful discharge claim is premised on a conflict between the employment conditions and the applicable constitutional, statutory, or regulatory provisions. *Id.*  "A discharge is not 'wrongful' because it violates the contractual terms of employment." *Id.*

To prevail on a claim for wrongful termination, Dowell must prove that he refused to perform an illegal act or act in a manner contrary to public policy, that he was discharged, and that there was a causal connection between his discharge and his refusal to engage in the actions at issue. *Id.* at 103.

In Count IV of his Counterclaim, Dowell alleges that, although CHE's stated reasons for terminating him on February 20, 2009, were gross misconduct, insubordination, dereliction of duty, and violation of the company's standard operating procedures, CHE actually terminatede him because he refused to perform illegal acts requested of him by York.  He alleges that he never acted in a way to warrant termination for cause, and that a "contributing" factor or reason for his termination, and Defendants' refusal to pay him a bonus, was his refusal to engage in illegal acts as requested by Defendants.

Dowell alleges that, during his employment with CHE, he was asked to break into StorageTek ("STK") Virtual Storage Master ("VSM") units, to hack into a competitor's work,

and to use copyrighted materials from other companies in violation of Federal Copyright law. Dowell alleges that, "[w]ith regard to the STK VSM unit, York wanted a password to the unit by assembling in St. Louis to attempt to break into unit and that such activity would be protected through litigation as necessary" [ECF No. 58 at 4].  Dowell asserts that CHE and York received passwords of CHE competitor STK, and that CHE and York wanted Marcus Smith and his department, including Dowell, to use those passwords to read hard drives, extract data, and determine how STK's systems worked.  Dowell claims that CHE and York wanted to create a hacked system that would allow CHE to maintain STK hardware at customer sites, but control the unit at a low level, which would interfere with other companies performing maintenance on the device.  According to Dowell, when CHE and York asked Marcus Smith's team to "hack" into a STK VSM unit, Smith and Dowell determined the request was illegal and refused to comply.  Dowell alleges that York shipped a tape library to Smith with Dowell, and that, although Dowell understood that his role was to understand the legitimate installation of the system and to reverse engineer its function, York wanted to hack the password protection system. Dowell asserts that this request was refused and the unit was sent back to Defendant's home office.  Dowell alleges that he "reported his concerns with such activity regarding this illegal activity through the chain of command."  He claims that he "avoided York's requests to participate and conduct illegal acts, refused to participate in any criminal actions, and he reported his concerns with the illegal conduct to superiors."  Dowell asserts that, prior to his termination, he was never written up and had never been disciplined by Defendants.

  CHE contends that it is entitled to summary judgment on Count IV, Dowell's claim for wrongful termination, because Dowell has failed to state a claim upon which relief may be granted.  CHE argues that the undisputed record establishes that Dowell did not engage in

protected conduct, and that there is no causality between Dowell's alleged "whistleblowing" and his employment termination.  Dowell argues that the Motion for Summary Judgment should be denied as to Count III's wrongful termination claim, because genuine issues of material fact remain as to whether he engaged in protected conducted, "blew the whistle" on protected conduct, and was terminated as a result.

The Court finds that the record contains insufficient evidence to establish an essential element of Dowell's wrongful termination claim, as he has not produced any evidence to show that he refused to perform an illegal act or act in a manner contrary to public policy, to show that he reported wrongdoing or violations of law to superiors or public authorities, and, most significantly, to show a causal connection between his discharge and his alleged refusal to engage in any illegal act or to act in a manner contrary to public policy.  Although Dowell now claims he refused to perform an illegal act, his deposition testimony serves to void his claim.

It is undisputed that CHE has purchased numerous STK units for training purposes, and that the STK units come with operating and owner's manuals [ECF No. 315 at 11].  A settlement agreement between CHE and STK allows CHE to purchase microcode from STK [ECF Nos. 315 at 11, 315-13].  Dowell has produced no evidence showing that CHE had unlawful possession of any of  passwords, manuals, or any other protected property of STK.

When questioned about the incident involving the STK VSM unit in St. Louis during his deposition, Dowell testified that it was his understanding that he and the rest of the IT team were to gain a much deeper understanding of how the device worked by engaging in reverse engineering [ECF No. 301-3 at 64].  Dowell stated that it was his understanding that reverse engineering is not unlawful if you own the device [ECF No. 301-3 at 65].  He testified that he believed CHE owned the STK device he and the team were taking apart [ECF No. 301-3 at 65].

30

Dowell said that they made considerable progress, and stated they had contacted the vendor of the embedded system to discuss acquiring a software development kit.  He testified the vendor told the team they could purchase a kit for around $20,000 [ECF No. 301-3 at 65].  Dowell said the team left without actually breaking the password system, and said that he does not believe he crossed any boundary beyond the reverse engineering zone [ECF No. 301-3 at 65].   Dowell stated that, because it was his understanding at the time that reverse engineering was not lawful, he would not have informed anyone that his conduct was unlawful [ECF No. 301-3 at 65].  When asked if he, at any point in time, protested or said that he refused to engage in this reverse engineering, Dowell said that he could not think of any reason why he would have done so [ECF No. 301-3 at 65-66].  When asked if he ever told anyone at CHE, including Marcus Smith and York, that he believed he was asked to engage in unlawful conduct, Dowell replied, "I don't recollect that I may have had a specific chain of that nature, but I do recollect that we discussed, as the week went on, what were we doing and that we were – that I and the others appeared to be becoming less comfortable with what, you know, we were being instructed to do as a team" [ECF No. 301-3 at 66-67].  When asked if he ever objected, protested, or said anything to anyone at CHE that he believed he was personally required to perform an illegal act, Dowell said, that during the team's drive from St. Louis to Texas, he communicated to Marcus Smith and Pilling "that assuredly, if it was turning into a password project, that I didn't want to be a part of it" [ECF No. 301-3 at 67].  He also testified that he was not present for any conversation between Marcus Smith and York concerning the utilization of passwords, and stated that he learned about such conversations "only after the fact via Marcus" [ECF No. 301-3 at 67].

The Court notes that Dowell's allegations of wrongdoing describe conduct that has, in previous litigation between STK and CHE, been determined not to violate the DMCA.  *See*

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.* ("STK I"), 421 F.3d 1307

(Fed. Cir. 2005); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.* ("STK II"),

2006 WL 1766434 (D. Mass. June 28, 2006).  In *STK I*, STK alleged that CHE violated the

anticircumvention provision of the DMCA when CHE circumvented a protect system to force a

customer's Control Unit to transmit error codes.  *STK I*, 421 F.3d. at 1310.  Following remand

from the Federal Circuit, the District Court concluded that CHE's circumvention of the protect

system did not violate the DMCA because it did not infringe a right protected by the Copyright

Act.  *STK II*, 2006 WL 1766434 at *7.

> Furthermore, the Court finds that Dowell has not adduced evidence that he refused to
perform illegal activity or reported illegal conduct.  Moreover, the Court finds that the record
conclusively shows that Dowell was not terminated for such a refusal or for reporting illegal
activity.  Rather, the Court finds that York terminated him on February 20, because Dowell, in
collaboration with his team members, intentionally failed to attend a mandatory meeting called
by York on that date to discuss software problems.  In fact, the record shows several incidents of
favorable treatment received from CHE during the intervening ten-month period between the
alleged incident of wrongdoing and Dowell's termination, including positive reviews.  It is
undisputed that York informed Dowell of the mandatory meeting on February 20, 2009, and that
Dowell, following discussion with the other members of his team, decided not to attend the
meeting and, instead, sent York an email stating he was resigning, effective immediately.  It is
further undisputed that, after Dowell failed to attend the mandatory meeting, York rejected
Dowell's resignation, and terminated him.  Even if Dowell had adduced sufficient evidence that
he refused to perform, or had reported, a wrongdoing or violation of law, Dowell has not shown a
causal connection between the alleged April 2008 incident and his February 20, 2009

termination.  The Court will grant CHE's Motion for Summary Judgment as to Dowell's wrongful termination claim and will dismiss, with prejudice, Count IV of Dowell's Counterclaim.

## IV.    CONCLUSION

Counterclaim-Plaintiff Pilling previously dismissed Counts VI and VII of his Counterclaim; consequently, the Court's grant of summary judgment to CHE on Counts I, II, III, and IV will dispose of all remaining counts of Dowell's Counterclaim against CHE and York .

Accordingly,

**IT IS HEREBY ORDERED** that Custom Hardware Engineering & Consulting, Inc,'s Motion to Strike Portions of Declaration of Jonathan Dowell [ECF No. 332] is **GRANTED.** Paragraphs 17, 19, 20, and the phrase, "even though I met the milestones contained in Paragraph 21 of Declaration of Jonathan Dowell [ECF No. 319-16] are **STRICKEN**.

**IT IS FURTHER ORDERED** that  Counterclaim Defendants Custom Hardware Engineering, Inc. and David York's Motion for Summary Judgment as to Counts I, II, III, and IV of Counterclaim Plaintiff Jonathan Dowell's Counterclaim Directed Against Counterclaim Defendants [ECF No. 299] is **GRANTED**.  Counterclaim Plaintiff Jonathan Dowell's Counterclaim Directed Against Counterclaim Defendants [ECF No. 58] is **DISMISSED with prejudice**.

Dated this   24th   day of January, 2013.

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE