UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CUSTOM HARDWARE ENGINEERING  )
& CONSULTING, INC.,  )
  )
  )
Plaintiff/Counterclaim-Defendant,  )
  )
vs.  )        Case No. 4:10CV000653 ERW
  )
JONATHAN D. DOWELL, *et al*.,  )
  )
  )
Defendants/Counterclaim-Plaintiffs.  )

**MEMORANDUM AND ORDER**

This matter comes before the Court on Counterclaim Defendants Custom Hardware

Engineering, Inc. ("CHE") and David York's Motion for Summary Judgment as to Counts I, II,

III, IV and V of Counterclaim Plaintiff Marcus Smith's Counterclaim Directed Against

Counterclaim Defendants [ECF No. 300].

CHE filed its Second Amended Complaint ("SAC") for Injunctive Relief and Damages

against Defendants Jonathan D. Dowell, Marcus K. Smith, Laura Smith, William Pilling, and

TriPoint Development, Inc. ("TriPoint"), alleging the following causes of action: 1) Copyright

Infringement (against all Defendants); 2) Violation of Federal Fraud and Abuse Act (against all

Defendants); 3) Breach of Contract (against Dowell, Marcus Smith, and Laura Smith); 4) Breach

of Contract (against Pilling); 5) Breach of Fiduciary Duty and Duty of Loyalty (against Dowell,

Marcus Smith, Laura Smith and Pilling); 6) Tortious Interference with Contract (against

TriPoint); 7) Misappropriation of Trade Secrets (against all Defendants); 8) Unfair Competition

(against all Defendants); 9) Civil Conspiracy (against all Defendants); 10) Replevin (against all

Defendants); 11) Conversion (against all Defendants); and 12) Unjust Enrichment (against all Defendants) [ECF No. 147].

Defendants filed several counterclaims in this matter, naming CHE and David York as Counterclaim-Defendants [ECF Nos. 58, 59, 60, 61, 167, 169]. Laura Smith and Third Party Plaintiff Linda Pilling filed Third Party Complaints against CHE and York, alleging that the Court had supplemental subject jurisdiction over certain state law claims under 28 U.S.C. §1367 (claims so related as to form part of same case or controversy) [ECF No. 62, 63, 167, 169]. In his Counterclaim, Marcus Smith asserted seven claims: 1) unpaid wages (against CHE); 2) breach of contract (against CHE); 3) fraudulent misrepresentation; 4) wrongful termination; 5) slander and libel; 6) tortious interference with a business expectancy or relationship; and 7) abuse of process [ECF No. 59]. Subsequently, Marcus Smith dismissed and withdrew without prejudice his claim for vacation pay contained in Count I of his Counterclaim, and withdrew Counts VI (tortious interference), and VII (abuse of process) [ECF No. 169].

## I.    STATEMENT OF UNDISPUTED FACTS

The following fact statement is a recitation of undisputed facts taken from Counterclaim Plaintiff Marcus Smith's Counterclaims Directed Against Counterclaim-Defendants [ECF No. 59], Counterclaim-Defendant CHE's Answer to Counterclaim-Plaintiff Marcus Smith's Counterclaims [ECF Nos. 73, 73-1], Counterclaim Defendants CHE and David York's Statement of Uncontroverted Material Facts in Support of Their Motion for Summary Judgment as to Counts I, II, II, IV and V of Counterclaim Plaintiff Marcus Smith's Counterclaim Directed Against Counterclaim Defendants [ECF No. 303-1], Counterclaim Plaintiff Marcus Smith's Response to Counterclaim Defendants' Statement of Uncontroverted Material Facts [ECF No. 316], Counterclaim Plaintiff Marcus Smith's Statement of Controverted and Additional Material

Facts in Response to Counterclaim Defendants' Motion for Summary Judgment [ECF No. 316-1], Counterclaim Defendants CHE and David York's Response to Defendant Marcus Smith's Statement of Controverted and Additional Material Facts in Response to Counterclaim Defendants' Motion for Summary Judgment [ECF No. 336-1],  Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 147], Defendants' Joint Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint for Injunctive Relief and Damages [ECF No. 154], Defendants' Statement of Uncontroverted Material Facts [ECF No. 291], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Response to Defendants' Statement of Uncontroverted Material Facts [ECF No. 314-1], Defendants' Reply to Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts and Statement of Additional Facts [ECF No. 325-1], Plaintiff Custom Hardware Engineering & Consulting, Inc.'s Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF 304-1],  Defendants' Response to Plaintiff's Statement of Uncontroverted Material Facts in Support of Its Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 319], Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V, and VI of Its Second Amended Complaint [ECF NO. 319-1], and Plaintiff's Response to Defendants' Statement of Controverted and Additional Facts in Support of Their Response to Plaintiff's Motion for Summary Judgment as to Counts III, IV, V and VI of Its Second Amended Complaint [ECF No. 337-1].

CHE is a Delaware corporation with its principal place of business in Fenton, Missouri. CHE's President and Chief Executive Officer is David York.  In addition to its Fenton office

personnel, CHE has employees working from home across thirty-seven states.  In the course of

its business, CHE  provides, among other things, computer hardware maintenance services on

IBM, STK, EMC, HP, Sun Microsystems, HDS, Spectrologix, Quantum, and several other

computer systems.  As part of the hardware services that it provides, CHE has developed and

fielded remote monitoring technology that allows CHE personnel to monitor and troubleshoot

computer systems remotely.  CHE provides its services to commercial and government entities in

all parts of the United States, including Missouri and Texas.  Some of CHE's customers are

Mainline, IBM, Service Express, Sentinel, SSCS, MVSS, Telestra, Bank of America, Fannie

Mae, and the State of California.

Defendants Dowell, Marcus Smith, and Laura Smith are residents of McKinney, Texas.

Defendant Pilling is a resident of Tucson, Arizona.  Defendant TriPoint is a Texas corporation

with its principle place of business in McKinney, Texas. CHE employed Pilling as a Software

Engineer in April 2003, and Dowell as a Systems Analyst in June 2005.  In 2007, Dowell told

Marcus Smith about an employment opportunity with CHE, and Marcus Smith applied for the

position.  CHE hired Marcus Smith as a Director of Security and Information Systems in March

2007, and it employed his wife, Laura Smith, as a Software Quality Assurance Specialist in the

spring of 2008.  Marcus Smith, Laura Smith,  Dowell, and Pilling signed Employment

Agreements with CHE.  The agreements[1] executed by Dowell, Marcus Smith, and Laura Smith

contain non-waiver clauses stating that no modification, amendment or waiver of the agreements'

provisions would be effective unless made in writing, and further provide, in part:

---

[1]The language in the agreements signed by Marcus Smith and Laura Smith differ slightly
from the language contained the in the agreement by Dowell, in that the Smith Employment
Agreements use the pronouns "he or she" to refer to the Employee, whereas the language in
Dowell's uses only the masculine pronoun for the reference.

3.  Faithful Performance  Employee acknowledges that he [or she] is employed by CHE in a fiduciary relationship of trust and confidence and therefore agrees to devote his [or her] full time and attention to the business and affairs of CHE and, at all time, to use his [or her] best efforts to promote the interests of CHE and to faithfully and efficiently perform the responsibilities assigned to him [or her] to the fullest extent necessary to discharge such responsibilities.  Further, Employee agrees that during his [or her] employment, he [or she] will not accept employment of any nature, including self employment, for which remuneration is received unless said employment is recognized, agreed to and approved in writing by CHE in its sole discretion prior to such employment or association.  Employee also agrees he [or she] shall have no financial or other interest in any business entity which detracts from or interferes with, Employee devoting his [or her] full time and attention to CHE's business without the prior, written permission of CHE in its sole discretion.[2]

Pilling's Employment Agreement with CHE also included a nonwaiver clause.  Section 2 of Pilling's agreement provided, in part:

[E]mployee will devote Employee's full time and attention to the business of, and work exclusively for CHE unless otherwise agreed to by CHE's President, and shall not work for or assist any competitor of CHE or have any discussions with another person or business about engaging in any activity in competition with CHE.

CHE issued computers and other equipment to Dowell, Marcus Smith, and Laura Smith as part of their employment.  These defendants were contractually obligated, by the terms of their employment agreements, to return all CHE property upon termination:

4.6.  Return of Company Property.  Employee acknowledges that all written records, databases, source code, CDs, DVDs, and disks containing information relating to CHE's business, including, without limitation, memoranda, notes, correspondence, reports, manuals, books, papers, letters, Client profile data, orders, customer lists, contracts, software programs, drafts, and other documentation (whether in draft or final form), and other sales, financial or technical information relating to CHE's business, and any and all other documents containing Company Information furnished to Employee by any representative of CHE or otherwise acquired or developed by him or her in connection with his or her association with CHE (collectively, "Recipient Materials") shall at all times be CHE's exclusive property.  Within twenty-four (24) hours of termination of his or

---

[2]The Court notes that CHE has indicated that this language is contained in Section 1 of the agreements; however, the quoted language is actually contained in Section 3.

her employment, Employee promises to return any Recipient Materials that are in
his or her possession, custody or control, regardless of whether such Materials are
located in Employee's office or automobile, or on Employee's office, home or
personal computer. . . . Additionally, within twenty-four (24) hours of the
termination of his [or her] employment, Employee . . . shall disclose any and all
passwords or codes required to gain access to such devices.

Pilling's "Employee Confidentiality and Non-Competition Agreement" with CHE

provided that, upon his termination , "and at any time or times before then when requested by

CHE," Pilling would "return to CHE, and shall not retain, all CHE property and all documents,

computer disks, and other electronic storage media containing or embodying any Confidential

Information, and shall destroy or erase all such information from all non-CHE owned

information systems and electronic media storage disks (but first shall make a copy of the same

and deliver it to CHE)." The agreement also stated that, because compliance with this provision

might require data to be removed from Pilling's personal or home computer equipment, Pilling

granted CHE or its contractors access to such equipment for that purpose.

During the course of their employment with CHE, Defendants were provided access to

CHE's trade secrets and confidential proprietary information, including copyrighted computer

programs identified as E-PET, E-LEM, and ERDS. CHE's intellectual property also includes the

source code for E-LEM, E-PET 1.9, E-PET 4.0, FED-AA, SAM, ARG, ERDS, SERPA, Blue

Bayou, TDT, DDT, and CHE's MySQL database structure. E-LEM, E-PET1.9, E-PET 4.0,

SERPA and Blue Bayou are remote monitoring tools. DDT is used in conjunction with E-PET

1.9, and TDT is used in conjunction with E-LEM. The SAM (Site Account Manager) program is

utilized to monitor employee activity.

In Section 3 of his "Employee Confidentiality and Non-Competition Agreement," Pilling

agreed to never "publicize, or disclose or reveal to any third party not employed or engaged by

CHE any Confidential Information," and to "never use (or attempt to recreate by memory or

otherwise) any Confidential Information except for CHE's benefit" during Pilling's period of

employment with CHE.  Dowell's, Mr. Smith's, and Mrs. Smith's Employment Agreements

limited their use of CHE information as follows:

> 4.2.2.  Employee agrees not to, directly or indirectly; participate in the
> unauthorized use, disclosure, or conversion of any Company Information.
> Employee agrees not to use Company Information for the benefit of a competitor
> or in any other way that harms CHE or diminishes the value of Company
> Information.

As Director of Security and Information Systems, Marcus Smith was responsible for the

day-to-day operations of CHE's current and future network systems.  His duties and

responsibilities included developing a company network equipment design requirements

document for business systems' enhancement; developing a collocation network strategy and

implementation plan; and developing a company network security strategy that would insure high

availability to CHE team members but, at the same time, lock out competitors and other

unwanted network attacks.  He was also in charge of implementing proper software testing

procedures for programs developed by company software personnel; supervising, as a senior

developer, the software coders, the design of the code, and supervising other company network

personnel and resources.  Within three months of his hire, Marcus Smith became the direct

supervisor of Pilling, Dowell, and Terry Neckar.

Marcus Smith informed his wife, Laura Smith, of a position in documentation and quality

assurance at CHE in 2008.  After interviewing for the position with Marcus Smith and York,

Laura Smith accepted an offer of employment with CHE.  She signed her Employment

Agreement on May 1, 2008.  Mrs. Smith also received and read CHE's Employee Handbook, and

agreed to abide by its terms.  Mrs. Smith's job responsibilities were to make sure that CHE

software was functioning properly, and did not contain any "bugs."  She worked exclusively from

home, and exclusively on CHE programs.  Mrs. Smith also worked for a Montessori school while she was employed at CHE.  Mrs. Smith did not seek York's approval to work twenty hours weekly at the Montessori school.

In late May 2008, Pilling, Dowell, and Marcus Smith decided to form an entity they would call "TriPoint Development."  TriPoint, a "custom solutions and consulting" information technology firm, was formed in June 2008, by Dowell, Marcus Smith, Pilling, and Linda Pilling. Marcus Smith and William Pilling owned two-thirds of TriPoint's shares.  Defendants operated Tri-Point, serviced TriPoint customers, invoiced its customers, and collected revenue on its behalf during the time period between July 2008 and February 20, 2009.  Defendants were employed by CHE at all times between July 2008 and February 20, 2009.

After leaving CHE on February 20, 2009, Defendants continued to operate and perform work for TriPoint.  According to information displayed on its company website,  TriPoint specializes in the design and implementation of Great Plains and other Microsoft development applications;  provides in-house solutions developed to meet the student tracking and administrative needs of the educational market; and develops, through its Remote Systems Group, custom solutions around mainframe tape and disk storage systems.  One of TriPoint's computer programs, "CIT" captures customer information and allows incoming phone calls to be tracked by the customer's caller ID and to be logged into a database.

TriPoint provided services as a subcontractor for Matrix while Defendants were still employed at CHE.  In its relationship with Matrix, TriPoint performed work for several companies with Texas locations, including Pioneer, Pinnacle Anesthesia, Rapp Collins Consulting, Trintech, Independent Bankers' Bank, and Enfora.  TriPoint also performed some business as a subcontractor through a company called the Harbor Group.  Defendants did not

have written permission to perform side work while employed by CHE, and Defendants did not inform CHE of TriPoint's existence, or that they were providing services to TriPoint.

On October 1, 2008, David York sent an e-mail to Marcus Smith, in which York described several issues that had not been accomplished by Marcus Smith and his team, and warned, "Either you and every member of your team get your selves organized, communicating effectively and producing functional deliverables or I will take actions to find replacement personnel who can do precisely that" [ECF No. 314-8 at 1-2].  In this e-mail, York detailed numerous issues existing within Marcus Smith's department and with his teams, including the team's failure to communicate, follow-up, and keep CHE's systems running.  York also stated, "I requested on or about August 19, 2008 a total systems design paper with logins and passwords.  I get an e-mail that basically says nothing nor demonstrates anything in that regard" [ECF No. 314-8 at 1].

CHE uses a program called Star Team to store and maintain its source code [ECF No. 325-1 at 40].  While employed at CHE, Defendants began using a program called Groove to store CHE's source code [ECF No. 325-1 at 40].

On February 20, 2009, David York notified Defendants and others by em-mail that a mandatory meeting had been scheduled for that afternoon [ECF No. 314-20 at 1-2]. The mandatory meeting resulted from ongoing issues, many of which were outlined in York's October 1, 2008 e-mail to Marcus Smith.  York's February 20th e-mail included an agenda for the conference call, and advised the recipients that they were going to address problems happening with various tools provided by CHE.

Prior to the mandatory meeting, Pilling had a conference call with Dowell and the Smiths. Approximately one hour after receiving York's e-mail calling a mandatory meeting, Pilling sent

York an e-mail telling York that he was resigning, effective immediately.  Subsequently, Dowell and the Smiths sent similar e-mail communications.  All of the individual defendants attempted to resign from CHE on or about February 20, 2009.  However, York rejected their resignations, and terminated them on that date.  York sent an e-mail to CHE employees on February 20, with the subject "Company Departures," stating, among other things, that Defendants had "been terminated by the company for gross misconduct, insubordination, dereliction of duty, and violation of company's standard operating procedures" [ECF No. 303-26].  The e-mail was sent to "checonsulting" and "service_users@cheservice.com".

On April 2, 2009, CHE sent a letter to Marcus Smith, informing him that funds had "been withdrawn" from Smith's "vacation pay" in accordance with CHE rights under its employment agreement with Smith, and enclosing a prepared invoice regarding legal fees incurred due to Smith's termination, as well as a check for "vacation hours paid minus legal fees" [ECF NO. 303-27].

Defendants eventually returned CHE property, including the computers they used to perform their job duties with CHE.  Pilling returned his personal computer and CHE equipment after CHE compensated him for it.  Upon inspection, CHE was unable to find any of its source code on Dowell's, Pilling's, Marcus Smith's, or Laura Smith's computers.  CHE has remained unable to locate its source code [ECF No. 325-1 at 8-9, 40-41].  Following their terminations, Defendants continued to operate and perform work for TriPoint.

CHE initiated this litigation on April 20, 2010 [ECF No. 1].  During the course of discovery, Defendants were instructed, by Court Order, to protect electronically stored information [ECF Nos. 12-15].  Defendants were also directed to turn computers within their possession over to forensic-imaging experts for examination.  On April 30, 2010, mere hours

before he turned over his computer for imaging, Pilling installed Eraser 6, a data-wiping software, on his computer [ECF No. 291-21].  Eraser 6 makes it impossible to determine what files have been on a computer and what the file's contents had been. [ECF No. 325-1 at 39].

## II.      SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56(c) provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment will not lie if a genuine dispute about a material fact is shown; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In ruling on a motion for summary judgment, the Court may not make credibility determinations, weigh the evidence, or draw inferences from the facts.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

To satisfy his initial responsibility, the movant must inform the court of the basis for his motion and must identify those portions of the record that he believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 1042.  Once the moving party has discharged the requisite evidentiary burden, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial."  *Id.*  (citations omitted).  If the

nonmovant fails to produce such evidence, summary judgment in favor of the moving party is proper.  *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## III.   DISCUSSION

### 1.   <u>Count I: Unpaid Wages (against CHE)</u>

In Count I of his Counterclaim, Marcus Smith alleges that CHE did not pay him in full for his last two weeks of employment, did not reimburse him in whole for outstanding expense reports as of the date of his termination, and did not pay him for bonus money owed under CHE's Bonus Program.  Mr. Smith also alleges that CHE, in direct violation of Missouri Revised Statute 290.110,[3] "removed money from [his] check to pay for a consultation  with an attorney regarding [his] termination."  Marcus Smith claims that, as part of his position, he was enrolled in a seven-part "Bonus Program" which was to provide incentive-based income during his first year of employment.  Marcus Smith alleges that he met the requirements for all seven parts of the program, but that CHE did not pay him the bonus money owed to him.  Among other things, Marcus asks for an award for the difference between actual pay due and pay given after the

---

[3]Mo. Rev. Stat. § 290.110 (Payment due discharged employee – exceptions – penalty for delay) provides:

Whenever any person, firm, or corporation doing business in this state shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of the servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of the discharge or refusal to longer employ and the servant or employee may request in writing of his foreman or the keeper of his time to have the money due him, or a valid check therefor, sent to any station or office where a regular agent is kept; and if the money or valid check therefor, does not reach the station or office within seven days from the date it is so requested, then as a penalty for such nonpayment the wages of the servant or employee shall continue from the date of the discharge or refusal to further employ, at the same rate until paid; provided, such wages shall not continue more than sixty days.  This section shall not apply in the case of any employee whose remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar activities and where an audit is necessary or customary in order to determine the net amount due.

witholding for attorney's fees; money for unspent vacation, sick and similar paid time off days; money owed for unpaid wages and bonuses, and "[p]ursuant to RSMo § 290.110, sixty (60) days wages as penalty for violation of § 290.110[.]"

Missouri Revised Statute § 290.110 is a penal statute, and must be strictly construed. *Slavens v. William C. Haas Co., Inc.*, 563 S.W.2d 157, 160 (Mo. App. 1978). In Missouri, all actions upon any statute for any penalty shall be commenced within one year after the commission of the offense. Mo. Rev. Stat. § 516.380.

The record shows that Marcus Smith was terminated on February 20, 2009, and received his last paycheck sometime thereafter. On April 2, 2009, CHE sent a letter to Mr. Smith, which stated:

> Attached please find a prepared invoice from Lashly Baer, CHE's Labor Law Firm, regarding legal fees incurred due to the end of your employment with CHE.
>
> These funds have been withdrawn from your vacation pay in accordance with CHE rights under the Employment Agreement you signed on 03/29/2007.
>
> The enclosed check reflects vacation hours paid minus legal fees.

[ECF No. 303-27]. The attached invoice billed for $480.50 for 1.60 hours of legal services, including review of e-mails, phone conferences, review and analysis of contracts, and legal research, performed between March 3 and 10, 2009 [ECF No. 303-27].

Marcus Smith filed his counterclaim in this action on October 10, 2010. In its Motion for Summary Judgment, CHE argues that the Court lacks subject matter jurisdiction over the claim for unpaid wages contained in Count I of Mr. Smith's Counterclaim because the claim was brought after the one year limitations period codified at Missouri Revised Statute § 516.380. In his Response, Marcus Smith contends that the Court has subject matter jurisdiction over Count I of his Complaint because the appropriate statute of limitations for his unpaid wages claim is five

years, in accordance with Missouri Revised Statute §516.120(1),(2).  The Court finds that Marcus Smith's claim for unpaid wages, brought pursuant to Mo. Rev. Stat. § 290.110, is untimely under Mo. Rev. Stat. § 516.380, and must be dismissed.

Alternatively, CHE contends that it is entitled to summary judgment as to the unpaid wages claim for failure to state a claim, because Marcus Smith is unable to set forth a prima facie case of unpaid wages.  CHE argues that Mr. Smith's claims for wrongfully withheld attorney's fees; pay for unspent vacation, sick and similar paid time off days: and bonus pay are not cognizable under § 290.110.

As an initial matter, the Court finds that Marcus Smith's claims for vacation pay, sick pay, expense reimbursement, and bonus pay, are not cognizable under Section 290.110.  *See* Mo. Rev. Stat. §290.110 (section shall not apply in the case of any employee who remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar activities and where an audit is necessary or customary in order to determine the net amount due);  *Slavens*, 563 S.W.2d at 161 (when method of employee's payment is not within the statutory definition of "wages," employee cannot recover under Section 290.110; claims for vacation pay and sick leave pay are not within purview of the statute).  The Court has determined that Marcus Smith's unpaid wages claim is untimely under Section 290.110, and CHE contends that Mr. Smith's Complaint  fails to state an unpaid wages claim on any basis, because it paid him all wages due.

Although he voluntarily dismissed and withdrew his claim for vacation pay, Mr. Smith argues that, because it was CHE's policy to compensate its employees for unused vacation time, he is entitled to recoup the amount withheld for attorney's fees, even though it was withheld from his unused vacation pay.  He claims that a genuine issue of material fact exists as to whether the

14

withholding was permissible under his Employment Agreement with CHE, because the money was withheld before CHE sought its injunction to enforce the agreement, and before any breach had been judicially determined by the Court.  Mr. Smith asserts the withholding was premature and in violation of Missouri Revised Statute 290.110.  Additionally, he contends a genuine issue of material fact exists as to whether CHE's invoice regarding the withholding was proper, as he claims the amount withheld was excessive.  The Court finds Mr. Smith's arguments unpersuasive.

The record conclusively shows that the attorney's fees were withheld from Mr. Smith's check for unused vacation pay, and not from his check for wages.  Mr. Smith voluntarily dismissed his claim for vacation pay, leaving no basis for his arguments of improper withholding.   The Court will grant summary judgment to CHE on Mr. Smith's claim for unpaid wages, and will dismiss, with prejudice, Count I of Counterclaim Plaintiff Marcus Smith's Counterclaim Directed Against Counterclaim Defendants.

### 2.    **Count II: Breach of Contract**

In Count II of his Counterclaim, Marcus Smith alleges that CHE failed to increase his salary pursuant to Section 2.1 of his Employment Agreement, and that CHE failed to reimburse him for out-of-pocket expenses pursuant to the terms of Section 2.2 of the agreement.   Mr. Smith alleges that he submitted reasonable out-of-pocket expenses to CHE for reimbursement, but that he was not reimbursed for all of these expenses and that the reimbursement he did receive was not timely.

To make a submissible case on his breach-of-contract claim, Mr. Smith  must show: 1) the existence of a valid contract; 2) each party's rights and obligations under its terms; 3) a breach; and 4) damages.  *Kieffer v. Icaza*, 376 S.W.3d 653, 657 (Mo. banc 2012).

CHE claims that it is entitled to summary judgment on Count II, Marcus Smith's breach of contract claim, because the uncontroverted facts demonstrate that there was no breach of contract. CHE contends that Mr. Smith's Employment Agreement does not entitle him to an increase in salary, and that Mr. Smith has no evidence that he is owed any reimbursement.

Section 2.2 of the Employment Agreement, addresses fringe benefits offered to Mr. Smith, and provides as follows:

> During the term of this Agreement, Employee shall receive the same standard fringe benefits as CHE in its sole discretion provides from time to time to all other members of its salaried work force. For purposes of this Agreement, the term "fringe benefits" includes being reimbursed for all reasonable out-of-pocket expenses which he or she has properly incurred performing his or her duties and obligations under this Agreement. Upon receipt by the Company of satisfactory itemized accounts and receipts of all such expenditures, this will not be in excess of any limitation established for such expenditures by CHE from time to time. The reimbursement will be made in a timely fashion.

Marcus Smith's Response to CHE does not address, or even mention, his claim for unreimbursed expenses. The Court finds that Marcus Smith has failed to adduce evidence showing any amount due for alleged unreimbursed expenses, or showing that he submitted any claims for reimbursement of expenses.

CHE further argues that, even if Mr. Smith could demonstrate a breach by CHE, he cannot sue for specific performance of the agreement, because Mr. Smith materially breached his Employment Agreement. CHE further argues that an e-mail sent by Marcus Smith to David York shows that, due to a substantial raise he received after his first year of employment, Mr. Smith agreed he would not received a raise in pay in his second year.

Section 2.1 of Mr. Smith's Employment Agreement governs compensation, and states:

> The compensation of Employee payable by CHE for the period commencing from the Effective Date hereof until the Agreement is terminated or the salary is modified in accordance with the terms of the Agreement, shall be at the rate of $75,000 per year. This is an annual salary to be pro-rated if the Employee serves

16

less than one year.  This salary is to be paid in such time and manner as is standard company policy.  The rate of compensation shall be subject to periodic review and change.

The Court finds that the terms of the agreement do not contain a promise to give Mr. Smith a salary increase.  In his Response to CHE's Motion, Marcus Smith claims that his Employment Agreement was supplemented with a bonus program, which set out seven milestones as triggers for bonus payments.  Mr. Smith contends that an e-mail exchange between him and York indicates that all of the milestones were met, and that CHE has not fully compensated Mr. Smith for items four and five of the bonus program.  He claims that CHE owes him "some ten thousand dollars ($10,000.00)."   The Court notes that Count II of Mr. Smith's Counterclaim alleges CHE breached of his Employment Agreement, specifically, by failing to increase his salary pursuant to Section 2.1 of the agreement, and by failing to reimburse him pursuant to Section 2.2.

As pointed out by CHE in its Reply to CHE's Response, Count II does not mention a breach of the Bonus Program.  However, the "Common Factual Allegations" section of Mr. Smith's Counterclaim does contain allegations concerning the Bonus Program, as did Count I, the unpaid wages claim dismissed above.  CHE does not dispute that Marcus Smith was subject to a bonus program, the terms of which were set forth in a March 27, 2007 offer letter [ECF Nos. 59, 73].  Further, the record contains evidence, in the form of an e-mail chain, dated March 4, 2008, that Mr. Smith was paid incentive-based income under the agreement, and that he and CHE subsequently modified the terms of the agreement, including deferring any payment "revolv[ing] around items 4 and 5 which basically equates to $10,000 will be deferred until a pay period within January 2009"  [ECF Nos. 303-8, 316-12].  Mr. Smith states in his Response, however, that he "continually calls into question the authenticity of the e-mail chain where he

supposedly agreed to a modification of his bonus program" [ECF No. 316-2].   The record

contains an e-mail chain, with messages dated February 6 and March 5, 2008, submitted by

Defendants in their Response in opposition to CHE's and York's Motion for Summary Judgment

as to Counts III through VI of Plaintiffs' SAC, as evidence that Marcus Smith achieved all of the

bonus program's milestones, and that CHE has failed to compensate him for items 4 and 5 of the

program [ECF No. 316-12].  Ironically, the February 6, 2008 e-mail submitted by Mr. Smith in

his Response opposing the plaintiffs' Motion for Summary Judgment as to Counts III through VI

of the SAC is the heart of very same e-mail chain Mr. Smith now questions, and not only

expresses satisfaction with his payment under the bonus schedule, but actually proposes payment

in the amounts he received:

> In my bonus schedule Items 2 & 3 provide me with a 20% net cost savings for
> collocation expenses and network equipment.  The $5000 you generously sent me
> swiftly at Christmas, comes close enough to this that I am satisfied and view these
> items as settled.
>
> Item 1 which governs savings on the cost of the server gear comes out to $36,738
> total, however my fear is that this is simply too much to ask for in any single pay
> period (as my bonus schedule grants).  I would therefore request the following
> based on our conversations about shifting my base pay:
>
> 1) Move my salary for this year to 95 as originally proposed in February and pay
> up to current leaving $16,738
>
> 2) in March and April I would request half of the remainder at the end of each
> month, $8,369 ea
>
> This would settle Item 1 completely, and I would be in position for my second
> year to be at the appropriate base pay level with the bonus program behind us.

[ECF No. 316-12].

Contrary to Mr. Smith's contention, however, the e-mail does not establish that all of the

milestones were met: "Items 4, 5 & 6 call for $5000 each for tested, documented disaster

recovery system, seamless cutover to collocation, and delivery of software as promised prior to

my hiring.  On all of these fronts I am expecting complete victory" [ECF No. 316-12 at 2].  The Court finds this is an issue where testimony is conflicting.  The Court will deny summary judgment to CHE on Count II, Marcus Smith's claim for breach of contract.

###    3.    Fraudulent Misrepresentation

In Count III of his Counterclaim, Marcus Smith alleges that York, to convince him to work for CHE, told him that York intended to pay him under a Bonus Program.  Mr. Smith contends these statements were false, and material to his decision to work for CHE.  Mr. Smith further alleges that York knew he misrepresented the employment position to Mr. Smith, and tht his representations were false when he made them.  Mr. Smith claims York intended for Mr. Smith to accept employment with CHE, based on this falsehood.  Mr. Smith alleges that he believed York's representation to be the truth, and reasonably relied on York's honesty about the job and the bonus program in making the decision to work for CHE.  He claims that he accepted a lower initial salary based on the promise of the bonus money, and that, as a result of York's dishonesty, did not secure a higher paying job elsewhere.

Under Missouri law, the elements of a claim of fraud include a misrepresentation, its falsity, the maker's knowledge of its falsity, the maker's intent that it should be acted upon by the other person and in the manner reasonably contemplated, and the other person's ignorance of its falsity, detrimental reliance on its truth and right to rely thereon.  *Morrill v. Becton, Dickinson & Co.*, 747 F.2d 1217, 1222 (8th. Cir. 1984)(citing *Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 634 (Mo. App. E.D. 1980).  Proof of each element is essential, and failure to prove any element is fatal to recovery.  *Cantrell*, 603 S.W.2d at 634.  Although fraud may be established by a showing of facts and circumstances from which it reasonably and fairly may be inferred, a

finding of fraud must be supported by something more substantial than suspicion, surmise and speculation. *Id.* at 634-35.

In their Motion, CHE and York contend that they are entitled to a grant of summary judgment on Mr. Smith's claim of fraudulent misrepresentation in Count III of his Counterclaim because he has failed to state a claim upon which relief may be granted.  They assert that Mr. Smith has adduced no evidence that CHE made a false representation that he detrimentally relied upon, and that CHE fully honored the terms of Mr. Smith's bonus agreement.

The Court finds that Mr. Smith has failed to adduce evidence showing that the incentive offer was false, that York or CHE had knowledge of its falsity or ignorance of its truth, or that Mr. Smith suffered a consequent and proximately caused injury.

As discussed in connection with Mr. Smith's breach-of-contract claim, the undisputed evidence shows that he received a bonus of $36,738.00, and a $20,000.00 raise after his first year of employment, and that he was in accord with at least the compensation he received for sections 1, 2, and 3 [ECF Nos. 303-10, 316-12].  Mr. Smith has not adduced evidence showing that York or CHE did not intend to honor the terms of the bonus program when it was extended to Mr. Smith in 2007.   To the contrary, the record shows that Mr. York received substantial payments in accordance with the incentive offer.   The Court will grant summary judgment to CHE on Mr. Smith's claim for fraudulent misrepresentation, and will dismiss, with prejudice, Count III of Counterclaim Plaintiff Marcus Smith's Counterclaim Directed Against Counterclaim Defendants.

### 4.    Count IV: Wrongful Termination

"Under Missouri's employment at will doctrine an employer can discharge – for cause or without cause – an at will employee who does not otherwise fall within the protective reach of a

contrary provision and still not be subject to liability for wrongful discharge." *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. banc 1988).  However, the Missouri Supreme Court has expressly adopted a public-policy exception to its at-will employment doctrine that provides an employee a cause of action in tort for wrongful discharge if he is terminated: 1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body; or 2) for reporting wrongdoing or violations of law to superiors or public authorities.  *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. banc 2010).

Missouri has extended this limited right to bring a wrongful discharge in violation of public policy to contract employees.  *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 102-03 (Mo. banc 2010).  One of the compelling reasons identified by Missouri's Supreme Court for allowing contract employees to pursue an action for wrongful discharge in violation of public policy was that limiting the cause of action to at-will employees failed to recognize the distinct underlying purpose of the wrongful discharge cause of action.  *Id.* at 102.  While a breach-of-contract action enforces privately negotiated employment terms and conditions, a wrongful discharge claim is premised on a conflict between the employment conditions and the applicable constitutional, statutory, or regulatory provisions.  *Id.*  "A discharge is not 'wrongful' because it violates the contractual terms of employment."  *Id.*

To prevail on a claim for wrongful termination, Mr. Smith must prove that he refused to perform an illegal act or act in a manner contrary to public policy, that he was discharged, and that there was a causal connection between his discharge and his refusal to engage in the actions at issue.  *Id.* at 103.

21

In Count IV of his Counterclaim, Marcus Smith alleges that, although CHE's stated reasons for terminating him on February 20, 2009, were gross misconduct, insubordination, dereliction of duty, and violation of the company's standard operating procedures, CHE actually terminated him because he refused to perform illegal acts requested of him by York.  He alleges that he never acted in a way to warrant termination with cause, and that a "contributing" factor or reason for his termination and Defendants' refusal to pay him a bonus was due to his refusal to engage in illegal acts as requested by Defendants.

Marcus Smith alleges that, during his employment with CHE, he was asked to commit illegal acts, which included breaking into STK VSM units, use of sniffer software at customer sites, hacking into a competitor's work and using copyrighted materials from other companies in violation of Federal Copyright law.  He claims that CHE and York received passwords of competitor STK, and that they wanted Mr. Smith's department to use these passwords to read hard drives, extract data, and determine how STK's systems worked.  Mr. Smith alleges that CHE and York "wanted to create a hacked system that would allow CHE to maintain STK hardware at customer sites but control the unit at a low level which would interfere with other companies performing maintenance on the device.  Mr. Smith claims that when CHE and York asked his department to "hack" into a STK VSM unit, the team members determined the request was illegal and refused to comply.  He alleges that he reported his concerns with such activity to York, and that he sent e-mails to York regarding the illegal action.  Mr. Smith further alleges that he avoided York's requests to participate in, and conduct, illegal acts; refused to do so; and reported his concerns about the illegal conduct.

CHE contends that it is entitled to summary judgment on Count IV, Mr. Smith's claim for wrongful termination, because he has failed to state a claim upon which relief may be granted.

CHE argues that the undisputed record establishes that Marcus Smith did not engage in protected conduct, and that there is no causality between Mr. Smith's alleged "whistleblowing" and his employment termination.  Marcus Smith argues that the Motion for Summary Judgment should be denied as to Count III's wrongful termination claim, because genuine issues of material fact remain as to whether he engaged in protected conducted, "blew the whistle" on protected conduct, and was terminated as a result.

The Court finds that the record contains insufficient evidence to establish an essential element of Marcus Smith's wrongful termination claim, as he has not produced any evidence to show that he refused to perform an illegal act or act in a manner contrary to public policy, to show that he reported wrongdoing or violations of law to superiors or public authorities, and, most significantly, to show a causal connection between his discharge and his alleged refusal to engage in any illegal act or to act in a manner contrary to public policy.

It is undisputed that CHE has purchased numerous STK units for training purposes, and that the STK units come with operating and owner's manuals [ECF No. 315 at 11].  A settlement agreement between CHE and STK allows CHE to purchase microcode (source code) from STK [ECF Nos. 315 at 11, 315-13].  Marcus Smith has produced no evidence showing that CHE had unlawful possession of any of  passwords, manuals, or any other protected property of STK.  In fact, during his deposition, Mr. Smith testified that he did not "recall specifically what a VSM is" [ECF No. 303-4 at 13].  He stated that he did not "recall what the acronym stands for, what piece of equipment that represents" [ECF No. 303-4 at 13].  He further stated, "VSM and STK don't ring a bell together" [ECF No. 303-4 at 13].  As to receipt of code module, Mr. Smith stated that, sometime between October 2008 and February 2009, York wanted his team to analyze STK source code and STK internal documents, and that team members refused [ECF No. 303-4 at 14].

When Defendant Dowell was questioned about the April 2008 incident involving the

STK VSM unit in St. Louis during his deposition, Defendant Dowell testified that it was his

understanding that he and the rest of the IT team were to gain a much deeper understanding of

how the device worked by engaging in reverse engineering [ECF No. 301-3 at 64].  Dowell

stated that it was his understanding that reverse engineering is not unlawful if you own the device

[ECF No. 301-3 at 65].  He testified that he believed CHE owned the STK device he and the

team were taking apart, and that he does not recall specifically being asked to bypass a password

[ECF No. 301-3 at 65-66].  Dowell said that the team made considerable progress, and stated

they had contacted the vendor of the embedded system to discuss acquiring a software

development kit.  He testified the vendor told the team they could purchase a kit for around

$20,000 [ECF No. 301-3 at 65].  Dowell said the team left without actually breaking the

password system, and said that he does not believe he crossed any boundary beyond the reverse

engineering zone [ECF No. 301-3 at 65].   Dowell stated that he would not have told anyone that

his conduct was unlawful, because, at the time, it was his understanding that reverse engineering

was not unlawful [ECF No. 301-3 at 65].  When asked if he, at any point in time, protested or

said that he refused to engage in this reverse engineering, Dowell said that he could not think of

any reason why he would have done so [ECF No. 301-3 at 65-66].  When asked if he ever told

anyone at CHE, including Marcus Smith and York, that he believed he was asked to engage in

unlawful conduct, Dowell replied, "I don't recollect that I may have had a specific chain of that

nature, but I do recollect that we discussed, as the week went on, what were we doing and that we

were – that I and the others appeared to be becoming less comfortable with what, you know, we

were being instructed to do as a team" [ECF No. 301-3 at 66-67].  When asked if he ever

objected, protested, or said anything to anyone at CHE that he believed he was personally

24

required to perform an illegal act, Dowell said, that during the team's drive from St. Louis to Texas, he communicated to Marcus Smith and Pilling "that assuredly, if it was turning into a password project, that I didn't want to be a part of it" [ECF No. 301-3 at 67]. He also testified that he was not present for any conversation between Marcus Smith and York concerning the utilization of passwords, and stated that he learned about such conversations "only after the fact via Marcus" [ECF No. 301-3 at 67].

The Court notes that Mr. Smith's allegations of wrongdoing describe conduct that has, in previous litigation between STK and CHE, been determined not to violate the DMCA. *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.* ("STK I"), 421 F.3d 1307 (Fed. Cir. 2005); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.* ("STK II"), 2006 WL 1766434 (D. Mass. June 28, 2006). CHE repairs STK libraries, or "silos," that are connected to Library Control Units ("LCU"). *STK II*, 2006 WL 1766434 at *1. In order to diagnose problems with the silos, CHE intercepts and interprets error messages known as Fault Symptom Codes ("FSC") that are packaged within an Event Message. *Id.* STK tries to prevent others from using FSCs by setting the maintenance level of its silos to zero and requring a password to change the maintenance level. *Id.* To intercept and interpret FSCs, CHE must bypass the password protection scheme and change the maintenance level setting. *Id.* In *STK I*, STK alleged that CHE violated the anticircumvention provision of the DMCA when CHE circumvented a protect system to force a customer's Control Unit to transmit error codes. *STK I*, 421 F.3d. at 1310. The Federal Circuit concluded that it was unlike that STK would prevail on its claims because CHE's use of its circumvention devices were not reasonably related to any violation of the rights created by the Copyright Act. *Id.* at 1310. Following remand from the Federal Circuit, the District Court concluded that CHE's circumvention of the password

protection system did not violate the DMCA because it did not infringe a right protected by the

Copyright Act.  *STK II*, 2006 WL 1766434 at *7.   As a result of this litigation, STK and CHE

entered an agreement that provided certain STK microcode to CHE, and allowed CHE to

purchase certain additional microcode from STK on behalf of its customers [ECF Nos. 316, 316-

19].

   Furthermore, the Court finds that Marcus Smith has not adduced evidence that he refused

to perform illegal activity or reported illegal conduct.  Moreover, the Court finds that the record

conclusively shows that Marcus Smith was not terminated for such a refusal or for reporting

illegal activity.  Rather, the Court finds that York terminated him on February 20, because

Marcus Smith, in collaboration with his team members, intentionally failed to attend a mandatory

meeting called by York on that date to discuss software problems.  In fact, the record shows

several incidents of favorable treatment received from CHE during the intervening ten-month

period between the alleged incident of wrongdoing and Mr. Smith's termination, including

positive reviews, a substantial raise, and payment of an unexpected $5,000 bonus at Christmas.

It is undisputed that York informed Marcus Smith of the mandatory meeting on February 20,

2009, and that Mr. Smith, following discussion with the other members of his team, decided not

to attend the meeting and, instead, sent York an email stating he was resigning, effective

immediately.  It is further undisputed that, after Mr. Smith failed to attend the mandatory

meeting, York rejected Mr. Smith's resignation, and terminated him.  Even if Marcus Smith had

adduced sufficient evidence that he refused to perform, or had reported, a wrongdoing or

violation of law, Mr. Smith has not shown a causal connection between the alleged April 2008

incident and his February 20, 2009 termination.  The Court will grant CHE's Motion for

Summary Judgment as to Marcus Smith's wrongful termination claim and will dismiss, with prejudice, Count IV of Marcus Smiths's Counterclaim.

**5.**   **Count V: Slander and Libel**

In Count V of his Counterclaim, Marcus Smith alleges that the February 20 "Company Departures" e-mail sent to CHE employees by York wrongly accused him of gross misconduct, insubordination, dereliciton of duty, and violation of the company's standard operating procedures.  He claims the statement was prejudicial to his reputation because it accused him of acts unbecoming of an employee or co-worker.  Mr. Smith asserts that he has suffered damage to his business reputation because of the statement, that the computer industry is such that potential future clients, co-workers, and employers have heard or will hear the allegedly defamatory comments, and that the statement has harmed and will continue to harm him as he attempts to make a living.

To prevail on his slander and libel claim, Mr. Smith must establish: 1) publication; 2) of a defamatory statement; 3) that identifies him; 4) that is false; 5) that is published with the requisite degree of fault; and 6) damages his reputation.  *State ex rel. BP Prod. N. Am., Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. banc 2005).  "A plaintiff must prove actual damages in all defamation cases."  *Id.*

CHE claims it is entitled to summary judgment on Mr. Smith's slander and libel claim (Count V) because the undisputed record establishes that the intra-corporate e-mail advising of Mr. Smith's termination, and the reasons for it, was true, and was subject to a qualified privilege. CHE also argues that Mr. Smith has not presented any evidence establishing that he sustained a quantifiable professional or personal injury on account of the e-mail.  Mr. Smith claims that genuine issue of material facts exist as to whether: 1) the statement made in the Company

27

Departures e-mail was true; 2) the e-mail reached only CHE employees and was subject to intra-

company privilege; and 3) he suffered reputational damage as a result of the e-mail.

 The Court finds that the record contains insufficient factual grounds to support Mr.

Smith's slander and libel claim.  In particular, the Court finds that he has failed to show that the

e-mail was false, or that the statements within the e-mail were made with knowledge that they

were false, or with a reckless disregard for the truth.  The record shows that York informed

Marcus Smith, of York's dissatisfaction with the performance of the IT personnel in his

department, including Mr. Smith himself, and that he called a mandatory meeting with Mr.

Smith's IT team, requiring their attendance on February 20, 2009 [ECF Nos. 316 at 23, 25, 316-

26].  The record further shows that, although notified of the mandatory meeting via e-mail, Mr.

Smith did not attend, but, instead, following a conference call with Dowell, Laura Smith, and

Pilling, sent York an e-mail stating that, effective immediately, he was resigning [ECF Nos. 303-

23, 316 at 25-26].  York rejected Mr. Smith's resignation, and instead, terminated him and the

other members of the IT team who refused to attend the mandatory meeting [ECF Nos. 316 at 25-

26, 303-24].  In his e-mail rejecting Pilling's resignation, York informed Mr. Smith: "The

company has elected to terminate you effective immediately for gross misconduct,

insubordination, dereliction of duty and violation of the company's standard operating

procedure" [ECF No. 303-24].  York sent an e-mail titled "Company Departures" explaining to

others at CHE that Defendants Marcus Smith, Laura Smith, Dowell, and Pilling were no longer

employed at CHE, and stating that York terminated them for "gross misconduct, insubordination,

dereliction of duty, and violation of company operating procedures" [ECF Nos. 316 at 27, 303-

26].

Under Missouri law, insubordination is defined as "a willful disregard of express or implied direction or a defiant attitude." *Dixon v. Stoam Industries, Inc.*, 216 S.W.3d 688, 693 (Mo. App. S.D. 2007). Willful misconduct is established when action or inaction by an employee "amounts to conscious disregard of the interests of the employer or constitutes behavior contrary to that which an employer has a right to expect from an employee." *Id.* With these principles as a guide, the Court finds that Mr. Smith's refusal to comply with the lawful and reasonable directive from his employer to attend a meeting to discuss problems impacting the company's ability to service its customers constitutes misconduct and insubordination. As well, because it is a related rule of law in Missouri that, in every contract of employment, it is implied that an employee will obey the lawful and reasonable orders and instructions of his employer, the Court finds that Mr. Smith's conduct violated CHE operating procedures. *Id.* Accordingly, the Court finds that the record shows that the statement made in the Company Departures e-mail was true.

Furthermore, the record is devoid of evidence that the statement damaged Mr. Smith's reputation. During his deposition, Mr. Smith testified, "I have not heard from anyone internal to CHE or members of the services users lists that I'm aware of that has read this e-mail" [ECF No. 303-4 at 23]. It is undisputed that Mr. Smith was employed in the computer services industry between April 2011 and May 2012, and that the corporation promoted him to team lead for all client services liaisons [ECF No. 316 at 28]. It is undisputed that he resigned from that corporation due to health issues [ECF No. 316 at 28]. Mr. Smith has failed to adduce evidence of an existing relationship that has been seriously disrupted and has identified no third parties that have held him in lower regard due to any knowledge of the e-mail's statements. He has wholly failed to adduce evidence of damages. The Court will grant CHE's Motion for Summary

Judgment on Mr. Smith's libel and slander claim, and will dismiss, with prejudice, Count V of Counterclaim-Plaintiff Marcus Smith's Counterclaim.

## IV.     CONCLUSION

Counterclaim-Plaintiff Marcus Smith previously voluntarily dismissed Counts VI and VII of his Counterclaim [ECF No. 169]; consequently, the Court's grant of summary judgment to CHE on Counts I, III, IV and V will dispose of all remaining counts of Marcus Smith's Counterclaim against CHE and York except for Count II, breach of contract .

Accordingly,

**IT IS HEREBY ORDERED** that Counterclaim Defendants Custom Hardware Engineering, Inc. and David York's Motion for Summary Judgment as to Counts I, II, III, IV and V of Counterclaim Plaintiff Marcus Smith's Counterclaim Directed Against Counterclaim Defendants [ECF No. 300] is **GRANTED in part, and DENIED in part**. Counterclaim Defendants Custom Hardware Engineering, Inc. and David York's Motion for Summary Judgment is **GRANTED** as to Counts I, III, IV and V of Counterclaim Plaintiff Marcus Smith's Counterclaim directed against Counterclaim Defendants. Counts I, III, IV and V of Counterclaim Plaintiff Marcus Smith's Counterclaim Directed Against Counterclaim Defendants [ECF No. 59] are **DISMISSED with prejudice,** Counterclaim Defendants Custom Hardware Engineering, Inc. and David York's Motion for Summary Judgment is **DENIED** as to Count II of Counterclaim Plaintiff Marcus Smith's Counterclaim directed against Counterclaim Defendants.

Dated this  _25th_  day of January, 2013.

_E. Richard Webber_

_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE